# ATTACHMENT 3

1

1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2
     Criminal Action No. 01-CR-214-D
3
     UNITED STATES OF AMERICA,
4
          Plaintiff,
5
     vs.
6
     THEOLIAN LLOYD, a/k/a "Big Foot,"
7
          Defendant.
8

9
                    REPORTER'S TRANSCRIPT
10                       Sentencing

11

12          Proceedings before the HONORABLE WILEY Y. DANIEL,

13   Judge, United States District Court for the District of

14   Colorado, commencing at 2:33 p.m., on the 7th day of April,

15   2004, in Courtroom 15, United States Courthouse, Denver,

16   Colorado.

17                          APPEARANCES

18          KATHLEEN TAFOYA, Assistant United States Attorneys,

19   1225 17th Street, Suite 700, Denver, CO  80202, for plaintiff.

20          JOHN SCHLIE, John Henry Schlie & Barry A. Schwartz,

21   P.C., 1700 Broadway, Suite 1820, Denver, CO  80290, for

22   defendant Lloyd.

23

24   Proceeding Reported by Mechanical Stenography, Transcription
         Produced via Computer by Kara Spitler, RMR, CRR,
25       901 19th Street, Denver, CO, 80294, (303) 623-3080

2

1               PROCEEDINGS

2       (In open court at 2:33 p.m.)

3          THE COURT:  All right.  This is 01-CR-214, U.S.A. vs.

4   Theolian Lloyd, also known as Big Foot.

5          Counsel enter their appearances.

6          MS. TAFOYA:  Good afternoon; Kathleen Tafoya,

7   assistant United States attorney, on behalf of the United

8   States.

9          MR. SCHLIE:  Good afternoon.  John Schlie representing

10  the defendant, Theolian Lloyd.  Mr. Lloyd is present in the

11  courtroom, Your Honor; we are ready to proceed.

12         THE COURT:  Have both sides received and reviewed the

13  presentence investigation report, including all addenda?

14         MS. TAFOYA:  Yes, Your Honor.

15         MR. SCHLIE:  Yes, Your Honor.  I have, and I have

16  reviewed it with Mr. Lloyd as well.

17         THE COURT:  All right.  Does the government have any

18  objections to the contents of the report, including the

19  Guideline calculations?

20         MS. TAFOYA:  No, Your Honor.

21         THE COURT:  Mr. Schlie, would you identify on the

22  record what objections you're asserting today that have some

23  bearing on Guideline calculations and/or the sentence.

24         MR. SCHLIE:  Yes, Your Honor.  We are objecting to the

25  calculation of the offense level in this case, the calculation

1  of drug quantities under 2D1.1. And 1(b)(3). I would note for
2  the record, Your Honor, that we raised an objection as to
3  calculation of time served; however, that is an issue that is
4  calculated by the Bureau of Prisons at a later date. It
5  doesn't affect substantive determination by this Court of the
6  sentence to be involved and therefore we'll deal with that at
7  the very end and I would only note for the record, Your Honor.
8  So the issue that we are dealing with here today is the
9  calculation of drug quantity.

10  THE COURT: Now, as you know, the government, as to
11  Mr. Lloyd, also filed a sentencing-enhancement information on
12  August 6, 2003. Is there an issue there that you are raising
13  at all on behalf of Mr. Lloyd?

14  MR. SCHLIE: No, Your Honor. I would note for the
15  record that his conviction is for an attempted possession of a
16  controlled substance. However, it would appear by reading of
17  the definition of prior drug offense that it is a limitation --
18  or it fits within that definition so, no, we have not raised
19  that issue.

20  THE COURT: All right.

21  Miss Tafoya, let me have you make your record based on
22  the preponderance of the evidence test as to the relevant
23  conduct that applies to Mr. Lloyd as it relates to the drug
24  quantities that should be used for purposes of determining the
25  base offense level under section 2D1.1 of the Guidelines.

1      MS. TAFOYA:  Your Honor, at this point I'm going to
2  refer to some pages of transcripts.  I am told that probably
3  the most readily available transcript to the Court and as was
4  to the government is the Live Note transcript that all of us
5  got.  So that's my page numbers.  They're on the computer so
6  that we all probably have those.

7      The Live Note pages I will tell the Court, too, there
8  is a page at the bottom of the Live Note transcript which
9  appears on the screen.  There's also kind of breaking page
10 numbers that are in between.  So I can refer to either one.  I
11 have both of those pages numbers, so whatever the Court is more
12 comfortable with.

13     I want to start out by saying that the government has
14 proved that Theolian Lloyd was involved in ten transactions
15 that occurred during the period of the wiretap.  I'm going to
16 go through those, and also quote from exhibits as to what those
17 transactions show.  I'm not going to tell the Court that we
18 stopped Theolian Lloyd on any occasion and actually got the
19 drug amounts from him.  As the Court knows from the trial, that
20 did not happen.  So these, the analysis that I'm going to give
21 as to drug quantities involved in each of these transactions is
22 based on the words of the parties in the exhibits and the
23 testimony of Dachaun Davis, among others.

