IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Crim. No. 01-CR-00214-WYD
Civil Action No. 07-CV-00367-WYD

UNITED STATES OF AMERICA,

          Plaintiff/Respondent,

v.

4. ALVIN GREEN,
       a/k/a, Mel Dog,

          Defendant/Movant,

---

## UNITED STATES' ANSWER TO DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255

---

      The United States responds to defendant's post-conviction motion to vacate, set aside, or correct his sentence, under 28 U.S.C. § 2255 (doc. 3429).

### Stated Grounds For Relief

      The defendant Alvin Green alleges: (1) his trial counsel provided ineffective assistance by failing to cross examine a government witness regarding prior inconsistent statements; and (2) his appellate counsel was ineffective in failing to raise meritorious issues on appeal. Green seeks an evidentiary hearing on these issues.

## Timeliness

Title 28, U.S.C. § 2255 requires that a motion be filed within one year of "the date on which the judgment of conviction becomes final . . . ." Final judgment entered on April 15, 2004. *See* doc. 3026 (attachment 1). The defendant appealed his conviction and the Court of Appeals affirmed on September 15, 2005. *See United States v. Willie Small, et al.*, 423 F.3d 1164 (10th Cir. 2005) (attachment 2). The Supreme Court denied defendant's petition for writ of certiorari on February 21, 2006.[1] Defendant's § 2255 motion (doc. 3426) was filed February 21, 2007 and is timely. *See United States v. Burch*, 202 F.3d 1274, 1276 (10th Cir.2000) (judgment of conviction becomes final under § 2255 on the later of the expiration of 90 day time for filing certiorari petition or Court's final disposition of petition). A corrected motion (doc. 3429) was filed February 22, 2007, containing an electronic signature. *See* Docket Annotation no. 3432.

Pursuant to Rule 5(b) of the Rules Governing § 2255 Proceedings, the United States informs the court that no prior post-conviction motions have been filed by the defendant and no hearings have been conducted.

---

[1] This date is taken from the General Docket, U.S. Court of Appeals for the Tenth Circuit, in *United States v. Alvin Green,* No. 04-1157, entry of March 6, 2006 (per PACER).

## Factual Background

Following trial to a jury, Green was found guilty of conspiracy to distribute 50 grams or more of crack cocaine. Doc's 2661 & 3026.  Trial began September 22, 2003, and ended November 13, 2003. The Second Superseding Indictment charged thirty-two defendants with drug trafficking, firearms offenses, and money laundering. Doc. 1595. Seven of those defendants remained at the time of trial: Willie Small, Sammy Woods, Alvin Green, Theolian Lloyd, Zebedee Hall, Max Cooper, and George Murray. Small, Woods, Green, Lloyd, and Hall were found guilty of the conspiracy charge (Count One);  Murray and Cooper were both acquitted of the conspiracy charge.

In addition to the conspiracy conviction, Green was convicted on Counts Thirty-Eight and Thirty-Nine, charging use of a communications facility to further a drug trafficking crime, and Count Seventy-Five, charging money laundering. Doc's 2661 & 3026.

The sentence was determined by the quantity of crack cocaine charged in Count One (50 grams or more) and the fact that Green had two prior felony drug convictions. This court sentenced Green to a mandatory term of life imprisonment, pursuant to 21 U.S.C. § 841(b)(1)(A).

## Argument

To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) counsel's performance prejudiced him in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). This court must "give considerable deference to an attorney's strategic decisions and 'recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir. 2002) (*quoting Strickland*, 466 U.S. at 690).

In reviewing a claim of ineffective assistance "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

## ARGUMENT

### I.  Defendant's Trial Counsel Was Not Ineffective

Green argues his counsel was ineffective because he did not cross-examine a government witness regarding prior inconsistent statements the witness allegedly made concerning Green's role in the drug distribution scheme. Motion at 6; Supporting Memorandum of Law (hereafter "MOL") at 10. Green does not identify specific statements he alleges were inconsistent with the trial testimony, nor does he provide any citations to the record.

The witness in question, Dachaun Davis, was a close associate of Willie Small, and was called by the government at trial to testify concerning Small's connections to other drug dealers. Early in the direct examination of Davis, the government elicited testimony showing that during an initial debriefing, Davis had failed to tell the government about Alvin Green. The testimony was as follows:

Q:   You know, you've talked about Alvin Green. Does he have any relationship to the Davis family?

A:   No.

Q:   Did he have any relationships with anyone in the Davis family?

A:   Yes. With Keyonna.

Q:   What was that relationship?

A:     They were friends back before, I guess. Dated, whatever.

