1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 01-cr-214-WYD
3
UNITED STATES OF AMERICA,
4
     Plaintiff,
5
vs.
6
DACHAUN DAVIS, a/k/a "DayDay",
7
     Defendant.
8
_____
9
              REPORTER'S TRANSCRIPT
10    Supervised Release Modification Hearing
_____
11
12          Proceedings before the HONORABLE WILEY Y. DANIEL,
13   Judge, United States District Court for the District of
14   Colorado, commencing at 11:13 a.m., on the 2d day of October,
15   2008, in Courtroom A1002, United States Courthouse, Denver,
16   Colorado.
17                    APPEARANCES
18          GUY TILL, Assistant United States Attorney, 1225 17th
19   Street, Suite 700, Denver, CO  80202, for plaintiff.
20          MICHAEL NORTON, Burns, Figa & Will, P.C., 6400 South
21   Fiddlers Green Circle, Suite 1030, Englewood, CO  80111, for
22   defendant.
23
24   Proceeding Reported by Mechanical Stenography, Transcription
       Produced via Computer by Kara Spitler, RMR, CRR,
25      901 19th Street, Denver, CO, 80294, (303) 623-3080

1                          PROCEEDINGS

2        (In open court at 11:13 a.m.)

3              THE COURT:  You may be seated.

4              This is 01-cr-214, U.S.A. vs. Dachaun Davis.

5              Counsel enter their appearances.

6              MR. TILL:  Good morning, Your Honor.  Your Honor, I'm

7    Guy Till.  I'm an assistant U.S. attorney representing the

8    government.

9              MR. NORTON:  Good morning, Your Honor.  Michael J.

10   Norton on behalf of Mr. Davis, who is present.

11             THE COURT:  Have a seat.

12             I want to review some history on this.  I looked at

13   this file 'cause I remember Mr. Davis from the Willie Small

14   conspiracy case and also remember when the Court sentenced him

15   back in 2003.  And I have some concerns here.  Let me just

16   articulate them.

17             As you know, probation department generated a petition

18   for issuance of summons due to violation of the supervised

19   release, which I approved on August 28, 2008.  And as you know,

20   there are six violations noted.  The first has to do with

21   possession and use of a controlled substance on or about

22   January 28, 2008.  And he tested positive based on urine

23   samples that were submitted for marijuana.

24             Then we have a second violation.  Which is February --

25   well, it's a second violation, but it shows that he tested

1  positive for marijuana on February 7, 2008.

2         Then we have a third violation, possession and use of

3  a controlled substance.  I want to -- and I didn't talk to

4  Mr. Meyer about this.  He's not sure that this represents

5  perhaps a new use or a reading related to the second, but

6  anyway, numbers, there are three distinct violations, two of

7  which are definite and probable at least from probation's

8  perspective.

9         Then we have a failure to report arrest/questioning by

10 law enforcement, which is violation no. 4.  And in this case,

11 Mr. Davis admitted to probation that he had deliberately

12 provided a false statement on his November 2006 monthly

13 supervision report, as he stated, that he could beat this case

14 and thus would not have to report it to probation.  So he lied

15 to his probation officer, which concerns me.  In other words,

16 he submitted a false monthly statement.

17        Then we have the fifth violation, failure to report

18 arrest/questioning by law enforcement officer.

19        And when I note some of these things, and then in

20 connection with the fifth violation, it says, quote, On

21 June 12, 2008, that the defendant stated that he had been

22 driving a motor vehicle without a valid driver's license.

23 Defendant told me that on the evening of May 20, 2008, he had

24 gone out to a club at 1:30 a.m. and had been stopped by police

25 for driving without his headlights on.

1    Why is the defendant, who is on supervised release and

2    who is not supposed to be drinking and using drugs, at a club

3    at 1:30 a.m.  It doesn't pass the smell test.

4    Then we have the sixth violation, failure to report

5    arrest/questioning by law enforcement.  And this has to do with

6    events that occurred in July of 2008.

7    Now, as I understand it, these charges were dismissed

8    because, as I understand it, the police officer didn't ask for

9    consent before he searched the defendant.  But there's a strong

10   suggestion from this fact pattern that the defendant was using

11   marijuana.  Because while speaking with the defendant, the

12   officer detected a strong smell of marijuana coming from inside

13   the vehicle.  Upon being asked to exit the vehicle, the

14   defendant immediately became nervous, asking questions, and

15   became fidgety.  After he stepped out of the vehicle, the smell

16   of marijuana grew stronger.  And this is an incident that

17   occurred at 11:30 p.m. on July 28, 2008.

18   As I understand it, because I asked Mr. Meyer about

19   this, these charges were dismissed so obviously there can't be

20   any charges.  But when I look at the totality of this

21   picture -- and I realize we're here today because the defendant

22   was unwilling to go to a residential reentry center for up to

23   120 days -- my reaction is why shouldn't I set this down for a

24   violation hearing and why shouldn't I determine if the

25   defendant shouldn't be sent back to jail if in fact these

1    violations did occur.  And I express no opinion about whether

2    they did or didn't occur.

3         So this pattern troubles me.  And most likely if the

4    defendant had agreed to what probation suggested, meaning a

5    modification to include placement into a residential reentry

6    center, I probably would have approved it.  But when that

7    didn't happen, which the defendant had a right to do, of

8    course, I took the time to look at the whole file.

9         I don't like this picture.  It seems like Mr. Davis is

10   willy-nilly disobeying the law.  He has used drugs, he's gotten

11   caught on a couple occasions, and there's a strong suggestion

12   he's been using marijuana on a continuous basis.  He's out late

13   at night, and I don't understand why there shouldn't be a more

14   severe intervention by this Court.