24     As to Dachaun Davis, I want to start out with some
25 general things that Dachaun Davis said.  I talked about these

5

1   in our last hearing, and I have now found some page references.
2   On September 29 of 2003, on page 207, Dachaun Davis talked
3   about how he and Willie Small packaged their drugs in quarters,
4   that that was the standard packaging methodology before anyone
5   had even really ordered drugs, that they packaged everything in
6   quarters.

7        On September 30 of 2003, at page 31 and again at --
8   it's a different day, so I'll do these separately -- on the
9   30th of September, at page 31, Dachaun Davis said that a price
10  of a quarter was between 225 and $250 depending on who the
11  customer was.  He again repeated the quarter analogy and a
12  quarter's cost on pages 43 and 44 of that same day.

13       On October 1, Mr. Davis also again talked about a
14  quarter ounce being 7 grams of crack cocaine.  He weighed this
15  out, and a price for a quarter or 7 grams of crack cocaine was
16  typically 225.  $225.

17       I want to draw the Court's attention to all of the
18  exhibits of the various actual drug quantities that were
19  received in this case.  I can lay them out again, but the
20  amounts that I talked about and the exhibit numbers in the 800
21  series in Alvin Green's hearing, what I'm talking about is each
22  and every transaction that occurred with Roz Parker.

23       As to each of those transactions, many of which were,
24  for instance, for an ounce of crack cocaine, if it was an
25  ounce, what was received and testified to and what was actually

1    the exhibit in front of the Court was for little bags of crack
2    cocaine.  So an ounce or anywhere near around 28 grams was
3    always delivered in four little packages.  When it was more
4    than an ounce, it was five little packages.  That's not only
5    testimonial, but that is the exhibit itself.  That's how it
6    looked when it was taken out of the bag.  So that substantiates
7    Dachaun Davis's testimony that what they sold and how they
8    packaged was quarters.  And he said that was what one generally
9    was was a quarter, which is 7 grams.

10          That becomes important for most of the other
11   calculations that we do on sentencing because when people order
12   one or something like that, that's what it meant, given Dachaun
13   Davis's testimony.

14          Fortunately, with Mr. Lloyd, however, we have a better
15   representation of exactly what his normal amount was.  And so I
16   want to start with that, even though it's a little bit out of
17   order chronologically.  In Exhibit 77, there is a series of
18   calls, Mr. Lloyd actually sets forth himself what he normally
19   buys and what he normally wants.  In Exhibit 75, this is a call
20   between Willie Small and Theolian Lloyd, Theolian Lloyd orders
21   what I normally do, split it, though, I want two of them.

22          The next call is Exhibit 77, and in that call,
23   Mr. Lloyd is apparently afraid that he didn't make himself
24   quite clear enough, and he says -- Willie Small says, Well, you
25   want me to make that like 3.5 3.5 and 7.

1    Theolian Lloyd says, Yeah, I want them just like you
2  said, but I want one for me, so I want two total.

3    And Willie Small says, One of them, 7, the other 3 and
4  a half, 3 and a half.

5    So that is very, very clearly laid out that the normal
6  is exactly as Dachaun Davis said, it is a quarter and
7  occasionally he orders a half.

8    Now, as to Theolian Lloyd in particular, Dachaun Davis
9  testifies on September 30 of 2003, pages 146 and 147, that he
10  delivered to Theolian Lloyd quite a few times and then he says,
11  five or ten times.  Each time a quarter.

12    On October 1 of 2003, at page 139, Dachaun Davis says,
13  Small is a seller of quarters.

14    So now going back to the trial, as the trial
15  progressed, it was apparent that the government had started its
16  wiretap on the very end, the tail end of Mr. Lloyd's dealings
17  with Mr. Small.  The dealings between Mr. Lloyd and Mr. Small
18  actually pretty much stopped on April 13 of 2001.  There was
19  various testimony, there was various calls that were played
20  that all indicated that Mr. Lloyd owed Mr. Small quite a bit of
21  money and so he stopped dealing with him.  So for the idea of
22  foreseeability and relevant conduct as far as what we can prove
23  that Mr. Lloyd touched, okay, and that is not the standard for
24  relevant conduct, but what we can prove that Mr. Lloyd touched,
25  I'm going to focus on March 28, 2001, through April 13 of 2001.

1           THE COURT:  Let me interrupt you here.  Before you get
2  to those dates, I have in my notes, these are my trial notes,
3  that Dachaun Davis -- well this was in the context, I think, of
4  Exhibit 207 that was played.  I have a notation that says
5  something to the effect that drug-dealing with Lloyd, that
6  Dachaun Davis and/or Willie Small delivered crack cocaine to
7  Lloyd for money.

8           Can you amplify that notation?

9           MS. TAFOYA:  Yes.  There were several -- well,
10  everybody delivered for money.  There was some fronting
11  behavior, and there was a exchange of money.  The crack cocaine
12  cost $225 a quarter.  Apparently, judging from the phone calls,
13  Mr. Small was willing to front Mr. Lloyd some crack cocaine, so
14  he was willing to give him some, without prepayment.  But then
15  he expected to be repaid the next time.