Q:     You remember coming into the office of the U.S. attorney and

       giving some statements about your role and involvement in the

       case?

A:     Yes.

Q:     Did you come in more than once?

A:     Yes.

Q:     On the first time that you came in, in February of 2003,

       did you give the complete picture?

A:     No.

Q:     Why not?

A:     Because I felt some sympathy, I guess, for a few of the guys on

       the case.

Q:     Who did you not tell about the first time around?

A:     Mel. Mel Dog.

Q:     Alvin Green?

A:     Yeah, Alvin Green.

Q:     Did you - - did you change your mind about that later?

A:     Yes.

Q:     And what did you - - what did you say when you came back in the

second time?

Q:    That it was a - - I seen him with large amounts of money, guns,

and drugs.

A:    And was that truthful?

Q:    Yes.

A:    And why hadn't you told us that the first time?

Q:    Like I said, I felt some sympathy towards him. I had been

knowing him since I was young. So I, you know, I felt like I didn't

want to tell.

ROA, Vol. XXXIX (Day 6 - 9/29/03) at 1254-1255 (attachment 3).

The government presumes that this is the "prior inconsistent

statement" to which Green refers. However during a later debriefing, Davis

did tell the government about Green's role in dealing drugs with Willie Small.

Thus, Davis' trial testimony was consistent with his later pre-trial statement,

and the only ground for impeachment that might have been pursued by

Green's counsel, was that during the initial debriefing Davis failed to

incriminate Green. That omission does not undermine Davis' later statement

or his trial testimony. Davis also gave a plausible reason for protecting Green

the first time around. Davis testified he had known Green "since I was

young," and that Green had dated his sister Keyonna. In any event, whatever

Davis' motives in initially failing to implicate Green, his prior statement was before the jurors, who were free to draw any inference they deemed appropriate.

Green alleges his trial counsel should have cross-examined on the issue, but does not state *what* his trial counsel should have done, or how cross-examination might have assisted his defense. No doubt, on cross-examination defense counsel could have confronted Davis with his initial debriefing statement, but this would have done little more than confirm what Davis had already testified to. A possible inference might be that Davis was lying when he implicated Green at trial. But an attempt to impeach Davis in this manner would have entitled the government on re-direct examination to revisit the entire subject of Davis' trial testimony, which was devastating to Green. Such an impeachment tactic would also have entitled the government to elicit from Davis the details of his other pre-trial statements, made in a later debriefing, that implicated Green and were consistent with Davis' trial testimony. *See* Fed.R.Evid. 801(d)(1)(B) (prior consistent hearsay statements admissible "to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive"). Under these circumstances, a reasonable attorney could have made a tactical decision not to pursue the matter on cross-examination. Such a decision cannot be assailed post-trial in order to

show ineffective assistance. *See Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995), *citing United States v. Ortiz Oliveras*, 717 F.2d 1, 3 (1st Cir. 1983) ("tactical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance"). *See also Bullock v. Carver*, 297 F.3d 1036,1044 (10th Cir. 2002) (court must give deference to attorney's strategic decisions and presume counsel made all significant decisions in the exercise of reasonable professional judgment). Thus, Green's trial counsel did not provide ineffective assistance by refraining from cross-examination on the subject.

Green insists that had his counsel pursued the issue, the jury would have had a reasonable doubt as to his guilt. MOL at 10. As shown above, however, the prior statement was brought out by the government on direct examination and thus there was little defense counsel could do with the issue. But even if Green's counsel had cross-examined on the issue and challenged Dachaun Davis' credibility, there was abundant other evidence  that Green was involved with Willie Small in distributing drugs. In affirming Green's conviction on appeal, the Tenth Circuit found that "[t]he trial evidence showed that Green was a major source of supply for Small's drug operation, that he traveled to California for the purpose of obtaining large quantities of drugs for Small, and that Small was dependent on Green to supply the

operation."423 F.3d at 1183. The court's conclusion was based upon far more than the words of Dachaun Davis. Davis' testimony was corroborated by the testimony of witnesses such as Keyonna Davis, Bridget Johnson, and Sandra Davis. And the testimony of all these witnesses was corroborated by the government's wiretap evidence.

Keyonna Davis testified that Willie Small told her that he was waiting on Green for cocaine. Vol. XLII (tr. 10/2/03) at 1788-89.[2] She observed that Green would leave town and when he returned, she would have more crack at her house. *Id.* at 1791. Small gave money to Green for crack. *Id.* at 1804-05. Small told her he had to sell Green's drugs so he could get Green his money. *Id.* at 1805. Small also told her he got better deals on the drugs from Green than from his other suppliers. *Id.* She saw Green with large amounts of money; the wads of bills were so large they were hard to hold. *Id.* at 1807.