15        So I just wanted to put on the table my thoughts,

16   Mr. Norton, because as I understand from Mr. Meyer, you're

17   probably going to propose electronic monitoring be imposed, and

18   I don't understand why that makes any sense, either.

19        So let me hear from you.

20        MR. NORTON:  Your Honor, I can speak to the Court by

21   way of offer of proof or call Mr. Davis as a witness or just

22   ask the Court if the Court has questions of Mr. Davis, he has

23   indicated his desire and willingness to explain to the Court

24   whatever factual background and circumstances the Court might

25   like to inquire into about these matters of concern to the

1  Court.

2         By way of both offer of proof and statement, the first

3  three violations that are listed in the original report, also

4  be -- I want to be sure the Court is aware that just this

5  morning I got report of a violation which was a fight on

6  September 8 --

7         THE COURT:  Right, right, I understand.  I didn't

8  allude to that, but that's the most recent report.  This fight

9  and apparently there are misdemeanor charges pending against

10 him at this time, as I understand, Mr. Norton.

11        MR. NORTON:  I don't know anything about that, other

12 than what I read this morning.  But outside of the report

13 that's there, it looks like Mr. Davis was assaulted, himself,

14 but that's not -- when everybody comes in to sort things out,

15 everybody is pulled into the process.

16        But by way of both offer of proof and statement, the

17 first three violations, Mr. Davis would testify would -- that

18 he would admit, acknowledge that for a period of time from

19 early December '07 until the test that's referred to in that

20 first violation, which is January 3, urine sample on

21 January 23, he had relapsed and was using marijuana.

22        He would further testify that after January 23, there

23 were no further uses of marijuana by him, and it's his belief

24 that the February 7 and February 11 tests demonstrate or show

25 residue of marijuana in his system that was just a carryover

1  from the use prior to the January 23.

2       He would further state that since that date, and

3  there's some allusion in this most recent report to a sort of a

4  trace of marijuana that's below the national reporting cutoff

5  levels, and I'm not sure what that means, but that's the last

6  line of the report I got this morning.  If it's not reportable,

7  or not a violation, it probably ought to not be referred to.

8  But at least since those three tests, there's been no further

9  level of marijuana found as a result of any UA samples that

10 Mr. Davis has, has submitted.

11      THE COURT:  Let me interrupt you.  And I don't mean

12 and it's not appropriate for me to ask the defendant to admit

13 marijuana uses for which there haven't been verified tests, but

14 there's a pattern here that disturbs me, and I need to know

15 whether or not the defendant's been using.  And I say this not

16 to be punitive.  It's not to be punitive.  But he needs to

17 'fess up with me and tell me what his situation is.  Because

18 there is circumstantial evidence in all this that would lead me

19 to draw a inference, emphasizing an inference, that he's

20 probably continued to use marijuana, even if he hasn't tested

21 positive.

22      And if so, if there's no basis for me to draw such an

23 inference, I need to better understand that because the

24 totality of all of this is really what concerns me more, to be

25 honest with you, Mr. Norton, than the earlier incidents because

1   we're now at October and if he tested positive early in the

2   year and if probation didn't bring him to me for that sooner, I

3   probably wouldn't slam him on that.  But I am concerned about

4   the cumulative effect of all this.  I am concerned about the

5   reference in the most recent report to a diluted urine sample.

6   The inference to be drawn is that it was somehow intentionally

7   diluted so that the amount of marijuana that was detected would

8   be lower than it otherwise would have been.  Again, I'm not

9   making any accusation and I don't want the defendant to believe

10  that I will not give him fairness, but I just need to have him

11  be honest about what he's doing or not doing.

12          MR. NORTON:  I appreciate that, Your Honor.  I've had

13  these discussions with Mr. Davis as well.

14          I might just back up and say that the Court correctly

15  summarized sort of the status of why we are here when this

16  matter first arose and I as Mr. Davis's CJA-appointed attorney

17  during the trial was contacted by Mr. Meyer.  I believe he'd

18  already had contact with Mr. Davis about the possible

19  resolution being a return for a period of time to a,

20  essentially a custodial setting, a residential reentry center.

21          Mr. Davis is perfectly willing to answer any questions

22  the Court has and is going to be straightforward about them, I

23  believe.  But quite frankly, the problem is in that residential

24  incarceration setting is that he has a six- or seven-year-old

25  son who he is the sole custodial parent for.  He has a

1   full-time job as a hairdresser in Aurora called Cuts and Style.

2   He is the supporting parent for this child, and if he were to

3   be placed into a custodial setting, there is no other parent.

4   The mother of the child is currently in custody in a state of

5   Colorado institution.  There is no other person able to take

6   care of that child.

7           That situation was explained to Mr. Meyer, and Mr.

8   Meyer rightly said, based on these violations, I can't, I can't

9   accept that kind of a setting, which would be ankle bracelet or

10  some kind of home detention with a right to go to the

11  employment.  And Mr. Davis asked for the opportunity to plead

12  with the Court for that type of resolution rather than a

13  custodial setting simply because of his parental

14  responsibilities to this child.  That's what this is all about.

15          THE COURT:  No, and I understand that.  We're going to

16  get to that.

17          What I think concerns Mr. Meyer -- and I don't mean to

18  speak for him -- and concerns me is that there are these

19  inferential suggestions that he's continued to use drugs even

20  if he hasn't been tested; and of course if he's on an ankle

21  bracelet, there would be no inhibition to him using alcohol

22  and/or drugs.  It would mean that he'd have to stay at home,

23  but he could be at home smoking pot.  And so I think I need to

24  understand more, honestly, about what Mr. Davis has done.

25          And it would be better if he were -- if he's been

1   using drugs, to 'fess up here.  I'm not -- this is not a

2   violation hearing, so under no circumstance today could I do

3   anything, because this wasn't noticed for that.  So I want to

4   make it clear, but this case has gotten my attention again, and

5   I got to make sure that Mr. Davis understands that he has to

6   cease and desist from any activity that either puts him in the

7   zone of using drugs, being out late at night, hanging around

8   with people who are doing illegal things, getting arrested,

9   getting charged, and doing what he wants to do even if he knows

10  he shouldn't.