16           THE COURT:  All right.  Go ahead to your March time
17  frame.

18           MS. TAFOYA:  All right.

19           So keeping in mind that the wiretap doesn't go up
20  until March 28, the very first call, Exhibit No. 1, is between
21  Mr. Lloyd and Mr. Small.  This is a transaction where there is
22  a call, Exhibit 1, and there is surveillance by Joe Davidson of
23  the transaction which occurred.  There was a meeting between
24  Mr. Small and Mr. Lloyd on March 28 of 2001.  And that is
25  supported by Exhibit 1.

9

1          On the -- basically Exhibit 1 says, this is Big Foot,
2     I'm going to be heading towards your way within the next 20
3     minutes.

4          And the response is I'll be in the parking lot.

5          So -- and then Officer Joe Davidson observes the
6     Suburban that we saw in numerous videos meeting with the black
7     Mercedes for just a few seconds and then leaving.

8          Moving on to the March 30, I'm not going to cover all
9     of the calls on March 30 because that was one of the counts for
10    which Mr. Lloyd was acquitted.  Now, I don't think that really
11    means that this Court can't find by a preponderance of the
12    evidence that there wasn't a drug transaction then, so I will
13    just remind the Court that this was the incidence where
14    Mr. Lloyd met at Club Mixx with Willie Small and then was
15    followed by Officer Stanton to Barney's where he met briefly
16    with some other people.  That, we are contending, was part of a
17    regular 7-gram transaction, so -- but I don't want to mislead
18    the Court about that particular transaction.  That would be the
19    one that we believe the jury acquitted on.  It was supported by
20    videotape, and the exhibits that supported that transaction
21    were Exhibits 3, 5, 7, 9, and 11.

22         One thing that is important about these calls, though,
23    is that Mr. Lloyd and Mr. Small are talking in Exhibit 7, and
24    Mr. Small says that he has another customer for the one.  And
25    that whoever gets it, it will be the first one.  Now, we think

1  that's important because that shows that Mr. Lloyd had to know
2  there was at least one other person buying drugs from Willie
3  Small at that point. That shows that there is some
4  foreseeability, that someone else is also getting orders from
5  Mr. Small.

6           On March 31, there is -- there are actually two deals
7  that occur that are supported by exhibits and by videotape.
8  The exhibits are 13, 15, and 17, Exhibit 973, and the
9  videotapes 701-001 and 002. This is an interesting deal
10 because the first particular deal on March 31 was a 7-gram
11 deal. But the second -- and we are saying that because of the
12 general testimony of Dachaun was that he dealt with him over
13 and over, it was always 7 grams.

14           Interestingly, though, this second deal that occurred
15 at the Conoco was supported by Exhibit 13, and it says, I'm
16 about to get at you, man.

17           And Mr. Small says, But you got to get that number
18 right.

19           Mr. Lloyd says -- or Mr. Small says, you know, the
20 225.

21           The same as normally before, right.

22           And Small says, yes.

23           Lloyd says, I ain't got no problem especially if it's
24 a little better.

25           And Small says, It's a lot better.

1          Lloyd says, I'll stick with you, and when we go down,
2    you know, I ain't had a problem about bringing it down.

3          So, again, this is a reference to 225, supporting the
4    fact that this first deal in Exhibit 13 is a 7-gram
5    transaction.

6          Now, there are a couple of other calls and then we get
7    to Exhibit 19.  And as I'm sure the Court is aware, without me
8    saying, the transcripts that underlie these are the next
9    following numbers.  So Exhibit 19 and 20 is the transcript.

10         This supports the second deal where Mr. Lloyd is seen
11   meeting with Mr. Small, and this is interesting because
12   Mr. Lloyd says I'm trying to get through, I'm trying to get
13   some things together.  I got 425.  I wanted two.  And I'll take
14   the rest later on.  I'm trying to get back on my feet.

15         This is where Mr. Small says, That's what I like about
16   you, you be handling your business, I'll work with you like
17   that.

18         The amount of money clearly denotes that this time he
19   wants two, so that's 14 grams.  Now, it doesn't mean 2 ounces,
20   but two quarter-ounce deals, so that is 14 grams that occurs on
21   the second deal at the Conoco station.

22         Again, there are Exhibits 976, 974, and 975, 977.
23   These are pictures of Mr. Lloyd meeting with Mr. Small and
24   701-003 is a video clip of them meeting.

25         Next, and I would like the Court to keep in mind, too,

12

1   these were occurring with like maybe one day in between.   These
2   are bam, bam, bam.   Then we go to April 2; this is at a car
3   wash at Iliff and Havana.   This call that supports this meeting
4   is Exhibit 23, and this meeting between the two are -- is
5   surveiled by Archie Singleton, who testified at trial that
6   basically they go, meet very, very quickly, they don't talk or
7   anything.   Theolian Lloyd goes immediately to another car and
8   leans in the window of the other car right after meeting with
9   Mr. Small.