Bridget Johnson testified that she was present when Willie Small and Green discussed "dope" that "Mel" (Green) got from California. Vol. LIV (tr. 10/24/03) at 3306. Johnson knew that Small gave money to Mel, *id.* at 3307; that Mel went to California to pick up cocaine, *id.* at 3332; and that Small gave Mel "a grand" for drugs, *id.* at 3335.

---

[2] Citations are to volumes of the record on appeal.

Sandra Davis testified that she knew Green as "Mel" and that he would ask her to make airline reservations for him to Los Angeles. Vol. XLVIII at 2400, 2403.[3] Small told her that Green went to Los Angeles to find drugs. *Id.* at 2406. Sandra Davis used to clean house for both Small and Green, and she testified that Small kept crack cocaine in a false-bottomed can of cleaning solution. *Id.* at 2377, 2395-96, 2407. She knew that Small took the can to Green's house. *Id.* at 2410.

Brain Harris testified that on at least one occasion (he was not sure which), Green was with Willie Small during a drug transaction he (Harris) had with Small. Vol. XLV (tr. 10/03/03) at 2023.

The testimony of these witnesses – and Dachaun Davis' testimony – about Green's drug dealing activities was corroborated by numerous telephone conversations between Green and Willie Small that were intercepted on the government's wiretaps. The wire interceptions show the connection between Green's supply side of the drug business and Small's distribution side. Wiretap evidence admitted at trial shows:

‣ Green took monthly trips to California to purchase cocaine. Vol. XLIX (testimony of Van Dyke, tr. 10/10/03) at 57-58; exhibit 921; exhibit 154R at 5;

_____

[3]   This corroborates Dachaun Davis' testimony that Green's nickname was "Mel" or "Mel dog." *See* Vol. XXXIX (tr. 9-29-03) at 1249.

exhibit 180 at 2 (Green in California).[4]

    ‣ When Green was out of cocaine, Small would deal with other, less reliable sources, such as cooperating witness Dwayne Van Dyke. *See, e.g.*, Exhibit 398, where Small had to put off Sammy Woods, who wanted to buy drugs, stating that he was waiting for the drugs to arrive. Small expressed his annoyance at Green's supply interruptions to Green himself, saying "I really don't want to fuck with Ian." Exhibit 380 at 3.

    ‣ Small told Van Dyke not to bother with looking for alternate supplies of drugs when he knew Green was returning from California, where Green obtained kilogram quantities of cocaine. In Exhibit 498 at 2, Small says "I'm straight, Mel got back last night."

    ‣ Small tells "Bobby" to "tell him [Soul] I sent like 20, 20 large up to Caly . . . the same day the shit happened to him and I ain't retrieved my package yet, so my ends are tighter than a motherfucker." Exhibit 590 at 3. Trial testimony showed that a kilogram of cocaine coast approximately $20,000. Vol. LI (testimony of Steve Stanton, tr. 10/21/03) at 78-79. Small states "I got one and a half and another one on the way, referring to kilograms as "birds."" Exhibit 194RR.

---

[4] The exhibits cited were admitted at trial. They are also contained in an Addendum of Exhibits filed with the government's answer brief on appeal.

‣ Small needed Green to supply drugs, because some of his former suppliers ran into legal problems and stopped coming to Colorado. Vol. LIV (testimony of Bridget Johnson, tr.10/24/03) at 72.

‣ Small needed Green to return from California so he could continue the distribution side of the business: "I want you to get back so bad cause . . . that thing gonna come up where it ain't nothing . . . we want to be able to take care of our business until it get back on." Exhibit 514 at 3.

‣ A statement Small made to Sandra Davis shows the close financial interdependence of Green and Small: "Man I ain't got no money, shit I gave Mel all that money, and that fucked me because I wanna make sure he's able to take care of his, if he can't take care of his end. I sure can't take care of mine, so I try to get the money to him as fast as possible . . . so that's why . . . I give him all that money at one time so that way he can get back and I'll still have some while he gone." Exhibit 530R at 4.

‣ Small tells Zebedee Hall: "I went in with my homeboy on this thing . . . he goes to California . . . I trust him cause he always comes back with the thing." Exhibit 536 at 3.

‣ Small tells Dachaun Davis, "We need to get something going man. Mel's got work that we need to try to get to, if he ain't downed it already." Exhibit 272 at 3.

‣ When Zebeedee Hall wanted two additional ounces, Small called Green to get some of his supply to sell to Hall. Exhibit 350 at 2.