11          So those are the areas where I have concerns; and,

12  Mr. Norton, however you choose to address those is up to you.

13  If you choose not to, I have to figure out what I want to do

14  next.  But I'm not going to limit this hearing today just to

15  whether or not it should be residential reentry center, a

16  modification to supervised release, or an ankle bracelet.

17  Because I've got these sort of overarching concerns.

18          MR. NORTON:  I appreciate that.  I've consulted and

19  conferred with Mr. Davis, and he's prepared to testify, Your

20  Honor, and answer questions the Court may want to put to him in

21  a challenging way.

22          THE COURT:  Okay.

23          MR. NORTON:  I don't know how you'd like to handle

24  that examination, if you'd like to have me ask him questions

25  first.

1          THE COURT:  You can ask him questions.  But I think

2    having him testify under oath would be a helpful thing.

3          MR. NORTON:  I think it would be as well, Your Honor.

4    Recognizing for the record that I rarely recommend that a

5    client of mine take the stand in this or any other courtroom, I

6    agree with the Court.

7          THE COURT:  Okay.

8                    (**DACHAUN DAVIS, DEFENDANT, SWORN**)

9          THE COURTROOM DEPUTY:  Please be seated.

10         THE WITNESS:  Good morning, Judge.

11         THE COURT:  Good morning, Mr. Davis.

12         THE COURTROOM DEPUTY:  Please state your full name and

13   spell your full name for the record.

14         THE WITNESS:  Dachaun Davis, D-A-C-H-A-U-N, Davis,

15   D-A-V-I-S.

16                      **DIRECT EXAMINATION**

17   BY MR. NORTON:

18   Q    Good morning, Mr. Davis.

19         Tell me your age.

20   A    My age is 28 years old.

21   Q    And tell me your family situation.

22   A    Currently, like you said, I am the sole provider for my

23   son, Dachaun Davis, Jr., which is seven years old.  My wife is

24   currently in custody at La Vista Pueblo facility for women.

25   That's basically it.

Dachaun Davis - Direct

1  Q   Where does Dachaun, Jr., stay during the day or what does

2  he do during the day?

3  A   From 8:30 till 3:45, he is at school.  He attends Palmer

4  Elementary.  And from that time, I am at work at Expertise Cuts

5  and Styles, Colfax and Galena.

6          THE COURT:  Colfax and where?

7          THE WITNESS:  Galena.

8          THE COURT:  That in Denver or Aurora?

9          THE WITNESS:  Aurora.  80012.

10  BY MR. NORTON:

11  Q   Let's talk a little bit about Dachaun, Jr., for a minute.

12  I want to know and have you tell the Court exactly how you care

13  for Dachaun, Jr., how you get him to school, how he is picked

14  up from school, where he is when you're not in the home, either

15  at work or wherever else.

16  A   Okay.  My weekly schedule is get him to school by

17  eight-thirty.  I have to be to work by ten.  And normally I use

18  my auntie's car, that Mr. Meyers knows about.

19  Q   What?

20  A   My auntie's Cadillac.  The last couple of weeks, I've had

21  some problems with the car, so I've had a friend, you know,

22  bring me or take me to the designated areas that I need to be

23  at.  He has football practice Tuesday, Thursday, and Friday,

24  which I attend.  Games on Saturday.

25          THE COURT:  You're talking about your son now?

Dachaun Davis - Direct

1          THE WITNESS:  Yes, sir.

2          THE COURT:  All right.  Go ahead.

3          THE WITNESS:  Yes, sir.

4          That's basically it as far as --

5    BY MR. NORTON:

6    Q    Okay.

7          Now, who picks him up at school?

8    A    I do.

9    Q    And you take him to the football practice and the games and

10   so forth?

11   A    Yes, sir.

12   Q    And then what are your work hours at the hair stylist that

13   you work at?

14   A    My normal work hours are ten o'clock a.m. to eight o'clock

15   p.m. in the afternoon.  But because he gets out at 3:45, they

16   allow me time to leave, go pick him up.  Sometimes he comes

17   back to the shop with me.  And he does his homework there.  And

18   practice is by six o'clock, so we go from the shop to football

19   practice, and then home.

20   Q    Okay.

21          So are there times during your weekly schedule when

22   you leave him alone or unattended, you're working or somebody

23   else?

24   A    My mother.

25   Q    Okay.

Dachaun Davis - Direct

 1   A    I might take him to my mother, occasionally.  Like on

 2   Mondays, I attend my drug class.  At six o'clock till

 3   seven-fifteen, so in between this time, if I -- if, if I don't

 4   have a designated babysitter, I take him to my mother's house.

 5   Q    Where are you currently residing?

 6   A    1121 Albion Street, Apartment 52, Denver.

 7   Q    Who lives in that apartment with you?

 8   A    Me and my son.

 9   Q    And where is your wife at the current time, the mother of

10   your son?

11   A    She's currently in La Vista Pueblo in the women's facility

12   in prison.

13   Q    And how long is she there for at least as you understand

14   it?

15   A    I think she's on something like a turnaround.  Like she was

16   placed in a halfway house and some situation occurred and they

17   sent her back to prison.  And I think it's just a turnaround

18   period till they allow her to be placed back into a facility

19   like that.  So it could be anywhere from six to nine, to the

20   duration of her incarcerated time.  'Cause they switched her

21   DOC term, I mean her community -- community corrections term

22   into a DOC, during the period of time of corrections, term,

23   which it was four years, but she don't have to stay in that, in

24   prison until the whole time is done.  She can get out in

25   between time if she's awarded that, I guess.

Dachaun Davis - Direct

1  Q   When do you understand she would be available to be able to

2  care on an overnight basis for your son?

3  A   Wow.  That will probably be, if not a year, it might be

4  years.

5  Q   Why is it that your mother cannot care for your son on an

6  overnight or ongoing basis?