10          The very next day is the 3d of April, and Mr. Lloyd
11   calls again to meet with Mr. Small, and this was interesting
12   because Exhibit 27 shows that Mr. Lloyd knows that Bridget
13   Johnson is also part of this conspiratorial group.   And the way
14   that he knows that is that Willie Small tells him to meet
15   Bridget -- to meet at Bridget Johnson's.   This is the reference
16   to 1313 Xenia.   There is also a reference at this point to
17   Mr. Lloyd being with Mr. Cooper.   And so therefore he knows
18   that Mr. Cooper knows about what's going on and Bridget Johnson
19   knows about what's going on, so we've got two other people that
20   he's aware of are participating in dealings with Mr. Small.

21          There is a series of calls in here, and I'll remind
22   the Court that Dachaun Davis talked about this and that the
23   videotapes showed it.   Dachaun Davis and Shayla Ferguson, his
24   girlfriend who said she saw all the big amounts of money at
25   Mr. Small's house, actually bring an ounce quantity of crack

13

1  cocaine, packaged in four little bags, to Mr. Small on that
2  date at Bridget's house.  So we have Mr. Lloyd wanting to get
3  something, being told to meet at Bridget's, Dachaun going to
4  Bridget's and bringing the zip over there, that's Exhibit 29,
5  and the videotapes, 704-003.  Interestingly, on Exhibit 35,
6  Willie Small calls Dachaun back and says bring two more zips,
7  'cause I need even more.

8       On April 5, which is two days later -- that was on the
9  3d -- there is another deal between Mr. Lloyd and Mr. Small on
10 the 5th of April at the Amoco station.  And this is
11 exhibit -- supported by Exhibit 45.  Mr. Lloyd calls Mr. --
12 Mr. Lloyd says, I'm up at fall's market.

13      Small says, I don't want to come all the way up there,
14 I don't like to drive all that far with this shit.  Then he
15 says, I'll come to Havana.

16      And then Mr. Lloyd says, And now I wouldn't go get an
17 estimate on my goddamn Suburban.

18      Willie Small says, The Amoco, all right.

19      The reference to the Suburban is important only
20 because that's the car that we see repeatedly showing up
21 meeting with Mr. Small for very, very short amounts of time and
22 then Mr. Lloyd getting back in it and meeting on occasion with
23 other people.  The videotape is 708-003.

24      On April 6, there is another transaction that is
25 supported by quite a bit of videotape evidence.  The calls are

14

1  Exhibits 59 and 61.  There is a photo exhibit, 978, and there
2  are videotape exhibits, 709-001, 711, 709-002, and 710.  In
3  Exhibit 60, Mr. Lloyd says, Can you meet me.

4        And Mr. Small replies, My son is going to come by.
5  The video meeting is of Dachaun coming by.  So again, this
6  substantiates the transaction that Mr. Dachaun Davis talked
7  about where he met with Mr. Lloyd a number of times and it was
8  always 7 grams or a quarter.

9        THE COURT:  Let me ask you a question.  What quantity
10  of drugs is the government asserting should be attributable to
11  Mr. Lloyd for purposes of relevant conduct under the law?

12       MS. TAFOYA:  Well, when I get to the end, with the
13  support, I believe we can show 84 grams that he himself
14  touched.  And I will cite the Court to **Williams** and several
15  other cases that say that the amount that a coconspirator
16  touches himself is not an appropriate measure of his relevant
17  conduct, that you have to take other things into account, so I
18  will be arguing that it's more than 84 grams, but that is what
19  these exhibits, I believe, show that he touched.

20       THE COURT:  How many more exhibits do you have?
21       MS. TAFOYA:  Just a few.

22       THE COURT:  All right.  I want you to expedite your
23  presentation, please.

24       MS. TAFOYA:  Okay.  On 4-7, this is the one that I've
25  already talked about at the Kentucky Fried Chicken where the

1  calls say I want the same as I always get, 7, and then I want
2  two, I want 7, 3.5 and 3.5.  So we're attributing 14 grams to
3  that particular transaction based on what he said.

4      And then finally, we have April 13 of 2001, where the
5  meeting is at the Texaco station.  And Mr. Lloyd is -- calls
6  Mr. Small and says that he wants to meet with him.  This is
7  Exhibit 111.  Mr. Small says, You got to have some kind of
8  money to put with it, man, because we already have 75 in the
9  deal.  I can't continue to stack money on top of money, man.
10 But if he didn't have the money, he could pay him off and you
11 don't have to go through this shit.

12      So that is talking about some of the fronting
13 behavior, and the exhibits that support that again are also
14 121, 171, 718-001, 002 and 003.

15      So those are the transactions that we believe, and
16 those add up to -- there are two half-ounce deals, and the rest
17 are quarters.  That adds up to quarter grams.

18      Our argument is this:  There are a number of people,
19 some that I have referenced just now, that it is foreseeable to
20 Mr. Lloyd were also participating in this drug transaction.
21 There is, by name, Bridget Johnson, there is DayDay, and there
22 is Max Cooper, known as Red.  So he knows about at least those.
23 There is also evidence in the record that he knew about
24 Mr. Hawkins, that Mr. Hawkins was kind of instrumental over
25 there at Club Mixx and was participating at Club Mixx.  And the

16

1   Court may remember the testimony of Alex, who is the owner of
2   Club Mixx, who said that Theolian Lloyd was a regular there
3   until he got kicked out for doing something in the parking lot
4   in about April of 2000 -- excuse me, October of 2000.