‣ Small tells Sandra Davis: "normally I do all that for his . . . I can't give away what I got." Exhibit 248 at 3.

‣ Small tells Shirley Davis, "I got the little shit that Mel gave me but that shit'll be gone and I don't think he got no more." Exhibit 342 at 11.

‣ Small told Sandra Davis that Mel was taking longer than anticipated in California, stating, "he said he wasn't complete with the job he went to do, shit wasn't there, he gonna be there a while I believe . . . I told him how slow it was on my end and he said it ain't gonna be slow long . . . he said shit pop up but it be gone before you know it." Small explained "I think he [Green] get his kind a like half and half, half up front and half you know cash, so whoever get the full case is most likely the one who get the package." Exhibit 182R at 7.

‣ Small wired money to Green, so Green could get cocaine. Exhibit 940 at 2-5. Small tells Bridget Johnson he had to send money to Green for expenses stating: "you know, I had to give Mel a grand . . . but he need to take care of business up there and then come back." Exhibit 440 at 5.

‣ Green directs Small to send the expense money to a name different from his own in California. Exhibits 432 at 3;426 at 3; 432 at 3; 436 at 2; 446

at 2; 448 at 2; 450 at 2; 452 at 2. *See* Vol. LIII (testimony of Steve Stanton ,tr. 10/23/03) at 194-95.

▸ Discussing Green's trips to California, Small says: "When my dude gets back, I have work." Small also discusses the risks and suspicions of the business – he doesn't know exactly when Green will return and does not seem to want to know ("so if anything ever do happen, motherfucker can't say 'Well, Willie was the only one who knew'"). Exhibit 472 at 2.

Given this overwhelming evidence of Green's drug dealing activity, any error on the part of Green's counsel in failing to cross-examine Dachaun Davis – concerning a prior statement already brought out on direct examination – could not have affected the outcome of the proceedings.

## II.   Defendant's Appellate Counsel Was Not Ineffective

Green argues that his appellate counsel was ineffective because he "failed to argue the issue of severance which was raised at trial and also failed to argue the ineffective assistance of counsel at trial because of trial counsel's failure to request a special jury instruction as to drug quantities attributable to Petitioner." MOL at 15.

### A.   *Severance*

Green maintains his appellate counsel was ineffective in failing to appeal the district court's denial of his severance motion. MOL at 15. Green

does not identify a specific motion he filed and does not explain how the trial court erred in denying the motion. Green neither alludes to nor cites the district court order he maintains his counsel should have appealed. Green's argument is couched in generalities and the government responds in kind.

Defendant first cites *Zafiro v. United States*, 506 U.S. 534, 539-40 (1993), and argues that a joint trial presents "the possibility that evidence of wrongdoing of a codefendant might be used by the jury to determine the guilt of the defendant." MOL at 16. But Green does not bolster this legal truism with any citation to specific "spillover evidence" at trial that might have prejudiced him. And the truism Green cites is only part of the story. The Tenth Circuit has held that "in a conspiracy trial it is preferred that persons charged together be tried together." *United States v. Ray*, 370 F.3d 1039, 1045 (10th Cir. 2004), *citing United States v. Scott*, 37 F.3d 1564, 1579 (10th Cir.1994). To overcome this "presumption" in favor of joint trials – as the court described it in *Ray* – a defendant must make "a strong showing of prejudice." *Id*. The court held that "[p]rejudice occurs when there is a serious risk that a joint trial will compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*., *citing United States v. Edwards*, 69 F.3d 419, 434 (10th Cir.1995). Because Green fails to identify any specific evidence of "a co-

defendant's wrongdoing" that was admitted against him, he cannot satisfy this standard.

Again citing *Zafiro*, Green complains that the risk of prejudice is heightened in multi-defendant cases involving differing degrees of culpability. MOL at 16. This complaint is puzzling, because the evidence against Green was probably greater than the evidence against most of his co-defendants (with the exception of Willie Small). But even when the weight of the evidence against co-defendants is greater, this is not a ground for severance. The Tenth Circuit has held that "neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spill-over effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance." *United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1976); *United States v. Cardall*, 885 F.2d 656, 667-68 (10th Cir. 1989); *United States v. Colonna*, 360 F.3d 1169, 1178 (10th Cir. 2004). In *Ray*, the circuit court held that even evidence of murder and torture involving co-defendants did "not establish that the District Court committed reversible error in refusing to sever Mr. Ray's trial from his codefendants." 370 F.3d at 1045.