7  A   My mother is currently going through like some knee

8  problems.  She had knee problems.  She just graduated from

9  Cambridge college -- not Cambridge -- Concord for her, for her

10  medical or medical coding ability degree and she hasn't been

11  able -- you know, her physical abilities are not up to par yet.

12  Q   Is there anyone else in your family or even a close friend

13  that you know that you would entrust the care of Dachaun, Jr.,

14  to?

15  A   No, sir, not offhand.

16  Q   Okay.

17       Now, let's talk just a little bit about your job as a

18  hair stylist.  How long have you had that job?

19  A   Yes, sir.  We've been currently in business for

20  approximately two years.  Before that time, I was, I was in

21  school for barbering.  I got out of school.  My uncle Keith

22  Star wanted to go in business and get his own shop, so he did

23  that.  And allowed me to work there.

24  Q   So it's your uncle that owns the shop?

25  A   Yes, sir.

Dachaun Davis - Direct

16

Q    That's why he's cooperating with you on your time and so

forth?

A    Yes, sir.  Yes, sir.

Q    You making any kind of living by doing this work?

A    Like I said, we've been in business for two years.  The

first year, it was mediocre, a little rough.  This year it's

looking a whole lot better.  We're putting products into the

shop that we sell.  Not just as well as doing hair and

eyebrows, we're trying to think of other ways to get money into

the shop.  It could always be better, I guess.

Q    Are you making enough from your job there at the hair

stylist to be able to support yourself and your son, Dachaun,

Jr.?

A    Yes, sir.

THE COURT:  What is your current income?

THE WITNESS:  My current income.  It depends like --

on a monthly basis, I make probably about, let's say 500 a

month.

THE COURT:  And how long have you been making on the

average of $500 a month?

And I know you gave Mr. Meyer a report, so I'm not --

just need to better understand what dollar amount you're

talking about here.

THE WITNESS:  Right.

How long.

Dachaun Davis - Direct

1        I would say for the -- probably like the duration.

2    It's probably fluctuated in between time.

3        THE COURT:  When you say $500 a month, is that net or

4    gross?

5        THE WITNESS:  That is gross.

6        THE COURT:  Okay.

7        How much, how much is your rent?

8        THE WITNESS:  I'm currently on section 8 housing.

9    DAHI.  They pay, they pay all of my rent.  I pay utilities.

10       THE COURT:  Okay.  So what is the amount of the rent,

11   I'm asking.

12       THE WITNESS:  The amount is 845.

13       THE COURT:  So section 8 pays the landlord for the

14   rent.

15       THE WITNESS:  Yes, sir.

16       THE COURT:  All right.

17       And -- all right.  Okay.

18       Go ahead, Mr. Norton.

19   BY MR. NORTON:

20   Q   That's a pretty tight amount of money to make it through

21   the month on.  Are you supplementing or getting income from any

22   other source?

23   A   Yes.  I have help from my mom.

24   Q   You what?

25   A   I have help from my mother.

Dachaun Davis - Direct

1   Q    Loans from your mother?

2   A    Yeah.

3   Q    Or gifts?

4   A    Yeah.

5   Q    How much a month has she given to you?

6   A    It just depends.  If I need her to help me with my

7   utilities, she will.  So maybe a hundred, hundred 50 to maybe

8   two.

9   Q    Any other source?

10  A    No, I don't receive anything else.

11  Q    When did you get out of prison, Mr. Davis?

12  A    July 12, 2005.

13  Q    And how long was it after you were released that you

14  reported to the probation office and probably Mr. Meyer, I

15  would presume; is that correct?

16  A    From -- yeah.  From July 12 to December 21, if I'm correct,

17  maybe a day or two off, I was incarcerated.  I was at the

18  halfway house on Federal, I forgot the name of it.  But from

19  July 12 to December 21, '05, I was in the halfway house.  So I

20  really didn't deal with Meyers, Mr. Meyers, in between that

21  time, from July to December.

22  Q    All right.

23  A    It was only after I got out of probation -- after I got out

24  of the halfway house, then me and Mr. Meyer.

25  Q    So sometime in January of 2006, I take it, is when you

Dachaun Davis - Direct

1  began meeting with or relating to Mr. Meyer from the probation

2  office?

3  A   Yes, sir.  Yes, sir.

4  Q   Now, have you been obliged to take urinalysis, submit

5  urinalysis, samples since that July of 2006?

6  A   Yes, sir.

7  Q   How often are you supposed to do that?

8  A   It's color code.  As far as -- well, not a color code.  But

9  it's a code that you call a line every day.  You get a code.

10  My code is P18.  Before the UA, hot urine sample, I had got

11  down to where I was four times a year.  So instead of calling,

12  I would just wait for Mr. Harris to contact me and then go take

13  a UA.

14  Q   So since the so-called hot sample in January 23 of 2008,

15  how frequently have you submitted urine samples?

16  A   Once a week, sir.

17  Q   Pardon me?

18  A   Once a week.

19  Q   Once a week?

20  A   Once a week.

21  Q   Beginning in this January 2006 time frame forward, how many

22  times when you were to give a sample have you missed?

23  A   January 26?

24  Q   January 2006 to today's date?

25  A   How many?

Dachaun Davis - Direct

1  Q    How many times did you not give a sample during that time?

2  A    I just refer to him.  Maybe early September that I missed a

3  UA.

4  Q    Did you make that up?

5  A    Huh?

6  Q    Did you make that up?

7  A    No, he said that I couldn't make it up.  But he had let me

8  make one up when I went to jail concerning the marijuana that

9  was --

10  Q    So during this approximately two-, almost three-year period

11  of time, you've missed one sample; is that right?

12  A    One UA, yes, sir.

13  Q    Now, are you doing drugs?

14  A    No, sir.

15  Q    Are you selling drugs?

16  A    No, sir.

17  Q    Are you doing marijuana?

18  A    No, sir.

19  Q    Have you been doing marijuana since you've been out of

20  prison and on probation?