5            So we believe that it is foreseeable to Mr. Lloyd that
6   at least three to five other people are doing the same thing
7   he's doing with Mr. Small. We have only a snapshot of time
8   with what Mr. Lloyd was doing because of when the wiretap went
9   up, so we have from March until -- March 28 until April 13.
10  That's about a two-week period he's doing quarter grams. So in
11  a month, if he was doing the same thing, he's doing, you know,
12  150 grams a month. We have testimony that he's doing it back
13  into October. So we have 150 times the five months that we can
14  prove for what he was doing based on his own behavior, what he
15  was touching. If other people were doing the same amount that
16  he was doing, then those amounts would be attributable to him
17  as well.

18           So I believe that attributing the people that you can
19  put with him, including Bridget Johnson, Curtis Hawkins,
20  Dachaun Davis, and Max Cooper, you come up with approximately a
21  thousand grams of crack cocaine between those people alone, if
22  they were doing the same amount that he was doing. And again,
23  there's the references in there to, you know, first come first
24  served, that sort of thing.

25           THE COURT: All right. Mr. Schlie. Respond.

1       MR. SCHLIE:  Your Honor, let me begin by saying that
2   there is absolutely no evidentiary support in the record for
3   the statement that if other people are doing what Mr. Lloyd is
4   doing.  That's absolutely unsupported.  And should be
5   disregarded in its totality by the Court in this calculation.

6       It's somewhat confusing in terms of how the government
7   is coming up with its numbers; but if we deal with it by date,
8   there were two counts of conviction, one on the 7th of April
9   and one on the 30th of March.  Those are counts 14 and 17.  I
10  concede that there is evidence in the record to support
11  14 grams on each occasion.  So there is, admittedly,
12  evidentiary support for 28 grams.

13      Moving beyond that, however, and again dealing with
14  the evidence in the record by date, the phone calls to which
15  Ms. Tafoya referred on March 28 refer to a meeting with
16  Mr. Small.  There's no discussion of drugs.  There's no
17  discussion of quantities, there's no discussion of money.  And
18  as this Court is well aware, because I've mentioned it on a
19  number of different occasions, all the officers and agents in
20  this case testified that they never observed Mr. Small handing
21  controlled substances to Mr. Lloyd, they never observed any
22  money transactions between the two, they never observed
23  Mr. Lloyd transferring controlled substances to third parties.
24      So, Your Honor, we would make that argument in
25  regard -- with regard to each and every other transaction aside

18

1   from those occasions that constitute counts 14 and count 17 of
2   the indictment.

3           On March 30, Your Honor, that is the count of
4   acquittal and relate to the transaction in the parking lot or
5   alleged transaction in the parking lot outside of Club Mixx.  I
6   would refer the Court to the conversation that was recorded on
7   the next morning at 10:33 a.m. on the 31st of March, which
8   would have been Exhibit 14, Your Honor. And I would submit to
9   the Court that the context of that conversation makes it clear
10  that Mr. Lloyd did not in fact receive any cocaine or crack
11  cocaine from Mr. Small on the previous occasion, and I would
12  further submit to the Court that on the basis of that
13  conversation is why the jury acquitted Mr. Lloyd of that
14  distribution count.

15          There is a later series of conversations on the 31st
16  of March. None of them refer to drugs. None of them refer to
17  money. There is a reference to a meeting on April the 2d; and
18  aside from the conversation on the 7th of April, which we've
19  already dealt with, which was a count of conviction, none of
20  those other conversations involve any discussion of drugs or
21  money or any such references at all, Your Honor. So we would,
22  therefore, suggest that there is no evidentiary support to
23  include quantities from those events into the calculations.

24          I would suggest to the Court that the conversation
25  that Miss Tafoya referred to on April 3 illustrates the point.

1  Miss Tafoya says that Bridget Johnson was brought into the
2  conversation. If the Court will review the transcript from
3  that date, Bridget Johnson is not mentioned. 13th and Xenia
4  location is mentioned, not Bridget Johnson, not by name, not by
5  reference.

6      And she further tries to bring in Shayla Ferguson and
7  DayDay bringing over additional quantities of controlled
8  substances. Your Honor, those conversations occurred at 2008
9  on that day. 2008 would equate with 8:08 p.m. where the
10 conversation with Mr. Lloyd occurred at 5:35 p.m. So obviously
11 Mr. Lloyd is not present at any occasion where Ms. Ferguson or
12 Mr. Davis come over with additional quantities of drugs. And
13 therefore there's no evidentiary basis to suggest that those
14 drugs are reasonably foreseeable by him.

15     With regard to Mr. Cooper, Your Honor, Mr. Cooper was
16 acquitted of the conspiracy count in this case. So the jury
17 defined the scope of the conspiracy so as not to include
18 Mr. Cooper. So the government's argument in that regard is not
19 supported by the evidence.

20     Mr. Hawkins being instrumental at Club Mixx, there was
21 no citation to the record in any form, Your Honor, about
22 Mr. Lloyd being familiar with Mr. Hawkins. No citation
23 whatsoever. And therefore that argument must fail.