Any disparity in evidence in the present case, if one existed at all, involved largely the matter of drug quantities and individual relationships

among co-conspirators. Such matters are unlikely to give rise to prejudice. And in *Zafiro*, the Supreme Court held that the potential for prejudice inherent in joint trials can ordinarily be addressed through limiting instructions. *Zafiro v. United States*, 506 U.S. at 539-40. At trial, this court gave numerous instructions cautioning the jury to weigh the evidence against each defendant separately. Instruction no. 9 advised the jurors that in certain instances "evidence was admitted only concerning a particular party or only for a particular purpose" and cautioned them against using the evidence "for any other purpose or against any party not specifically mentioned." Vol. LIII at 4123. With instruction no. 27 the court cautioned the jury: "It is your duty to give separate and personal consideration to the case of each defendant." The instruction required the jury to analyze the evidence with regard to each defendant, "leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants." *Id*. at 4131. Instruction no. 28 further cautioned the jury to consider separately the evidence and charges against each defendant and not to allow a verdict on one charge to "control your verdict as to any other offense charged against that defendant or against any other defendant." *Id*. at 4132. Green has provided no evidence to suggest the jury was unable to follow these instructions.

Perhaps anticipating the government's argument, Green argues that

"[i]t is not simply a matter that Petitioner had a greater chance of acquittal with a separate trial, but that the Government would have had to prove the weight of the drugs attributed to Petitioner as well as prove a direct link in the conspiracy." MOL at 16. Green maintains that at the sentencing hearing the government's attribution to him of over 50 grams of crack cocaine was based upon "tenuous links" made through "the testimony of persons in their own criminal trouble." MOL at 17. This argument is misguided. Count One of the Second Superceding Indictment charged Green with conspiring to distribute and possess with intent to distribute crack cocaine "weighing more than fifty grams." ROA Vol. III, doc. 1595 at 4. The weight of the drugs was an element of the offense. In order to render a guilty verdict, the jury was instructed it must find each element of the offense "as to each defendant." Vol. LIII at 4134.[5] Element no. 2 required the jury to find: "That the conspiracy involved 50 grams or more of crack cocaine." *Id*. Element nos. 3 and 4 required the jury to find that each defendant knew the essential objectives of the conspiracy and knowingly and voluntarily agreed to become

---

[5] Those elements are: 1. That two or more persons agreed to distribute or to possess with intent to distribute crack cocaine; 2. That the conspiracy involved 50 grams or more of crack cocaine; 3. That the defendant knew the essential objectives of the conspiracy; 4. That the defendant knowingly and voluntarily agreed to became involved in the conspiracy; and 5. That the alleged conspirators were interdependent. Vol. LIII at 4134.

involved in the conspiracy. By rendering its guilty verdict, the jury found that the government proved that Green conspired to distribute and possess with intent to distribute 50 grams or more of crack cocaine. *See United States v. Alvin Green*, 423 F.3d at 1187 ("The quantity of drugs was alleged in the indictment and found by the jury beyond a reasonable doubt").The joint trial did not change the government's burden of proof. Green has shown neither error nor prejudice in the trial court's denial of his severance motion. Thus, Green's appellate counsel acted reasonably in not raising the issue on appeal.

B.   *Trial Counsel's Failure to Request a Special Jury Instruction*

Green also maintains his appellate counsel was ineffective because he failed to argue on appeal that trial counsel was ineffective in failing to request a special jury instruction to determine the quantity of drugs attributable to him. MOL at 15,17-18. However the Tenth Circuit has held that claims of ineffective assistance should not ordinarily be brought on direct appeal. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) ("Ineffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal. Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed"). It is unclear why Green does not present this issue as another alleged instance of ineffective assistance by his trial counsel. But even so construed, his

argument has no merit. As shown above, the jury was required to find the quantity of drugs attributable to Green. Thus, his trial counsel could not have been ineffective in failing to seek a special verdict.

## Conclusion

Defendant's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 should be denied. Because the record clearly shows that Green's claims have no merit, he is not entitled to an evidentiary hearing. *See United States v. Lopez*, 100 F.3d 113, 121 (10th Cir. 1996).

Respectfully Submitted,

TROY A. EID
United States Attorney

s/ James C. Murphy
By: James C. Murphy
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado  80202
Telephone:(303) 454-0100
Fax: (303) 454-0404
E-mail: james.murphy3@usdoj.gov

Counsel for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on April 12, 2007, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the following e-mail addresses:

Vincent James Oliver
Vjoliverlawyer@cs.com

TROY A. EID
United States Attorney

s/ James C. Murphy
By: James C. Murphy
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado  80202
Telephone:(303) 454-0100
Fax: (303) 454-0404
E-mail: james.murphy3@usdoj.gov

Counsel for Plaintiff
United States of America