21  A    Yes, I have.

22  Q    Let's talk about the possession, the charge, the first

23  charge whereby there was a hot sample on January 23, 2008.  And

24  then one on February 7, 2008, and then one February 11, 2008.

25       What's your explanation to the Court for those

1   situations?

2   A   What it was is for the New Year's, you know, we was

3   partying and I let the situation get to me, you know, I slipped

4   back into what I know is wrong for me, being on probation and

5   as far as getting my life back together.  I've been in this

6   courtroom.  I've seen people, you know, come out of here with

7   life sentences, you know, and I don't want that for me, you

8   know.  But it was early January, you know, I got caught up, and

9   I allowed myself to slide back into that.  You know, I used

10  marijuana.

11       THE COURT:  On how many separate occasions do you

12  recall using marijuana in either late '07 or early '08?

13       THE WITNESS:  I would say five or six.

14       THE COURT:  Okay.

15       THE WITNESS:  Maybe six or seven.

16       THE COURT:  Six or seven.

17       All right.  Now, I want to ask you about this not for

18  purposes of any intent for criminal consequences, but you're

19  aware that one of the, one of the charges in this order that I

20  signed regarding the petition for issuance of summons due to

21  violation of supervised release relates to contact you had with

22  the Denver Police Department on or about July 15, 2008.  Do you

23  know what I'm talking about?

24       THE WITNESS:  Yes, sir.

25       THE COURT:  Now, as a part of the charge that's in

Dachaun Davis - Direct

1   here, a copy of the police report was obtained.

2         THE WITNESS:  Yes, sir.

3         THE COURT:  According to the statement of probable

4   cause, on July 15, 2008, at approximately 11:30 p.m., a Denver

5   police officer observed you, Mr. Davis, driving a vehicle and

6   speeding.  The defendant's vehicle also had dark tinted

7   windows, including illegally tinted front side windows.  Upon

8   stopping the vehicle, the defendant had all of the side windows

9   partially rolled down.

10        Now, is that true or untrue, what I just read?

11        THE WITNESS:  All of it is true except for the fact

12   that all the windows were partially rolled down.

13        THE COURT:  Okay.  Why were you out at night at 11:30

14   p.m. on July 15?  What were you doing?

15        THE WITNESS:  I had just picked up a girl that I'm

16   sure in the police report that they stated there was another

17   lady with me.  I had just picked up a girl.  We were headed

18   back to my house.

19        THE COURT:  Okay.

20        Now, I want to skip for a moment this reference to you

21   didn't have current proof of insurance.

22        Then it says, quote, While speaking with the

23   defendant, the officer detected a small smell of marijuana

24   coming from inside the vehicle.  Upon being asked to exit the

25   vehicle, the defendant immediately became nervous, asked many

Dachaun Davis - Direct

1    questions and became fidgety.  After he stepped out of the

2    vehicle, the smell of marijuana smelled stronger.  After

3    patting down the defendant, the officer felt a large object and

4    the defendant stated it was his wallet.

5            I'm not going to ask you about that, because the

6    charges were dismissed; is that right?

7            THE WITNESS:  Yes.

8            THE COURT:  Was there marijuana in the vehicle on

9    July 15, 2008?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  And why was the marijuana in the vehicle?

12           THE WITNESS:  Like I said, I had picked up a lady

13   friend, and when I picked her up, she let me know that she did

14   have marijuana on her, but I said that I'm legal, you know, I

15   don't have nothing to worry about and I was pulled over.  And

16   she was like, I have a warrant and I'm like, don't worry about

17   it, you know what I'm telling you.

18           THE COURT:  Why would you have somebody in your car --

19   let me back up.

20           Who was smoking marijuana in the vehicle on July 15?

21           THE WITNESS:  No one, sir.

22           THE COURT:  Why was there the smell of marijuana in

23   the vehicle if no one was smoking it?

24           THE WITNESS:  That's the question I asked the officer.

25           THE COURT:  Do you admit that there was a smell of

Dachaun Davis - Direct

1  marijuana in the vehicle?

2          THE WITNESS:  There was marijuana in the vehicle.

3  There was no lit marijuana, there was no smoked marijuana,

4  there was no doobies in the ashtray, there was nothing like

5  that.

6          THE COURT:  Where did the marijuana come from, then?

7          THE WITNESS:  It came from her.

8          THE COURT:  Why were you associating with somebody who

9  had been smoking marijuana?

10         THE WITNESS:  I guess you can say bad judgment of

11  character.  I knew it, but I didn't --

12         THE COURT:  No, you did it.  I'm not attempting --

13  this is not just part -- I'm trying to understand who you are

14  and why you're doing stuff you're doing.  This is July 15.  Why

15  would you have somebody in your car -- I want you to be honest

16  with me now.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Tell me honestly why you had a woman in

19  your car who had warrants out for her arrest and who reeked of

20  marijuana.  So explain to me why you did those things.

21         THE WITNESS:  She was a -- she is a escort.

22         THE COURT:  Okay.

23  BY MR. NORTON:

24  Q   Mr. Davis, are you saying that you were looking for a

25  sexual relationship with this woman?

Dachaun Davis – Direct

1  A   Not necessarily a sexual relationship because I had knew

2  her before then.  You know, if it's like that, I had had sex

3  with her before then.  So it wasn't strictly a sexual thing

4  like that.  It wasn't that I was looking to have sex that night

5  or nothing like that.  I had sex with her before that.

6          THE COURT:  Now, are you telling the truth about the

7  marijuana?  I want to know the truth now.  I don't want any

8  made-up information.

9          Now, again, this has nothing to do with you being

10  charged criminally with drug use, possession, because those

11  charges were dropped.  But I want to know, I want to know that

12  you're telling me the truth.  So you're telling me that there

13  was a strange smell of marijuana in the vehicle.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  But nobody was using marijuana; but nobody

16  was using marijuana, is that what you're saying?