24     With regard to the testimony of Alex, the owner of
25 Club Mixx, he only testified that there was some occasion in

1    October where Mr. Lloyd was banned from his facility and that
2    he thought it had something to do with the parking lot.  As the
3    Court may recall, there was later testimony by a Mr. Burdette,
4    a rather burly fellow called by Mr. Cooper, who was the head
5    bouncer at Club Mixx.  And he testified on October 29, 2003,
6    page 123, line 3, that he remembered that Mr. Lloyd was barred
7    from Club Mixx because he got drunk and got into a dispute with
8    a bartender.  So I would refer the Court to that section for
9    that reference.

10          So, Your Honor, what we have here, which has been
11   established in the record, is two occasions where there are
12   14 grams of crack cocaine each.  We're dealing with a 28-gram
13   scenario.  Beyond that, there is no evidentiary support for
14   additional quantities.

15          And I would refer the Court, as I did in my
16   objections, to 1B1.3, which is the Guideline section on
17   relevant conduct and the application notes to that section.
18   And which the Sentencing Commission has set forth how the
19   relevant-conduct provision is to be applied.  Under subsection
20   C, subsection -- sub subsection 4, is an illustration regarding
21   a conspiracy; and although it relates to child pornography, it
22   is particularly illustrative in this situation.  And I have
23   cited in my objections, if the Court simply substitutes "crack
24   cocaine" for "child pornography," it sets forth how the
25   Sentencing Commission envisioned this relevant-conduct

1  provision to work.

2      And it says, Defendant K is a wholesale distributor of

3  crack cocaine.  In this situation, Defendant K could be Willie

4  Small.

5      Defendant L is a retail-level dealer who purchases

6  crack cocaine from the defendant K and resells it but otherwise

7  operates independently of defendant K.  Defendant L in this

8  situation could be Mr. Lloyd.  Under the factual scenario

9  developed at trial.

10      Similar, Defendant M is a retail-level dealer who

11  purchases crack cocaine from defendant K and resells it, but

12  otherwise operates independently of defendant K.

13      Now, again, in this situation, Your Honor, Defendant M

14  could be either -- it could be either Mr. Sammy Woods or it

15  could be Zebedee Hall.  There is no evidence in the record, and

16  there wasn't any evidence at all at trial that Mr. Woods or

17  Mr. Hall knew of or associated in any way with Mr. Lloyd or

18  vice versa.  And similarly, there is no evidence in the record

19  that Mr. Small in any way controlled the activities of

20  Mr. Lloyd.

21      Going back to the illustration, Your Honor, defendants

22  L and M are aware of each other's criminal activity but operate

23  independently.  So even if they had known about each other, as

24  long as they operate independently, a distinction is to be

25  drawn.

22

1          Defendant N is defendant K's assistant who recruits
2 customers for defendant K and frequently supervises the
3 delivery of defendant K's customers.   Defendant N in this
4 situation is Dachaun Davis.

5          Each defendant is convicted of a count charging
6 conspiracy to distribute crack cocaine.   Defendant K's
7 accountable under subsection (a)(1)(A) for the entire quantity
8 of crack cocaine sold to defendant L and M.   Defendant N,
9 Dachaun Davis, also is accountable for the entire quantity sold
10 to those defendants under subsection (a)(1)(B) because the
11 entire quantity was within the scope of his jointly undertaken
12 criminal activity and reasonably foreseeable.

13          Defendant L, Mr. Lloyd, is accountable under
14 subsection (a)(1)(A) only for the quantity of crack cocaine
15 that he purchased from defendant K because the scope of his
16 jointly undertaken criminal activity is limited to that amount.

17          Your Honor, that is the scenario the Sentencing
18 Commission envisioned for the application of this guideline.
19 And that is a quantity for which Mr. Lloyd should be sentenced.
20 It is correct that the Court's determination is not limited
21 solely to the amounts that he dealt with personally.   That part
22 is true.   But the government has the burden to show what
23 additional quantities can be attributed to him.   And in this
24 situation, Your Honor, they have failed to do so.   And,
25 therefore, we would submit that 28 grams, in this scenario, is

23

1  the appropriate quantity to apply.

2          Thank you.

3          THE COURT:  All right.  This is -- let me go off the
4  record.

5      (Discussion off the record.)

6          THE COURT:  I don't want to hear a rebuttal from the
7  government.

8          Looking at the totality of the facts here, I want to
9  observe a couple things.  First, Mr. Lloyd was found guilty of
10  count one, the conspiracy count.  Mr. Schlie has admitted on
11  behalf of his client that because of the convictions in
12  counts -- of counts 15 and 17, that Mr. Lloyd, at a minimum,
13  should be attributed 28 grams for relevant-conduct purposes as
14  it relates to conspiracy.  Obviously there have to be
15  additional quantities of crack cocaine that are attributable to
16  the conspiracy of Mr. Lloyd or Mr. Lloyd wouldn't have been
17  convicted.  So the question is what is that number.