17          THE WITNESS:  No, sir, no one smoked marijuana.  They

18  don't even smoke in my car because they know I don't smoke.

19          THE COURT:  If you smell marijuana in the car, even

20  that means you allowed someone to enter the car who reeked of

21  marijuana; is that right?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Why did you do that?

24          THE WITNESS:  Bad choice.

25          THE COURT:  But why did you make the choice?  Of

Dachaun Davis - Direct

1   course it's a bad choice because you're in court today talking

2   about it.  But I want to know what your state of mind was at

3   the time you did it.

4        THE WITNESS:  My state of mind was I'm going home.

5   It's okay that she smells like marijuana, I know I don't smoke

6   it.  I know I don't smoke, okay, let's just go, we're going

7   straight home.

8        THE COURT:  Do you understand that your credibility is

9   not as strong as it might be because of your prior record?

10        THE WITNESS:  Yes, sir.

11        THE COURT:  And you've admitted to using marijuana.

12        THE WITNESS:  Yes, sir.

13        THE COURT:  And you're in a car that reeks of

14   marijuana.

15        THE WITNESS:  Yes, sir.

16        THE COURT:  But then you're telling me that you didn't

17   use marijuana.  So do you understand why I have some question

18   about whether you're telling the truth here?  Does that make

19   sense to you?

20        THE WITNESS:  Yes, sir.  The incident where I used

21   marijuana was in January.

22        THE COURT:  No, I understand that.  We're talking

23   about July now.

24        THE WITNESS:  Okay.

25        THE COURT:  I understand you've admitted to using in

Dachaun Davis - Direct

1  January.

2          Now, I want an honest answer to this question.  And

3  recognizing you are under oath.  When is the last time that you

4  consumed marijuana or any other illegal drug?

5          THE WITNESS:  I would say mid January.

6          THE COURT:  All right.  So you have not consumed any

7  marijuana since mid January of two --

8          THE WITNESS:  Since mid January, yes, sir.

9          THE COURT:  Are you telling the truth?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  Why should I believe you?

12         THE WITNESS:  Because I am subject to urine samples at

13  any point under Mr. Meyers' discretion.

14         THE COURT:  All right.  Now, let me ask a different

15  question.  Because I want to move this along.

16         You were asked to agree to a modification of your

17  conditions of supervised release to include placement in a

18  residential reentry center for a period of up to 120 days,

19  based on these violation.  Do you understand that?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  And you declined to agree do that, right?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Why did you decline to agree to do that?

24         THE WITNESS:  As Mr. Norton and myself stated, I am

25  the sole provider of my son.  It's just me and him.  Honestly,

Dachaun Davis - Direct

1   it's just me and him.  And if I don't pick him up, sometimes I

2   might be able to arrange for someone to pick him up from

3   school, but mainly I pick him up.  The teachers, his teacher,

4   Miss Currington, can verify that all of this is true.  I pick

5   him up, I attend meetings, I attend football games, football

6   practice, I'm the sole provider for my son.

7           THE COURT:  How important is it for you to be with

8   your son?

9           THE WITNESS:  And I know where this is going.  It's

10  very important.

11          THE COURT:  Well, if it's important, then you're going

12  to have to change the people you hang out with, you're going to

13  have to change some of your habits.  And you're going to have

14  to make it clear to me that you aren't putting yourself in

15  situations where you either get arrested, you're around people

16  that reek of marijuana, although you claim you haven't consumed

17  it, and you are squeaky clean.  'Cause if you aren't squeaky

18  clean, I don't think you want to be with your son.

19          Do you understand what I'm saying?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Okay.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Now, what pending criminal charges do you

24  have against you right now?

25          THE WITNESS:  What it is right now, I was at the

Dachaun Davis - Direct

1   bar --

2          THE COURT:  No, no, I don't want to know the details

3   of it.  I'm not going to ask you to describe what happened.  I

4   don't think that's a fair thing.  I'm only simply asking a very

5   limited question.  What pending charges do you have against

6   you?

7          THE WITNESS:  A fighting ticket.

8          THE COURT:  Okay.

9          MR. NORTON:  May I interject?

10          THE COURT:  Yes, absolutely.

11   BY MR. NORTON:

12   Q   The September 8 event we just got the report on this

13   morning, is that the criminal charge?

14   A   Did it happen on September 8?  I'm not familiar.

15   Q   That's what this report is.

16   A   I know I go to court October 8.

17          THE COURT:  What is the charge against you?

18          THE WITNESS:  Fighting.

19          THE COURT:  Is it a misdemeanor or felony?

20          THE WITNESS:  Misdemeanor.

21          THE COURT:  Do you have legal counsel representing

22   you?

23          THE WITNESS:  No.  Not currently at this time.

24          THE COURT:  Why don't you have legal counsel

25   representing you?

Dachaun Davis - Direct

1    THE WITNESS:  We haven't even been through it yet.  I

2    mean, from September 8, from what Mr. Norton just stated, when

3    it happened to --

4    THE COURT:  All right.

5    MR. NORTON:  I think the probable answer is, Your

6    Honor, a misdemeanor wouldn't qualify him for a public

7    defender, and he probably doesn't have the money to hire an

8    attorney.

9    THE COURT:  Do you have any other pending criminal

10   charges against you?

11   THE WITNESS:  No, sir.

12   THE COURT:  Okay.

13   All right.

14   Mr. Norton, do you have any more questions?

15   BY MR. NORTON:

16   Q   What, Mr. Davis, can you do to assure this Court, his

17   honorable Judge Daniel, that you're going to stay out of bars,

18   you're going to stay away from people doing drugs, you're going

19   to stay away from places you shouldn't be, what can you assure

20   him of that and make him believe that you're telling the truth?

21   A   Mr. Meyers gave me the hand paper about this Court today,

22   in which he notified me that I cannot drink, that I'm not

23   allowed in bars, because I'm currently in treatment, which is

24   prohibited if you're in treatment.  Which I didn't know.  I

25   didn't know.  But I can do all of those things.  I can -- I

Dachaun Davis - Direct

1   don't know, maybe a weekly, a weekly, what would you call it --

2   a weekly interview or.