18          Based on the government's proffer and considering
19  Mr. Schlie's response on behalf of Mr. Lloyd, I find that the
20  government has proved by a preponderance of the evidence that
21  84 grams should be attributed to Mr. Lloyd for purposes of
22  relevant conduct under the law that I articulated fully in the
23  sentencing for Alvin Green.

24          Does either side wish for me to rearticulate that law
25  from that record?

1          MR. SCHLIE:  No, Your Honor.  I think it would be
2    sufficient if the Court just incorporate the statements made.
3    For the record, Mr. Lloyd was not present during those
4    statements, but I was.

5          THE COURT:  All right.  I want to incorporate by
6    reference the recitation of the case authorities and the
7    standard the Court believes applies to determination of
8    relevant conduct in a conspiracy case.  And what I want to just
9    say is that despite the conspiracy conviction, the Court must
10   make a more refined assessment of the actual relevant conduct
11   as it relates to drug quantities that would have been
12   foreseeably known to the defendant in this case, Mr. Lloyd.
13   So, again, the Court finds that the government has proven by a
14   preponderance of the evidence that 84 grams would apply.  And
15   so therefore, with 84 grams, the base offense level is 32 under
16   section 2D1.1 of the Guidelines.

17         Is there any other issue that we need to decide for
18   sentencing for Mr. Lloyd?

19         MS. TAFOYA:  Your Honor, I don't have another issue,
20   but I would just like to read these cites into the record
21   because I'm sure there will be appeals.  These were trials, so
22   there will be appeals.

23         THE COURT:  What cites are you talking about?
24         MS. TAFOYA:  The cites that I mentioned earlier that,
25   **United States vs. Bernaugh**, which is 969 F.2d 858.  And **United**

25

1  **States vs. Ruiz-Castro**, 92 F.3d 1519. And **United States vs.**
2  **Williams**, 897 F.2d 1034. All three of those Tenth Circuit
3  cases say that it is not appropriate to only take what the
4  coconspirator touched, it is appropriate to see what was
5  reasonably foreseeable to him in concert with his codefendants
6  and coconspirators that he knew about. And I'm not arguing
7  with the Court. I understand you made a ruling. I just want
8  to have the record complete.

9           THE COURT: Let me just say, so the record is clear,
10 to the extent that the government has argued that 1,000 grams
11 should be applicable between Johnson, Hawkins, Davis, and
12 Cooper, I just don't find support in the record to elevate any
13 of those drugs above 84 grams for purposes of Lloyd. And I
14 should have added Lloyd to that group of defendants as well.

15          All right. Mr. Schlie, is there anything else you
16 want to raise with the Court regarding sentencing before I hear
17 from your defendant, or your client, meaning Mr. Lloyd?

18          MR. SCHLIE: Yes, Your Honor. The only remaining
19 issue is the application of the sentencing enhancement, Your
20 Honor.

21          THE COURT: All right.

22          MR. SCHLIE: And the issue was raised by Mr. Banta
23 earlier based on the case of **U.S. vs. Colon-Solis**, and there's
24 an abbreviation (sic) between those two. Your Honor, as
25 Mr. Banta stated, the First Circuit, the Sixth Circuit, the

1 Ninth Circuit, and the Fourth Circuit have all ruled that the
2 mandatory minimums under the sentencing enhancement only apply
3 if the -- I take that back.

4 Because the Court found over 50 grams, the sentencing
5 enhancement will apply here.

6 I stand corrected. It would only -- I would only have
7 had an argument had it been less than 50 grams.

8 So there are no further issues, Your Honor.

9 THE COURT: All right. Mr. Lloyd --

10 MS. TAFOYA: Your Honor, if I might, just submit the
11 certified copy of Government's Exhibit 1, which is the
12 conviction from Arapahoe County that is relied upon by the
13 government in its information. And I have provided a copy to
14 Mr. Lloyd -- or excuse me, to Mr. Schlie.

15 THE COURT: And the parties agree that for all of the
16 convictions, regarding my enhancement for Mr. Lloyd, we're only
17 talking about an enhancement under 841; is that correct?

18 MS. TAFOYA: Your Honor, the government -- that's
19 correct. Your Honor, 841(a)(1) and (b)(1)(A).

20 THE COURT: I understand.

21 All right. We'll make that exhibit as part of the
22 record.

23 Mr. Lloyd, this is your opportunity as part of the
24 criminal sentencing proceeding to make a statement to the
25 Court. So if you'd like to make a statement, do it at this

1  time.

2         THE DEFENDANT: I really don't have nothing to say.

3  It's just been a long three years, and I still feel that the

4  government didn't prove nothing on me and I just feel that I

5  been railroaded under this and I just hope I get the bottom of

6  the Guidelines. And that's all, Your Honor.

7         THE COURT: All right.

8         Does probation have a revised sentencing statement to

9  give me?

10        MR. THOENE: Yes, I do, Your Honor.

11        THE COURT: Let me ask Mr. Lloyd and his counsel to go

12  to the lectern.