3   Q    Like Alcoholics Anonymous or something like that?

4   A    Not necessarily that because I'm currently in classes.

5   Q    Are you?

6   A    Yes.

7   Q    How often do you go to class?

8   A    Once a week, every Monday, from six o'clock to

9   seven-fifteen.

10          MR. NORTON:  I have nothing further.

11          THE COURT:  Okay.  Mr. Till, do you have questions?

12          MR. TILL:  Just a few.

13                    **CROSS-EXAMINATION**

14   BY MR. TILL:

15   Q    Mr. Davis, are you under the impression that it's okay to

16   lie to Mr. Meyer when he asks you something?

17   A    No, sir.

18   Q    And do you know that you're supposed to report contacts

19   with the police as soon as you have them?

20   A    Yes, sir.

21   Q    Why don't you do that?

22   A    I guess my ignorance to the court proceedings, to the

23   proceedings that Mr. Meyers have, you know, to, you know, I

24   thought, I thought would be more severe than what it was, now

25   that I should have just notified him of the traffic ticket and

1   brought along, you know, this court proceeding where he's

2   saying that I lied to him, which that was not my intention, I

3   was really just honestly trying to get tooken care of because I

4   didn't want -- in my perspective, I thought the traffic ticket,

5   it was, you know, something minor.  You know.  And I just

6   thought I could get it tooken care of.  That was a bone-head

7   error on my part.  It was a mistake, a bad choice.

8   Q   What was the mistake?

9   A   The mistake was not notifying Mr. Meyers within 72 hours

10  like I was notified, when I signed the probation papers, when I

11  got out of prison.

12  Q   So you gave your word that you were going to do that?

13  A   I gave my word.

14  Q   And you broke your word?

15  A   Yes, sir.

16  Q   Are you going to stop doing that?

17  A   Yes, sir.

18  Q   Did you tell Mr. Meyer that the marijuana was on the seat

19  in the car?

20  A   Yes, sir.

21  Q   On July 15?

22  A   Yes, sir.

23  Q   But it wasn't on the seat, was it?

24  A   You're right, yes.

25  Q   So why did you tell him that part of the story?

Dachaun Davis - Cross

1  A   I don't have no explanation for that.  You know.

2  Q   Well, you're ready to give your word to the Court and to

3  Mr. Meyer that you're going to start telling him the strict

4  truth?

5  A   Yes, sir, that's my word here today.

6  Q   You saw what happened to people who tried to cheat and lie

7  and wiggle-waggle and break the rules, didn't you?

8  A   Yes, sir, firsthand.

9  Q   A pound of marijuana, that's a distribution amount of

10  marijuana, isn't it?

11  A   I guess.  Yes.

12  Q   Have you ever paid for marijuana, yourself?

13  A   Yes, I have.

14  Q   How much does an ounce of marijuana cost?

15  A   Varies.  Varies.  Typical, probably about 40, 50 bucks.

16  Q   Okay.

17       So what is a pound of marijuana worth, at 40, 50 bucks

18  an ounce?

19  A   How many ounces is in -- 16 ounce in a pound?

20  Q   Right.

21  A   So $50 an ounce, so what is that, maybe about 500, 600

22  bucks.

23  Q   Is that a lot of money to you?

24  A   No, sir.

25  Q   It's not?

Dachaun Davis - Cross

1   A    No, sir.

2   Q    On your tight budget, it's not tempting to get five or $600

3   profit from selling marijuana?

4   A    I mean, I could say that a tight budget, I mean,

5   everybody's suffering from a tight budget.

6   Q    Right.

7   A    But if I could get five or $600 and not selling it, I would

8   do it, which I do it every day at work.  I get five.

9   Q    You make $500 a day?

10  A    Not a day.

11  Q    Well, there's temptations out there.

12  A    Yes, sir.

13  Q    Do you know what will happen to you if you slide into those

14  temptations?

15  A    Yes, sir.

16  Q    You don't want to have that happen, do you?

17  A    No, sir.

18  Q    Do you understand that because you have a prior conviction,

19  if you came back in here, the next time it would be much more

20  severe; do you understand that, sir?

21  A    Yes, sir.

22  Q    And by the time you got out, your son would probably be in

23  high school.

24  A    Yes, sir.

25  Q    You don't want that, do you?

Dachaun Davis - Cross

1   A   No, sir.

2   Q   So you have the temptation, can you think about your son?

3   A   Yes, sir.

4   Q   And if you have a temptation to try to minimize or shade

5   the truth or not tell the whole truth, can you think of your

6   son and tell the truth?

7   A   Yes, I can.  And I will.

8   Q   I think the last time I saw you, you were a very young man.

9   To me you're still a young man.

10   A   Yes.

11   Q   You have a world of potential ahead of you, and everyone is

12   going to be very sad if you have to go to prison.  Do you

13   understand that, sir?

14   A   Yes, sir.

15       MR. TILL:  Thank you.

16       THE COURT:  Mr. Norton, do you have any more

17   questions?

18       MR. NORTON:  No, thank you.

19       THE COURT:  I'm going to look you in the eye,

20   Mr. Davis, and tell you this; and if you don't believe me,

21   you'll suffer the consequences for not believing me.

22       What I'm going to do is I'm going to continue this

23   proceeding.  Let me explain what I'm saying about that.  I

24   honestly believe you've been using marijuana since January.

25   But I can't prove it.  I'm not so sure you're being as truthful

1    as you need to be, even though you're under oath, about what

2    happened on July 15, but I'm going to give you one last chance

3    to comply with all the rules of supervised release.

4         If you have any infraction, I don't care what it is, I

5    don't care how minor or technical it is, I want Mr. Meyer to

6    write you up for all the violations, including the five or six

7    in this report and anything new, and we will have a hearing on

8    supervised-release violation.