13        In the matter, then, of United States of America vs.

14  Theolian Lloyd, case no. 01-CR-214. The Court makes the

15  following finding concerning the objections to the presentence

16  report. Relevant conduct, based on the evidence and testimony

17  adduced at trial, the Court finds that the defendant's relevant

18  conduct involved 84 grams of cocaine base, which establishes a

19  base offense level of 32 under the Guidelines. The Court

20  determines that no finding is necessary concerning the

21  remaining objections to the presentence report because the

22  controverted matters will not be taken into account in imposing

23  sentence or will not affect the sentence. Neither the

24  government nor the defendant has challenged any other aspect of

25  the presentence report. Therefore, the remaining factual

1   statements and Guideline applications are adopted without

2   objection as the Court's findings of fact concerning

3   sentencing.

4         The Court finds that the total offense level is 32 and

5   the defendant's criminal history category is V. Which results

6   in an imprisonment range of 188 to 235 months and a fine range

7   of $11,500 -- or 17,000?

8         MR. THOENE: 17,000.

9         THE COURT: $17,500 to $8 million.

10         Based on the mandatory minimum sentence of 240 months,

11   which is dictated and required by 21 U.S.C. section 841 and the

12   applicable subsections therein, the Guideline range becomes 24

13   months pursuant to section 5G1.1(b).

14         MR. THOENE: 240 months.

15         THE COURT: Let me do this again. Based upon the

16   mandatory minimum sentence of 240 months, which is by operation

17   of law, the Guideline range becomes 24 months pursuant to

18   5G1.1(b).

19         MS. TAFOYA: I think that's 240 months.

20         THE COURT: What did I say?

21         MS. TAFOYA: 24.

22         THE COURT: Did I say 24 again?

23         Let me do it again.

24         The Court will enhance this sentence pursuant to

25   21 U.S.C. section 841. As a result of that and based on the

1  mandatory minimum sentence of 240 months, the Guideline range
2  becomes 240 months.  Also refer to guideline section 5G1.1(b).
3  The statutorily required supervised release term for count one
4  is ten years.  The statutorily required supervised release term
5  for counts 14 and 17 is eight years.  The Court finds no reason
6  to depart from the Guideline range which exceeds 24 months and
7  will impose a sentence within that range.  The sentence is
8  imposed for the following reasons:  Punishment, deterrence, and
9  protection of the public.

10         Pursuant to the Sentencing Reform Act of 1984, it is
11  the judgment of the Court that the defendant, Theolian Lloyd,
12  is hereby committed to the custody of the Bureau of Prisons to
13  be imprisoned for a term of 240 months as to counts one, 14,
14  and 17, with the terms of imprisonment to run concurrently.

15         If you wish for me to recommend any particular
16  facility for his client to serve his sentence, Mr. Schlie.

17         MR. SCHLIE:  Your Honor, Mr. Lloyd has considerable
18  family members in Texas and would ask that the Court recommend
19  a facility, appropriate facility in the state of Texas.

20         THE COURT:  The Court will recommend to the Bureau of
21  Prisons that the defendant be incarcerated in the appropriate
22  facility within the state of Texas.

23         Upon release from imprisonment, the defendant shall be
24  placed on supervised release for a term of ten years.  This
25  term consists of ten years as to count one and eight years as

1  to counts 14 and 17.  All terms of supervised release are
2  ordered to run concurrently.  Within 72 hours of release from
3  the custody of the Bureau of Prisons, the defendant shall
4  report in person to the probation office in the district to
5  which the defendant is released.  While on supervised release,
6  the defendant shall not commit another federal, state, or local
7  crime; shall not illegally possess controlled substances; shall
8  not possess a firearm or destructive device; and shall comply
9  with the standard conditions adopted by this court.

10        If this sentence includes a fine or restitution
11  obligation, it shall be a condition of supervised release that
12  the defendant pay any such fine or restitution that remains
13  unpaid at the commencement of the term of supervised release in
14  accordance with the schedule of payments set forth in the
15  judgment.

16        The defendant shall refrain from the unlawful use of a
17  controlled substance and submit to one drug test within 15 days
18  of release on supervised release and at least two periodic
19  tests thereafter for use of a controlled substance.  The
20  defendant shall pay a special assessment of $100 per count of
21  conviction, for a total of $300.  The Court finds that the
22  defendant does not have the ability to pay a fine, so I will
23  waive the imposition of a fine in this case.

24        Mr. Lloyd, you're advised of your right to appeal the
25  sentence I just imposed, along with the underlying conviction.

31

1  If you desire to appeal, a notice of appeal must be filed with
2  the clerk of the court within ten days after the entry of
3  judgment or your right to appeal will be lost.

4        If you are unable to afford an appeal -- strike
5  that -- if you are unable to afford an attorney for purposes of
6  an appeal, the court will appoint one to represent you at the
7  court's expense.  If so you request, the clerk of the court
8  will immediately file a notice of appeal on your behalf.

9        We're going to take about a ten-minute break and we'll
10  go back with the sentencing hearing of Max Cooper.

11        MR. SCHLIE:  Thank you, Your Honor.

12     (Recess at 3:25 p.m.)

13                    REPORTER'S CERTIFICATE

14        I certify that the foregoing is a correct transcript
15  from the record of proceedings in the above-entitled matter.
16  Dated at Denver, Colorado, this 9th day of April, 2004.

18                              _Kara Spitler_
                                    Kara Spitler