9         Now, I want to make it clear, I'm not -- my statements

10   don't apply to what you've done previously.  But I'm talking

11   about going forward --

12        THE WITNESS:  Yes, sir.

13        THE COURT:  -- if you have any infractions, any

14   violation, you fail to report to the probation officer, if you

15   test positive for use of illegal drugs, if you associate with

16   people you shouldn't associate with, if you go to bars, if you

17   drink alcohol, you even have the suggestion that you're using

18   more marijuana, I want Mr. Meyer to of course notify you of

19   that; but I want him to convert all of this, including the

20   pending charges and any new ones, into a supervised-release

21   violation hearing.  I'll give you your due-process rights, but

22   if I find that you violated supervised release, guess what I'm

23   going to do?

24        THE WITNESS:  Send me back to prison.

25        THE COURT:  I'm going to send you back to prison.  I'm

1    not going to just send you for a little bit of time.  I'm going

2    to send you for a long time.  'Cause you're on notice that if

3    you really care about your son, if you really care about

4    yourself, if you really care about doing what you're supposed

5    to, you're going to do what you're supposed to.  If you can't

6    figure out how to do that, then you need to be in prison.  It's

7    just that simple.  So you have no margin for error.  You have

8    no room to make mistakes.  You have to do everything by the

9    book, through the book, and be a law-abiding citizen.

10           So do I make myself clear?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  And when you're tempted not to do that, I

13   want you to remember that Judge Daniel told you that if you get

14   caught, 'cause you will get caught, then there will be severe

15   and harsh consequences.

16           Now, I will give you a due-process hearing, because I

17   don't want the record to ever suggest that I would ever take

18   punitive sanctions without giving somebody a hearing, but if as

19   a result of that hearing, it turns out that you've done

20   something wrong, whatever that might be, then I will impose

21   severe, swift consequences.

22           Now, how much longer does he have on supervised

23   release?

24           MR. MEYER:  Your Honor, his expiration date is

25   December 20 of 2010.

1          THE COURT:  So now, to give you some incentive, which

2    there always needs to be, I want Mr. Meyer to keep all of this

3    pending for the next six months.  So if over the next six

4    months nothing occurs of a negative nature, then I want us to

5    have another status conference to figure out what we do next.

6    Because I want to stay in touch with Mr. Davis to satisfy

7    myself that he's doing what he's supposed to, Mr. Norton, and

8    Mr. Till.

9          So, so I take no action today, so therefore I'm not

10   going to order that you go to the residential reentry center

11   because I believe there's some merit to the fact that your son

12   needs you.  Also I'm not going to impose electronic monitoring

13   because I don't think it's going to serve a useful purpose.

14   Because my concern is that you will have a propensity or

15   inclination to drink or use illegal drugs.  But I'm telling you

16   if you do that, you'll get caught and I want Mr. Meyer to bring

17   you back if you do anything, even a technical violation of what

18   you're supposed to do.

19          So if you're not sure of what you can or can't do,

20   what should you do?

21          THE WITNESS:  Contact Mr. Meyer and go over it.

22          THE COURT:  You need to have a sheet that tells you

23   everything you can't do, you need to memorize what's on it, and

24   you need to make sure you don't do it.

25          And if you do do it, realize that what you're telling

1  yourself is that you want to go to jail.

2           THE WITNESS:  Yes, sir.

3           THE COURT:  So you're old enough to make decisions, so

4  you either make an adult decision that shows you care about the

5  law and yourself and your family, or you don't.  And I have no

6  compunction about sending you to jail and then somebody else

7  will have to take care of your son and then that's the

8  consequence.  If that's important enough to you, then you need

9  to reform your actions.

10          So I think what we'll do, Mr. Meyer, I'd like you to

11 sort of prepare a proposed order that sort of just memorializes

12 the high points of what I've said, I'll look at that and we'll

13 enter it --

14          MR. NORTON:  I'm sorry, you're asking me to do that?

15          THE COURT:  No, Mr. Meyer.

16          MR. MEYER:  Yes, Your Honor.

17          THE COURT:  Does anybody have any objections to what

18 I've said, do you have any clarifications, because I want to

19 obviously get input here from counsel.

20          Mr. Till, start with you.

21          MR. TILL:  No objection, Your Honor.

22          MR. NORTON:  No objection, Your Honor.

23          THE COURT:  Mr. Davis, do I make myself abundantly

24 clear?

25          THE WITNESS:  Yes, sir.

1          THE COURT:  So you figure out what you need to do and

2     make it happen.  And if you don't, then the consequences will

3     flow from there.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  All right.

6          MR. MEYER:  Excuse me, Your Honor; will we be setting

7     up a specific date, then, six months?

8          THE COURT:  Yes.  Mr. Keech is there; he has the

9     calendar.  Why don't we get a date six months from how.  Let's

10    just set a date and we're going to call it a status conference.

11    For Mr. Davis.

12         THE COURTROOM DEPUTY:  Do you want to do it April --

13    there's a Thursday, April 2; Friday, April 3, both open.

14         THE COURT:  Doesn't make any difference, just pick

15    one.

16         THE COURTROOM DEPUTY:  Thursday, April 2, at 10 a.m.

17         THE COURT:  Okay.

18         MR. NORTON:  Give me about five seconds to get to that

19    date here.

20         THE COURT:  Sure.  Take your time.

21         MR. NORTON:  That will be fine.

22         THE COURT:  All right.  April 2, 2009, at 10 a.m.

23         Does that work for you, Mr. Till?

24         MR. TILL:  Yes, Your Honor.

25         THE COURT:  We'll be in recess.

1      (Recess at 12:03 p.m.)

2                    REPORTER'S CERTIFICATE

3           I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5    Dated at Denver, Colorado, this 27th day of October, 2008.

6

7                                    s/KaraSpitler_____
                                        Kara Spitler

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25