IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,  )
 )
      Plaintiff/Appellee,  )
 )
v.  )  CASE NO.  CASE NO. 04-1148
 )
THEOLIAN LLOYD  )
 )
      Defendant/Appellant.  )

_____

On Appeal from the United States District Court
for the District of Colorado
The Honorable Wiley Y. Daniel, District Judge

District Court Criminal Action No. 01-CR-0084-N

_____

**APPELLANT THEOLIAN LLOYD'S OPENING BRIEF**
(Oral argument is requested)

_____

Respectfully submitted,

December 30, 2004

JOHN HENRY SCHLIE
LAW OFFICE OF JOHN HENRY SCHLIE , P.C.
6059 S. Quebec Street, Suite 200
Centennial, Colorado 80111
303.830.1616 - Voice
303.860.1297 - Facsimile

Appointed counsel for Mr. Lloyd

# **TABLE OF CONTENTS**

I. TABLE OF CASES, STATUTES AND OTHER AUTHORITIES. . . . . . . . . iii

II. PRIOR OR RELATED APPEALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

III. STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

IV. STATEMENT OF JOINDER IN AND
ADOPTION BY REFERENCE OF ISSUES PRESENTED
FOR REVIEW IN BRIEFS OF OTHER APPELLANTS. . . . . . . . . . . . . . . 2

V. ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

VI. STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
    Nature of the Case, Course of Proceedings, and Disposition Below

VII. STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

VIII. SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 10

IX. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B1. The government did not present sufficient evidence of
        interdependence with other co-conspirators to support
        Mr. Lloyd's conviction for conspiracy. . . . . . . . . . . . . . . . . . . 11

    B2. Pursuant to Mr. Lloyd's Right to a Jury Trial under
        the Sixth Amendment of the Constitution of the United States,
        a jury should have determined the amount of crack cocaine
        attributable to Mr. Lloyd beyond a reasonable doubt. . . . . . . . . . . . 19

    B3. The government failed to prove by a preponderance of the evidence
        that 84 grams of crack cocaine were attributable to Mr. Lloyd
        as part of the conspiracy and relevant conduct. . . . . . . . . . . . . . . . 26

X.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

XI.  STATEMENT OF COUNSEL REGARDING ORAL ARGUMENT. . . . . . .28

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

ATTACHMENTS PURSUANT TO 10TH CIR. R. 28.2(A)

     JUDGMENT IN A CRIMINAL CASE. . . . . . . . . . . . . . . . . . . . . . . . . . TAB A

     SECOND SUPERSEDING INDICTMENT. . . . . . . . . . . . . . . . . . . . . . TAB B

     TRANSCRIPTS OF RECORDED TELEPHONE CALLS. . . . . . . . . .TAB C

     VERDICT FORM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .TAB D

     FINDINGS OF FACT AND CONCLUSIONS OF LAW
          AS TO DEFENDANTS' MOTIONS FOR JUDGMENT
          OF ACQUITTAL PURSUANT TO FED.R.CRIM.P. 29
          CONCERNING COUNT ONE OF THE SECOND
          SUPERSEDING INDICTMENT. . . . . . . . . . . . . . . . . . . . . . . . . . TAB E

     TRANSCRIPT OF SENTENCING HEARING FOR
          ALVIN GREEN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB F

     TRANSCRIPT OF SENTENCING HEARING FOR
          THEOLIAN LLOYD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .TAB G

# I.  TABLE OF CASES, STATUTES AND OTHER AUTHORITIES

**A.**    **Cases:**

Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348,
    147 L.Ed.2d 435 (2000). . . . . . . . . . . . . . . . . . . . . . . 10, 11, 19, 23, 24

Blakely v. Washington, 542 U.S. ____, 124 S.Ct. 2531,
    159 L.Ed.2D 403 (2004). . . . . . . . . . . . . . . . . . . . . . . 1 0, 11, 19, 23, 24

Johnson v. United States, 520 U.S. 461, 117 S.Ct. 1544,
    137 L.Ed.2d 718 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

Kotteakos v. United States, 328 U.S. 750, 755, 66 S.Ct. 1239,
    1243, 90 L.Ed. 1557 (1946). . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

United States v. Badilla, 383 F.3d 1137 (10th Cir. 2004). . . . . . . . . . . . .11, 19, 24

United States v. Bibbero, 749 F.2d 581, 587 (9th Cir. 1984),
    *cert. denied* 471 U.S. 1103, 105 S.Ct. 2330,
    85 L.Ed.2d 847 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Cook, 949 F.2d 289, 295 (10th Cir.1991). . . . . . . . . . . .2 7

United States v. Cotton, 535 U.S. 625, 122 S.Ct. 1781,
    152 L.Ed.2d 860 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 1 9

United States v. Dickey, 736 F.2d 571, 585 (10th Cir. 1984),
    *cert. denied,* 105 S.Ct. 957 (1985). . . . . . . . . . . . . . . . . . . . . .12

United States v. Dirden, 38 F.3d 1131, 1142 (10th Cir. 1994). . . . . . . . . . . 12

United States v. Evans, 970 F.2d 663, 669 (10th Cir. 1992),
    *cert denied* 507 U.S. 922, 113 S.Ct. 1288,
    122 L.Ed.2d 680 (1993). . . . . . . . . . . . . . . . . . . . . . . . .12, 13, 14, 21, 22

United States v. Fox, 902 F.2d 1508, 1514 (10ᵗʰ Cir.),
       cert. denied, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990). . . . . . . . . .1 2, 13

United States v. Grimes, 967 F.2d 1468, 1472 (10ᵗʰ Cir.),
       cert. denied, 506 U.S. 927 (1992). . . . . . . . . . . . . . . . . . . . . . . . .11

United States v. Hooks, 780 F.2d 1526, 1531 (10ᵗʰ Cir.),
       cert. denied, 475 U.S. 1128 (1986). . . . . . . . . . . . . . . . . . . . . . .12

United States v. Hopper, 177 F.3d 824, 829 (9ᵗʰ Cir. 1999),
       cert. denied 528 U.S. 1163, 120 S.Ct. 1179,
       145 L.Ed.2d 1086 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

United States v. Horn, 946 F. 2d 738, 740 (10ᵗʰ Cir. 1991). . . . . . . . . . 12, 13

United States v. Lopez, 100 F.3d 113, 118 (10ᵗʰ Cir. 1996). . . . . . . . . . .12

United States v. Maldonado-Ramires, 384 F.3d 1228 (10th Cir.2004). . . .24

United States v. Memdoza-Salgado, 964 F.2d 993(10ᵗʰ Cir. 1992). . . . . . 15

United States v. Metropolitan Enters, 728 F.2d 444 (10ᵗʰ Cir. 1984). . . . . 13

United States v. Ortiz, 993 F.2d 204 (10ᵗʰ Cir. 1993). . . . . . . . . . . . . 11

United States v. Rios, 22 F.3d 1024, 1028 (10th Cir.1994). . . . . . . . 11

United States v. Shewmaker, 936 F.2d 1124 (10th Cir.1991),
       cert. denied, 502 U.S. 1037, 112 S.Ct. 884,
       116 L.Ed.2d 788 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

United States v. Sophie, 900 F.2d 1064, 1080 (7ᵗʰ Cir.),
       cert. denied, 111 S.Ct. 124 (1990). . . . . . . . . . . . . . . . . . . . . . . . 1 3

United States v. Torres, 53 F.3d 1129, cert. denied

iv

515 U.S. 1152, 115 S.Ct. 2599, 132 L.Ed.2d 845 (1995). . . . . . . . 2 1, 22

United States v. Urena, 27 F.3d 1487, 1489 (10ᵗʰ Cir.),
    cert. denied, 513 U.S. 977 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . .11

**B.**    **Statutes and Rules:**

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C.§ 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 9, 11, 20, 22

21 U.S.C. §841(b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 22

21 U.S.C. §841(b)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C.§ 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. §851. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Title III of the Omnibus Crime Control and Safe Streets Act of 1968. . . . . . 5

Fed. R. App. P. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. App. P. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

F.R.A.P. 28(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Section 2D1.1 of the United States Sentencing Guidelines. . . . . . . . . . . . . 9

## II.  PRIOR OR RELATED APPEALS

Mr. Lloyd filed an appeal from the District Court's denial of release on bond

pending trial in Case No. 03-1327. Said appeal was denied.  There are no other prior

appeals by Mr. Lloyd in this or any related matter.  There are related appeals filed by co-

defendants Alvin Green (Case No. 04-1157); George Murray (Case No. 04-1161);

Sammy Lee Woods (Case No. 04-1168); Willie Small (Case No. 04-1188); and Dwayne

VanDyke (Case No. 04-1201).  Further, Tommy Jones (Case No. 03-1513) was

originally a co-defendant with Mr. Lloyd before his trial was severed from that of Mr.

Lloyd and the other co-defendants.

## III.  STATEMENT OF JURISDICTION

This case arises from the prosecution of alleged offenses against the laws of the

United States after a federal grand jury returned an indictment charging Defendant-

Appellant Theolian Lloyd in four counts of a 62 count Indictment filed on June 7, 2001,

(Vol. I, Doc.1) with a Superseding Indictment filed August 8, 2001 (Vol. I, Doc. 425),

and a Second Superseding Indictment filed on January 7, 2003 (Tab B, Vol. III, Doc.

1595). The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.

This appeal is taken from certain alleged errors committed by the district court up

to and during the course of trial and during sentencing.  The Judgment in a Criminal

Case, the final order or judgment that disposes of all parties' claims herein, was signed

on April 12, 2004 and entered on April 14, 2004.  (Tab A, Vol. VI, Doc. 3029).  M r.

Lloyd filed a timely Notice of Appeal on April 19, 2004 (Vol. VI, Doc. 3036). This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 3 and 4.

## IV.  STATEMENT OF JOINDER IN AND ADOPTION BY REFERENCE OF ISSUES PRESENTED FOR REVIEW IN BRIEFS OF OTHER APPELLANTS

Pursuant to F.R.A.P. 28(i), Mr. Lloyd joins in and adopts by reference the following issues presented for review in the briefs of other related Appellants:

Willie Small (Case No. 04-1188 ) - Issues I, II and III relating to the suppression of evidence obtained pursuant to the wiretap.

George Murray (Case No. 04-1161 ) - Issue III.  Whether the district court erred in denying Defendants' motion for a mistrial/motion for a new jury venire.

As the opening briefs of other related Appellants will be filed subsequent to Mr. Lloyd's Opening Brief, Mr. Lloyd would request the opportunity to join in and adopt by reference the arguments made by said related Appellants.

## V. ISSUES PRESENTED FOR REVIEW

1.  WHETHER MR. LLOYD'S CONVICTION FOR CONSPIRACY TO DISTRIBUTE OR POSSESS WITH THE INTENT TO DISTRIBUTE CRACK COCAINE WAS SUPPORTED BY ADEQUATE EVIDENCE.

2.  WHETHER MR. LLOYD WAS DENIED HIS RIGHT TO JURY TRIAL UNDER THE SIXTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES BECAUSE THE TRIAL COURT, RATHER THAN THE JURY, MADE FACTUAL FINDINGS AT SENTENCING UNDER A PREPONDERANCE OF THE EVIDENCE STANDARD WHICH INCREASED THE PENALTY BEYOND THE PRESCRIBED STATUTORY MAXIMUM.

3.  WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE

2

GOVERNMENT HAD PROVED THAT 84 GRAMS OF CRACK COCAINE WERE ATTRIBUTABLE TO MR. LLOYD AS PART OF THE CONSPIRACY AND AS RELEVANT CONDUCT BY A PREPONDERANCE OF THE EVIDENCE.

## VI.   STATEMENT OF THE CASE
### Nature of the Case, Course of Proceedings, and Disposition Below

Mr. Lloyd was originally one of 29 defendants charged in a 62 count Indictment filed on June 7, 2001, (Vol. I, Doc. No. 1) with a Superseding Indictment filed August 8, 2001 (Vol. I, Doc. No. 425), and a Second Superseding Indictment filed on January 7, 2003 (Tab B, Vol. III, docket 1595), In the Second Superseding Indictment, Mr. Lloyd was charged, along with 25 other individuals, with conspiracy to distribute and possession with intent to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C.§ 846 (Count 1), and with three substantive counts of distribution and possession with intent to distribute more than 5 grams of crack cocaine in violation of 21 U.S.C.§ 841 (Counts 14, 16 and 17).  During the course of pretrial proceedings, 18 of the 25 co-defendants charged with the conspiracy in Count 1 reached dispositions with the government, although none of those 18 co-defendants entered a plea of guilty to the conspiracy charge.

Mr. Lloyd and most, if not all of the defendants, moved to suppress the government's evidence obtained pursuant to a wiretap.[1]   The District Court denied

---

[1]  The issue of the admissibility of the wiretap evidence is included in the Opening Brief of Appellant Willie Small, which has been adopted by reference by Mr. Lloyd.

defendants' motions to suppress the wiretap evidence.

Seven defendants, Willie Small, Alvin Green, Zebedee Hall, Max Cooper, George Murray and Sammy Lee Woods, all charged in the conspiracy, went to trial beginning September 22, 2003. Two of the defendants, Max Cooper and George Murray were acquitted of the conspiracy charge but convicted of substantive counts. Mr. Lloyd, along with Messrs. Small, Green, Hall and Woods were convicted of the conspiracy charge in Count 1. Mr. Lloyd was also convicted of distribution and possession with intent to distribute more than 5 grams of crack cocaine in violation of 21 U.S.C.§ 841 in Counts 14 and 17, but was acquitted of the same charge in Count 16. (Vol. LXII, Doc. 2673).

At a sentencing hearing held on April 7, 2004, Mr. Lloyd was sentenced to commitment to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 240 months for each of Counts 1, 14 and 17, all such terms to run concurrently (Tab G, Vol LXV, p.29, ff. 10-14) The Judgment in a Criminal Case was signed on April 12, 2004 and entered on April 14, 2004 (Tab A, Vol. VI, Doc. No. 3029). The Notice of Appeal was timely filed on April 19, 2004 (Vol. VI, Doc. No. 3036).

## VII. STATEMENT OF FACTS[2]

In September of 2000, agents interviewed a confidential informant who was

---

[2] Facts relating to the issue of the admissibility of the wiretap evidence are included in the Opening Brief of Appellant Willie Small, which has been adopted by reference by Mr. Lloyd, and will not be repeated here.

providing information to authorities in an effort to reduce potential criminal charges pending against her. This confidential informant advised the agents that Willie Small was a distributor of crack cocaine in the Denver/Aurora, Colorado metropolitan areas. From September 2000 through January of 2001, authorities conducted nine (9) controlled purchases of crack cocaine by the confidential informant from Willie Small, all of which were recorded. Authorities also identified contacts and associates of Mr. Small and located potential storage locations of Mr. Small's crack cocaine. On March 28, 2001, agents applied for received and received authorization for a wiretap on Mr. Small's cell phone pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968. The wiretap order[s] were extended as a result of subsequent applications in terms of time and to Mr. Small's land-line phone. The wiretaps lasted until early June, 2001, and Mr. Lloyd, along with many of the original co-defendants was arrested on June 15, 2001.

The evidence against Mr. Lloyd consisted primarily of:

A) twenty-three (23) taped telephone calls purportedly between the central figure charged in the conspiracy, Willie Small, and Mr. Lloyd (tapes - Exhibits 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 27, 45, 59,75, 77, 79, 105, 107, 111, 121, 171 [3]; Transcripts - Exhibits 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 28, 46, 60, 76,  78, 80, 106, 108, 112, 122.  172. ;Vol. XXXIX, pg. 1050, f.4 - pg. 1051, f.17; Vol. XLI, pg. 1679,f. 17 - pg. 1680, f. 11), which the government alleged were related to the sale of crack cocaine, on

---

[3]The Government initially offered tape Exhibit 189 and Transcript Exhibit 190 in the group as involving Mr. Lloyd but later withdrew them (Vol. XLI, pg. 1683, ff. 10-16).

the following ten (10) dates:

    March 28, 2001 (1 call)
    March 30, 2001 (5 calls) (Count 16, jury acquittal)
    March 31, 2001 (5 calls)(Count 17, jury conviction)
    April 2, 2001 (1 call)
    April 3, 2001 (1 call)
    April 5, 2001 (1 call)
    April 6, 2001 (1 call)
    April 7, 2001 (3 calls) (Count 14, jury conviction)
    April 11, 2001 (2 calls)
    April 13, 2001 (1 call)
    April 15, 2001 (1 call)
    April 25, 2001 (1 call);

and B) subsequent surveillance by agents of meetings between Mr. Small and Mr. Lloyd

(one each day listed except for March 31, 2001 when there were two meetings), some,

but not all of which, were followed by meetings between Mr. Lloyd and third parties.

    **It is important to note that:**

    **the calls on April 11, April 15 and April 25, 2001 (tape Exhibits 105, 107, 121**

        **and 171) did not result in meetings between Mr. Lloyd and Mr. Small;**

    **the calls on March 28, April 2, April 3, and April 5, 2001 (tape Exhibits 1, 23,**

        **27, and 45)  talk about meeting but there are no references to**

    **controlled substances or money in any way;**

    **the calls on March 30, 2001 (Count 14 of which Mr. Lloyd was acquitted)**

        **resulted in an apparent meeting between Mr. Lloyd and Mr. Small but**

        **the first recorded phone call on March 31, 2001 (tape Exhibit 13)**

        **indicates that no transaction actually occurred;**

6

the call and meeting on April 13 (tape Exhibit 111) appear to have been related to payment of a past debt rather than a new controlled substance transaction; and

the last sale of crack cocaine by Mr. Small to Mr. Lloyd in the record occurred on April 7, 2001.

Factually, it is undisputed that during the course of this <u>entire</u> investigation, throughout all the surveillance, none of the task force agents or officers ever observed Willie Small transfer a controlled substance to Mr. Lloyd. No agent and no officer ever observed Mr. Lloyd giving Willie Small any money. No agent or officer ever observed Mr. Lloyd transfer a controlled substance to any third party. No officer or agent observed any third party giving Mr. Lloyd any money. No drugs were found on the person of Mr. Lloyd. No controlled substances were seized that are being alleged to have resulted from a transaction involving Mr. Lloyd. And no money was seized that is being alleged to have resulted from a controlled substance transaction involving Mr. Lloyd. (Vol. LII, pg. 3016, f. 5 - pg. 3017, f. 7). There was absolutely no witness evidence in this record that Mr. Lloyd ever distributed controlled substances to anyone at any time.

Indeed, the only evidence regarding Mr. Lloyd actually being in possession of a controlled substance at any time came from Dachaun Davis, a young man who lived with Willie Small and was regarded as Small's "son", who testified to a delivery of seven grams of crack cocaine to Mr. Lloyd on April 6, 2001 (**which is not charged as a count**

**in the Second Superseding Indictment**) and to delivering crack cocaine to Mr. Lloyd on 5 to 10 unspecified occasions, without any description of date, time, location or amount (Vol. XL, pg. 1437, ff. 4 - 24) , and from Bridget Johnson, Mr. Small's girlfriend, who only testified that she was present at unspecified transactions between Mr. Small and Mr. Lloyd, without any description of date, time, location or amount (Vol. LIV, pg. 3311, f.24 - pg. 3312,f. 7 ).  There was absolutely no evidence that Mr. Lloyd <u>actually</u> received any controlled substance on any date other than April 6, 2001, including March 31, 2001, or April 7, 2001, the dates charged in Counts 14 and 17 of the Second Superseding Indictment of which Mr. Lloyd was convicted.  There was no evidence in the record at trial of any involvement between Mr. Lloyd and Mr. Small prior to March 28, 2001, or after April 25, 2001.

Furthermore, there was  no evidence in the record of any association between Mr. Lloyd and Mr. Green, Mr. Hall or Mr. Woods.  There was no evidence that Mr. Lloyd was aware or had knowledge of the activities of other people who had dealings with Mr. Small with the exception of one conversation on April 25, 2001, wherein Mr. Small complains about losing crack cocaine to use by Mr. Cooper ("Red"), **who was acquitted of being a member of the conspiracy,** and "Melvin" (referring to a individual who played pool with Mr. Cooper and Mr. Lloyd and not Alvin Green, Vol. LIII, pg. 3142, ff. 8 - 19; Vol. XXXIX, pg. 1178, f. 22 - pg. 1179, f. 8), and not knowing what an individual known as "Spoon", whose name or nickname does not appear anywhere else

8

in the record , was doing (Exhibit 171).  **Neither "Spoon" or "Melvin" were ever mentioned as being potential member of the conspiracy.**

As previously stated, Mr. Lloyd was convicted by the jury of the conspiracy charge in Count 1, along with Messrs. Small, Green, Hall and Woods, and was also convicted of distribution and possession with intent to distribute more than 5 grams of crack cocaine in violation of 21 U.S.C.§ 841 in Counts 14 and 17 but was acquitted of the same charge in Count 16. (Tab D,Vol. LXII, Doc. 2673).  At the sentencing hearing on April 7, 2004, Mr. Lloyd contested the quantity of crack cocaine which would be attributed to him for all counts of conviction.  The government argued for a determination of 85 grams of crack cocaine based on its view of the evidence.  Mr. Lloyd conceded that the recorded phone calls on March 31, 2001, and April 7, 2001, indicated a quantity of 14 grams of crack cocaine was involved on each occasion, for a total of 28 grams, but argued that the government had failed to prove any additional amounts by a preponderance of the evidence.  The trial court, without explanation as to its basis, made a factual finding that 84 grams of crack cocaine would be attributable to Mr. Lloyd for purposes of establishing the base offense level of 32, including relevant conduct, under Section 2D1.1 of the United States Sentencing Guidelines (Tab G, Vol. LXV, pg. 23, f.6 - pg. 24, f.16) .  Although the resulting guideline range for sentencing purposes would have been 188-235 months, because the amount exceeded 50 grams of crack cocaine, Mr. Lloyd had a prior conviction for a felony drug offense, and the government had filed

its notice of enhancement pursuant to 21 U.S.C. §851, the trial court imposed the

mandatory minimum sentence of 240 months, under 21 U.S.C. §841(b)(1)(A), on all

three counts of conviction, the sentences to be served concurrently (Tab G, Vol. LXV,

pg. 27, f.11 - pg. 29, f.14).

## VIII.   SUMMARY OF THE ARGUMENT

1.   THE RECORD LACKS SUFFICIENT EVIDENCE OF

INTERDEPENDENCE BETWEEN THE CO-CONSPIRATORS TO CONVICT MR.

LLOYD OF CONSPIRACY TO DISTRIBUTE OR POSSESS WITH THE INTENT TO

DISTRIBUTE CRACK COCAINE.

2.   MR. LLOYD WAS DENIED HIS RIGHT TO JURY TRIAL UNDER THE

SIXTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

PURSUANT TO THE REASONING OF APPRENDI V. NEW JERSEY  AND

BLAKELY V. WASHINGTON, BECAUSE THE TRIAL COURT, RATHER THAN

THE JURY, MADE FACTUAL FINDINGS AT SENTENCING UNDER A

PREPONDERANCE OF THE EVIDENCE STANDARD WHICH INCREASED THE

PENALTY BEYOND THE PRESCRIBED STATUTORY MAXIMUM.

3.   THE TRIAL COURT ERRED IN FINDING THAT THE GOVERNMENT

HAD PROVEN BY EVEN A PREPONDERANCE OF THE EVIDENCE THAT 84

GRAMS OF CRACK COCAINE WERE ATTRIBUTABLE TO MR. LLOYD AS

PART OF THE CONSPIRACY AND RELEVANT CONDUCT.

## IX.   ARGUMENT

### A. Standard of Review

In determining the sufficiency of the evidence, this Court reviews the record *de novo*. United States v. Grimes, 967 F.2d 1468, 1472 (10th Cir.), cert. denied, 506 U.S. 927 (1992); see United States v. Urena, 27 F.3d 1487, 1489 (10th Cir.), cert. denied, 513 U.S. 977 (1994).

Because the Sixth Amendment right to jury trial issue pursuant to the reasoning of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and Blakely v. Washington, 542 U.S. ____, 124 S.Ct. 2531, 159 L.Ed.2D 403 (2004), w as not raised before the trial court, this Court will review only for plain error. United States v. Badilla,383 F.3d 1137 (10th Cir. 2004).

This Court review the district court's finding of drug quantity for purposes of calculations under the Sentencing Guidelines for clear error. United States v. Ortiz, 993 F.2d 204 (10th Cir. 1993), United States v. Rios, 22 F.3d 1024, 1028 (10th Cir.1994).

### B1.  The government did not present sufficient evidence of interdependence with other co-conspirators to support Mr. Lloyd's conviction for conspiracy.

To find Mr. Lloyd guilty of conspiracy in violation of 21 U.S.C. §§841(a)(1) and 846, the evidence must show (1) that Mr. Lloyd agreed with another person to violate the

11

law, (2) that Mr. Lloyd knew the essential objectives of the conspiracy, (3) that Mr. Lloyd knowingly and voluntarily became involved in the conspiracy, and (4) that interdependence existed among the alleged conspirators.  United States v. Lopez,  100 F.3d 113, 118 (10th Cir. 1996).  In making such an inquiry, however, Mr. Lloyd acknowledges that this Court asks only whether, taking the evidence – "both direct and circumstantial, together with the reasonable inferences to be drawn therefrom" -- in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt. United States v. Dirden, 38 F.3d 1131, 1142 (10th Cir. 1994); United States v. Hooks, 780 F.2d 1526, 1531 (10th Cir.), cert. denied, 475 U.S. 1128 (1986).  Mr. Lloyd submits that he meets this standard.

The law related to conspiracies is lengthy and well known.  With respect to the element of the agreement, it is not enough for the government to show only "mere association" by Mr. Lloyd with conspirators known to be involved in crime, United States v. Evans, 970 F.2d 663, 669 (10th Cir. 1992), cert denied 507 U.S. 922, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993), citin g United States v. Dickey, 736 F.2d 571, 585 (10th Cir. 1984), cert. denied, 105 S.Ct. 957 (1985); or casual transactions between Mr. Lloyd and Mr. Small, a conspirator known to be involved in crime, Evans, supra, citing Horn, infra; or a buyer-seller relationship between Mr. Lloyd  and a member of the conspiracy such as Mr. Small.  Evans, supra, citing, Fox, infra.

While Mr. Lloyd did not  need to know of the existence or identity of the other

members of the conspiracy or the full extent of the conspiracy. *Id.,* citing <u>United States v. Metropolitan Enters</u>, 728 F.2d 444, 451 (10th Cir. 1984), he  must have been shown to have had a general awareness of both the scope and the objective of the enterprise to be regarded as a conspirator.  <u>Evans</u>, *supra,,* at 670.  Mere knowledge of illegal activity, even in conjunction with participation in a small part of the conspiracy, does not by itself, establish that Mr. Lloyd  joined the conspiracy.  *Id.* The conduct of the alleged coconspirators may be diverse and far-ranging, but the conduct must be interdependent in some way. *Id,* citing <u>United States v. Horn</u>, 946 F. 2d 738, 740 (10th Cir. 1991).

Interdependence exists when each conspirator's activities constitute essential and integral steps toward the realization of a common goal and where each conspirator depends on the operation of each link in the conspiratorial chain to achieve that common goal.  <u>Evans</u>, *supra,* at 670, citing <u>United States v. Fox</u>, 902 F.2d 1508, 1514 (10th Cir.), *cert. denied,* 111 S.Ct. 199, 112 L.Ed.2d 161 (1990).  In essence, Mr. Lloyd's actions must have facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole.  <u>Evans</u>, *supra,* at 670 and <u>Horn</u>, *supra,* at 740-41.  A single conspiracy does not exist solely because many individuals deal with a common central player such as Mr. Small; they must have been interconnected in some way. <u>Evans</u>, *supra,* at 670, citing <u>United States v. Sophie</u>, 900 F.2d 1064, 1080 (7th Cir.), *cert. denied,* 111 S.Ct. 124 (1990).  For example, in <u>Kotteakos v. United States</u>, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946), one defendant secured fraudulent loans for a number of

13

different persons and groups. The Court held that many separate conspiracies did not become one merely because they all included a common defendant. <u>Kotteakos</u>, *supra*, 328 U.S. at 773, 66 S.Ct. at 1252. The court reasoned by analogy that "thieves who dispose of their loot to a single receiver–a single "fence"–do not by that fact alone become confederates; they may, but it takes more than knowledge that he is a "fence" to make them such." *Id.* at 755, 66 S.Ct. 1243.

Separate spokes meeting at a common center constitute a wheel conspiracy only if those spokes are enclosed by a rim. *Id.* What is required is a *shared,* single criminal objective, not just similar or parallel objectives between similarly situated people. *Id.* at 769, 66 S.Ct. at 1250.

It is not enough that a group of people separately intend to distribute drugs in a single area, nor even that their activities occasionally or sporadically place them in contact with each other. <u>Evans</u>, *supra*, at 670-671. People in the same industry in the same locale (even competitors) can occasionally be expected to interact with each other without thereby becoming conspirators. *Id.,*at 671. What is required is that the conspirators intend to act together, for their shared mutual benefit, within the scope of the conspiracy charged. *Id.*

To distinguish a single from a multiple conspiracy, [the court] must examine "the nature of the scheme, the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals." <u>United</u>

14

States v. Hopper, 177 F.3d 824, 829 (9th Cir. 1999) quoting United States v. Bibbero, 749 F.2d 581, 587 (9th Cir. 1984), *cert. denied* 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985). However, once a conspiracy is established, only "slight evidence" is needed to connect a person to it, if there is sufficient evidence to establish that connection beyond a reasonable doubt. United States v. Memdoza-Salgado, 964 F.2d 993, 1005-06 (10th Cir. 1992).

In its Findings of Fact and Conclusions of Law as to Defendants' Motions for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 Concerning Count One of the Second Superseding Indictment filed April 6, 2004, (hereafter referred to as "the *Ruling*", Tab E, Vol. VI, Doc. 3010) the district court concluded "that the evidence supported a finding of interdependence" (Vol. VI, Doc. 3010 at pg. 30). Borrowing large portions of the government's proposed findings and conclusions opposing the defendants' Rule 29 motion verbatim[4] (*compare* the government's proposed findings of fact and conclusions of law, Vol. VI, Doc. 2849 at pgs. 28-33 with the court's *Ruling*, Vol. VI, doc. 3010 at pgs. 33-37.), the trial court listed the ways in which the evidence showed the conspirators were aware of the participation of the others and had a community of interest, citing specific trial exhibits and testimony.

The problem with the court's "evidence" **with specific regard to Mr. Lloyd and his knowledge or awareness** is that they are all instances in which Mr. Small either is:

---

[4]The trial court noted that it had adopted the governments factual representations in footnote 5, pg. 39 of the *Ruling*.

15

1. speaking to Mr. Lloyd specifically about matters unique to Mr. Small and Mr. Lloyd[5] -

    a) references to Exhibits 106. 108, and 112, *Ruling* pg. 5 and pgs. 11-12;

    b) reference to Exhibit 20, *Ruling* pg. 6-7 and pg. 8;

    c) reference to Exhibit 4, *Ruling* pg. 16;

    d) reference to Exhibits 700 and 710, videotapes of meetings between Mr. Lloyd and others after meeting with Mr. Small, *Ruling*, pg. 28;

    e) reference to Exhibits 76, 78 and 122, *Ruling*, pg. 28;

2) speaking to a non-conspirator about Mr. Lloyd, mostly complaining about Mr. Lloyd owing him money or how Mr. Lloyd had stopped dealing with Mr. Small -

    a) reference to Exhibit 176, a transcript of a call between Mr. Small and Mr. Murray about business being bad and an unnamed reference to Mr. Lloyd's parole problems, *Ruling* pg. 3;

    b) references to Exhibits 568, 584, 586, transcripts of calls between Mr. Small and Bridget Johnson, Mr. Cooper and Timothy Chandler about Mr. Lloyd's debt and testimony of Bridget Johnson about the debt, *Ruling* pg. 5-6, pg. 11, pg. 12, pg. 13, pgs. 33-34, pg. 35; or,

---

[5]All exhibits referred to that are transcripts of recorded calls between Mr. Small and Mr. Lloyd are contained in Tab C.)

speaking to Mr. Lloyd about the activities of non-conspirators[6] -

a) reference to Exhibit 172, a transcript of a call between Mr. Lloyd and Mr. Small on April 25, 2001, after Mr. Lloyd had stopped dealing with Mr. Small, wherein Mr. Small complains about losing crack cocaine to use by Mr. Cooper ("Red"), who was acquitted of being a member of the conspiracy, and "Melvin" (referring to a individual who played pool with Mr. Cooper and Mr. Lloyd and not Alvin Green, Vol. LIII, pg. 3142, ff. 8 - 19; Vol. XXXIX, pg. 1178, f. 22 - pg. 1179, f. 8), and not knowing what an individual known as "Spoon", whose name or nickname does not appear anywhere else in the record , was doing, *Ruling* pgs. 12-13, pg. 29, pg. 33, pg. 34, pgs. 36-37

b) reference to Exhibits 76 and 28, transcripts of calls between Mr. Small and Mr. Lloyd wherein Mr. Lloyd wants to meet at Mr. Cooper's house, *Ruling*, pg. 36).

In any of these cases, such evidence, whatever else it may show, cannot bolster the court's claim that Mr. Lloyd was aware of the participation of others involved in the conspiracy with Mr. Small.  Contrary to the trial court's findings, there was no evidence that Mr. Lloyd would have suffered a disruption in his crack cocaine distribution

---

[6]Exhibits 172, 76 and 28 are also contained in Tab C.)

enterprise (*Ruling*, pg. 8); Mr. Lloyd undertook activities which facilitated the activities of other alleged co-conspirators or the Willie Small drug distribution business as a whole (*Ruling*, pg. 30); that Mr. Lloyd knew any of the other alleged co-conspirators personally or the functions that others were performing (*Ruling*, pg. 33),;that Mr. Small kept Mr. Lloyd aware of the general health of the "organization" and its general structure (*Ruling*, pg. 33), that Mr. Small told Mr. Lloyd that Mr. Small was obtaining his powder cocaine from one or more sources, that Mr. Small had a local source, or that Mr. Small was working with other distributors in a similar way (Ruling, pg. 34); or that Mr. Small told Mr. Lloyd that other distributors were not performing at the appropriate level for one reason or another, thus demonstrating that Mr. Lloyd was aware that there were others in the distribution network (Ruling, pg. 34) .

While Mr. Lloyd may have purchased quantities of crack cocaine on certain occasions, the evidence does not rise to the level sufficient to support the verdict that Mr. Lloyd was involved in the conspiracy charged in Count 1 of the Second Superseding Indictment.   To the contrary, Mr. Lloyd simply seems to be lumped in with the other co-defendants who were alleged to have been distributors.  Even taking the evidence in the light most favorable to the government, a reasonable jury could not have found Mr. Lloyd to be interdependent with the other alleged members of the conspiracy and thereby guilty beyond a reasonable doubt. Therefore, the conspiracy conviction should be vacated.

18

**B2. Pursuant to Mr. Lloyd's Right to a Jury Trial under the Sixth Amendment of the Constitution of the United States, a jury should have determined the amount of crack cocaine attributable to Mr. Lloyd beyond a reasonable doubt.**

This Court "will correct an error not raised before the district court only if: (1) there is an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings. United States v. Badilla, *supra*., at pg. 1143, footnote 2, citing United States v. Cotton, 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) at page 631, 122 S.Ct. 1781. Therefore, the first issue is whether an error occurred pursuant to the reasoning applied in Apprendi and Blakely, *supra*.

In Apprendi, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In Blakely, the Supreme Court reaffirmed and clarified its ruling in Apprendi, stating:

Our precedents make clear, however, that the "statutory maximum"

for *Apprendi* purposes is the maximum sentence a judge may impose *solely*

*on the basis of the facts reflected in the jury verdict or admitted by the*

*defendant.* See *Ring, supra,* at 602, 122 S.Ct. 2428 (" 'the maximum he

would receive if punished according to the facts reflected in the jury verdict

19

alone' " (quoting *Apprendi, supra,* at 483, 120 S.Ct. 2348)); *Harris v.*

*United States,* 536 U.S. 545, 563, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002)

(plurality opinion) (same); cf. *Apprendi, supra,* at 488, 120 S.Ct. 2348

(facts admitted by the defendant). In other words, the relevant "statutory

maximum" is not the maximum sentence a judge may impose after finding

additional facts, but the maximum he may impose *without* any additional

findings. When a judge inflicts punishment that the jury's verdict alone

does not allow, the jury has not found all the facts "which the law makes

essential to the punishment," Bishop, *supra,* § 87, at 55, and the judge

exceeds his proper authority.

Blakely, 124 S.Ct. at 2537.

In the case at bar, Mr. Lloyd received the  mandatory minimum sentence of 240

months under 21 U.S.C. §841(b)(1)(A) on all three counts of conviction (Vol. LXV, pg.

27, f.11 - pg. 29, f.14) because the amount of crack cocaine attributed to Mr. Lloyd

exceeded 50 grams and Mr. Lloyd had a prior conviction for a felony drug  offense[7].

Although Count 1 of the Second Superseding Indictment specifically stated the

conspiracy charged involved more than 50 grams of crack cocaine (Tab B, Vol. III, Doc.

1595), the jury did not render a special verdict as to the amount of crack cocaine

specifically attributable to Mr. Lloyd (as it did with Counts 14 and 17)(Tab D,Vol. , Doc.

---

[7] Under *Apprendi* and *Blakely,* the determination of a prior conviction is the exception to
the enunciated rule and is not an issue here.

2673). As the trial court noted in response to the government's argument in its sentencing of co-defendant Alvin Green [8]:

> So and I'm not going to read more from this case [referring to United States v. Evans, *infra*.)] because presumably all of you have read this.  But I think that in this hearing, since the jury was not asked, nor was the jury request – nor was the Court requested to have the jury do it, by either party, to determine counts *(sic)* attributable to each defendant, then I think the burden is on the government to demonstrate what quantities of drugs should be properly attributable to Alvin Green under the existing legal tests.   And I think I've got to do that because I can't accept the government's sentencing statement as dispositive proof in light of the objection  (Vol. LXIV, pg. 7).

Under the law of this Circuit, Mr. Lloyd should be held responsible on the conspiracy (and as relevant conduct under the Sentencing Guidelines for Counts 14 and 17) for the scope of his agreement to undertake joint activity and for the criminal conduct of his co-conspirators which was reasonable foreseeable by him.  United States v. Torres, 53 F.3d 1129, cert. denied, 515 U.S. 1152, 115 S.Ct. 2599, 132 L.Ed.2d 845 (1995):

---

[8] Co-Defendant Alvin Green was sentenced first on April 7, 2004, and Mr. Lloyd's sentencing occurred immediately thereafter.  The trial court went through its legal analysis during the course of Mr. Green's hearing as he had made objections to the quantity of crack cocaine attributable to him similar to those of Mr. Lloyd.  Then, with the consent of the parties, the trial court simply incorporated the legal authorities which it utilized by reference in Mr. Lloyd's hearing (Vol. LXV, pgs. 23-24).

In determining the quantity of drugs attributable to particular members of a conspiracy, the sentencing court must focus on each defendant's own relevant conduct: "[w]hen several defendants are convicted of conspiracy, the relevant conduct for purposes of sentencing is not necessarily the same for every participant." United States v. Coleman, 7 F.3d 1500, 1504 (10th Cir.1993) (citations and internal quotations omitted). In essence, then, "[t]he Guidelines require examination of the scope of the defendant's agreement to undertake joint activity and of the reasonable foreseeability of co-conspirators' criminal conduct," id., although "the defendant need not have been indicted or convicted by the jury for quantities for which he is ultimately held responsible." Reed, 1 F.3d at 1111 (citations omitted).

supra., at 1143-1144 (Vol. LXIV, pgs. 33-34). Thus, if the quantity of crack cocaine attributable to Mr. Lloyd was less than 50 grams, he would not have subject to the mandatory minimum sentence of 20 years under 21 U.S.C. §841(b)(1)(A) and would only been subject to the lesser 10 year mandatory minimum sentence of 21 U.S.C. §841(b)(1)(B)[9]. As the trial court, citing Torres, supra. and United States v. Evans, supra. (Vol. LXIV, pgs.5-8), made the determination of crack cocaine attributable to Mr. Lloyd, using a preponderance of the evidence standard, Mr. Lloyd's sentence was not

---

[9] As the jury found in special verdicts for Counts 14 and 17 that the government had proved that Mr. Lloyd had distributed or possessed with the intent to distribute 5 grams or more of crack cocaine, he was subject to the 10 year mandatory minimum sentence of 18 U.S.C. §841(b)(1)(B)(Vol. , Doc. 2673).

imposed "solely on the basis of facts reflected in the jury verdict or admitted by the defendant." The finding that 84 grams of crack cocaine were attributable to Mr. Lloyd increased his penalty beyond the statutory maximum and therefore should have been submitted to a jury and proved beyond a reasonable doubt. Therefore, it is clear that an error did occur, satisfying the first prong of the plain error analysis.

The second prong of the plain error analysis, that the error be plain, is also satisfied. In Johnson v. United States, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), the Supreme Court held that "in a case such as this--where the law at the time of trial was settled and clearly contrary to the law at the time of appeal--it is enough that an error be "plain" at the time of appellate consideration." supra. 520 U.S. at 468. While it may be argued whether the law was settled at the time of trial, the Sixth Amendment error in Mr. Lloyd's case is certainly plain today. The trial court, and not a jury, made a factual finding under a lesser standard of proof that increased Mr. Lloyd's penalty beyond the statutory maximum. The error is thus plain.

With regard to the third prong of the plain error analysis, there can be no doubt that Mr. Lloyd's substantial right have been affected. Although the Supreme Court in Johnson, supra, declined to decide whether the failure to submit the issue of materiality to the jury affected Johnson's substantial rights and decided the plain error issue on other grounds, Apprendi and Blakely make clear that the right to trial by jury of every fact that increases the penalty for a crime beyond the statutory maximum and proved beyond a

23

reasonable doubt "reflects two longstanding tenets of common-law jurisprudence." Blakely, *supra*. at 2536. "These tenets have been acknowledged by courts and treatises since the earliest days of graduated sentencing" Blakely, supra. at 2536-2537, citing the compilation of relevant authorities in Apprendi dating back to W. Blackstone's Commentary on the Laws of England in 1769. Mr. Lloyd submits that the third prong of the plain error analysis has thus been met.

The fourth prong of the plain error analysis requires that the error seriously affect the fairness, integrity or public reputation of judicial proceedings. This prong is not met if the evidence underlying the sentencing enhancements was "overwhelming" or was conceded by the defendant. United States v. Maldonado-Ramires, 384 F.3d 1228, 1231 n. 1 (10th Cir.2004); United States v. Badilla, 383 F.3d 1137, 1143 n. 4 (10th Cir.2004). Mr. Lloyd submits that his case is distinguishable from those of either Maldonado-Ramires or Badilla as the evidence underlying the determination that more than 50 grams of crack cocaine was attributable to Mr. Lloyd was not proven, was far from "overwhelming", and was not conceded at any stage.

The record at trial contained no evidence concerning crack cocaine transactions between Mr. Lloyd and Mr. Small except on four occasions: the morning and afternoon of March 31, 2001 (Count 17), April 6, 2001 (the Dachaun Davis transaction) and April 7, 2001 (Count 14). Of the 23 recorded telephone conversations between Mr. Lloyd and Mr. Small, only ten meetings between the two resulted, including the four referenced

above.  The April 13, 2001, meeting appears to have been for payment of a past debt by Mr. Lloyd rather than a controlled substance transaction (Exhibit 111) . Based on the telephone call the next morning (Exhibit 13), the meeting between Mr. Lloyd and Mr. Small on March 30, 2001, (related to Count 16 of the Indictment of which Mr. Lloyd was acquitted) did not result in a controlled substance transaction.  The calls o n March 28, April 2, April 3, and April 5, 2001 (Exhibits 1, 23, 27, and 45)  talk about meeting and meetings did occur but there are no references to controlled substances or money in any way in the conversations, no observations of any controlled substance transactions were made and no physical evidence of any controlled substance transactions was ever procured (Vol. LII, pg. 3016, f. 5 - pg. 3017, f. 7).  What happened at those meetings is pure speculation and conjecture.

On the second set of March 31, 2001 telephone calls and the April 7, 2001 calls, Mr. Lloyd conceded at sentencing that both calls contained references to 14 gram transactions (Tab G, Vol. LXV, pg. 17).  Dachaun Davis testified that he delivered 7 grams of crack cocaine to Mr. Lloyd on April 6, 2001 (Vol. XL, pg. 1437, ff. 4-24) . In the telephone conversation in the morning of March 31, 2001, Mr. Lloyd and Mr. Small talk about the price being "two two five" which equates to a 7 gram purchase for two hundred and twenty-five dollars according to the evidence at trial (Exhibit 14, pg. 2), even though once again no observations of any controlled substance transactions were made and no physical evidence of any controlled substance transactions was ever

obtained. Assuming for the sake of argument that Mr. Davis' testimony is believed and the morning March 31 meeting resulted in a transaction of Mr. Small's regular quantity of 7 grams, the total of the crack cocaine resulting from these four events would be 42 grams of crack cocaine. There is no other evidence that Mr. Lloyd undertook any other alleged joint activity or that criminal conduct of other alleged co-conspirators was reasonable foreseeable by Mr. Lloyd. Thus, the evidence underlying the sentencing enhancement was not "overwhelming" and was not conceded by Mr. Lloyd. The error seriously affects the fairness, integrity or public reputation of judicial proceedings and meets the final component of the plain error test.

The finding that 84 grams of crack cocaine were attributable to Mr. Lloyd increased his penalty beyond the statutory maximum and therefore should have been submitted to a jury and proved beyond a reasonable doubt. Therefore, it is clear that an error did occur, the error satisfies the plain error analysis even though the issue was not raised before the trial court, and Mr. Lloyd's conviction and sentence should be overturned.

**B3. The government failed to prove by a preponderance of the evidence that 84 grams of crack cocaine were attributable to Mr. Lloyd as part of the conspiracy and relevant conduct.**

Mr. Lloyd submits that, outside of the Sixth Amendment violation argued above, the trial court erred in its finding that 84 grams of crack cocaine were attributable to Mr.

Lloyd as part of the conspiracy and relevant conduct at the sentencing hearing. The government bears the burden of proving, by a preponderance of the evidence, the quantities of drugs attributable to each defendant, United States v. Cook, 949 F.2d 289, 295 (10th Cir.1991).

The trial court failed to state a factual basis for its finding at the hearing other than stating:

> Looking at the totality of the facts here, I want to observe a couple of things. First, Mr. Lloyd was found guilty of count one, the conspiracy count. Mr. Schlie has admitted on behalf of his client that because of the convictions in counts -- of counts 15 (*sic*) and 17, that Mr. Lloyd, at a minimum should be attributed 28 grams for relevant-conduct purposes as it relates to the conspiracy. Obviously there have to be additional quantities of crack cocaine that are attributable to the conspiracy of Mr. Lloyd or Mr. Lloyd wouldn't have been convicted. So the question is what is that number.
>
> Based on the government's proffer and considering Mr. Schlie's response on behalf of Mr. Lloyd, I find that the government has proven by a preponderance of the evidence that 84 grams should be attributed to Mr. Lloyd for purposes of relevant conduct under the law that I articulated fully in the sentencing for Alvin Green..

27

The law regarding the determination of the quantity of drugs attributable to particular members of a conspiracy and the argument concerning the amount of crack cocaine proved to have been attributable to Mr. Lloyd under any standard of proof is set forth in the Sixth Amendment argument above and need not be repeated here. This Court will reverse only if "the court's finding was without factual support in the record, or if after reviewing all the evidence we are left with the definite and firm conviction that a mistake has been made." United States v. Shewmaker, 936 F.2d 1124 (10th Cir.1991), *cert. denied*, 502 U.S. 1037, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992). Mr. Lloyd submits that the trial court's finding that 84 grams of crack cocaine attributable to him as part of the conspiracy or as relevant conduct is without factual support in the record and that a mistake has been made. Mr. Lloyd's sentence should thus be vacated.

## X.   CONCLUSION

For the reasons set forth above, Mr. Lloyd respectfully requests that this Court reverse his judgment of conviction, vacate his sentence, order a new trial and provide such other and further relief as it deems just and proper in the premises.

## XI.   STATEMENT OF COUNSEL REGARDING ORAL ARGUMENT

Oral argument would assist this Court in its consideration of the facts and circumstances relating to the conduct of the trial. Accordingly, Mr. Lloyd does seek oral argument in this case.

RESPECTFULLY SUBMITTED this 30th day of December, 2004.

John Henry Schlie

THE LAW OFFICE OF JOHN HENRY SCHLIE, P.C.
6059 Quebec St., Ste. 200
Centennial, Colorado   80
Phone: 303.830.1616
APPOINTED COUNSEL FOR MR. LLOYD

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(c), I certify that this Opening Brief is proportionally spaced and contains 7470 words. I rely on my personal computer to obtain the count and I use Word Perfect version 8.0

I certify that the information on this form is true and correct to the best of my knowledge and belief after a reasonable inquiry.

John Henry Schlie

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of December, 2004, a true and correct copy of the foregoing **DEFENDANT THEOLIAN LLOYD'S OPENING BRIEF** was served by depositing the same in the United States mail, first-class postage prepaid, and addressed to:

James C. Murphy, Assistant United States Attorney
1225 17th Street, 7th Floor
Denver, Colorado 80202

Wade Eldridge, Esq.
1471 Stuart Street
Denver CO 80204

Ron Gainer, Esq.
6414 Fairways Drive
Longmont, CO 80503

Matthew C. Golla, Asst Federal Public Defender
John Carlson, Asst. Federal Public Defender
633 17th Street, Ste. 1000
Denver CO 80202

Michael Williams, Esq.
1860 Race Street
Denver, Colorado 80206

Dennis Hartley, Esq.
1749 S. 8th Street, Suite 5
Colorado Springs, Colorado 80906

30

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

APR 1 4 2004

UNITED STATES OF AMERICA

v.

THEOLIAN LLOYD
a/k/a "Big Foot"

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

CASE NUMBER: 01-CR-214-05-D

John H. Schlie, Appointed
(Defendant's Attorney)

**THE DEFENDANT:** Was found guilty on counts one, fourteen and seventeen of the Second Superseding Indictment after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Numbers |
|---|---|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(iii) and 18 U.S.C. § 2 | Conspiracy to Distribute and Possess with Intent to Distribute Fifty or More Grams of Cocaine Base, Aiding and Abetting | 06/07/01 | One |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.: 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

Defendant's Date of Birth: 03/02/68

Defendant's USM No.: 30410-013

Defendant's Residence Address:

    Federal Detention Center-Englewood
    9595 West Quincy Avenue
    Littleton, Colorado 80123

Defendant's Mailing Address:

    SAME

April 7, 2004
Date of Imposition of Judgment

Signature of Judicial Officer

Wiley Y. Daniel, U.S. District Judge
Name & Title of Judicial Officer

4/12/04
Date

DEFENDANT:  THEOLIAN LLOYD
CASE NUMBER:  01-CR-214-05-D

Judgment-Page 2 of 8

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Date Offense Concluded | Count Numbers |
|---|---|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii) and 18 U.S.C. § 2 | Distribution and Possession with Intent to Distribute 14 Grams of Cocaine Base, Aiding and Abetting | 04/07/01 | Fourteen |
| 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii) and 18 U.S.C. § 2 | Distribution and Possession with Intent to Distribute 14 Grams of Cocaine Base, Aiding and Abetting | 03/31/01 | Seventeen |

DEFENDANT:  THEOLIAN LLOYD
CASE NUMBER:  01-CR-214-05-D

Judgment-Page 3 of 8

---

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 240 months for each of counts one, fourteen and seventeen, to be served concurrently.

The court recommends that the Bureau of Prisons designate the defendant to a facility in Texas for service of sentence.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By_____
Deputy United States Marshal

DEFENDANT:  THEOLIAN LLOYD
CASE NUMBER:  01-CR-214-05-D                                    Judgment-Page 4 of 8

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of ten (10) years as to count one, and eight (8) years on each of counts fourteen and seventeen, all to run concurrently.

The defendant shall report to the probation office in the district to which he is released within 72 hours of his release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime and shall not illegally possess a controlled substance.

The defendant shall refrain from any unlawful use of a controlled substance and shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

The defendant shall not possess a firearm as defined in 18 U.S.C. § 921.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Monetary Obligations sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this Court (set forth below).  The defendant shall also comply with the additional conditions on the following page.

## STANDARD CONDITIONS OF SUPERVISION

1) The defendant shall not leave the judicial district without the permission of the court or probation officer.

2) The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month.

3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

4) The defendant shall support his dependents and meet other family responsibilities.

5) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons.

6) The defendant shall notify the probation officer at least ten days prior to any change in residence or employment.

7) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician.

8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

DEFENDANT:  THEOLIAN LLOYD
CASE NUMBER:  01-CR-214-05-D

Judgment-Page 5 of 8

9)     The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer.

10)    The defendant shall permit a probation officer to visit him at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.

11)    The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

12)    The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.

13)    As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

14)    The defendant shall provide the probation officer with access to any requested financial information.

## ADDITIONAL CONDITIONS OF SUPERVISION

None.

DEFENDANT: THEOLIAN LLOYD
CASE NUMBER: 01-CR-214-05-D

Judgment-Page 6 of 8

## MONETARY OBLIGATIONS

The defendant shall pay the following monetary obligations in accordance with the schedule of payments set forth below.

| Count | Assessment | Fine | Restitution |
|-------|-----------|------|-------------|
| One | $100.00 | $0.00 | $0.00 |
| Fourteen | $100.00 | $0.00 | $0.00 |
| Seventeen | $100.00 | $0.00 | $0.00 |
| **TOTALS** | $300.00 | $0.00 | $0.00 |

DEFENDANT: THEOLIAN LLOYD
CASE NUMBER: 01-CR-214-05-D

Judgment-Page 7 of 8

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total monetary obligations shall be due as follows:

The special assessment shall be due immediately.

All monetary obligation payments, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States Attorney.

The defendant shall receive credit for all payments previously made toward any monetary obligations imposed.

Payments shall be applied in the following order:  (1) special assessment.

DEFENDANT:  THEOLIAN LLOYD
CASE NUMBER:  01-CR-214-05-D

Judgment-Page 8 of 8

## STATEMENT OF REASONS

The court makes the following findings concerning the objections to the presentence report:

The court finds that the defendant's relevant conduct involved 84 grams of cocaine base, establishing a base offense level of 32.

Neither the government nor the defendant has challenged any other aspect of the presentence report.  Therefore, the remaining factual statements and guideline applications are adopted without objection as the court's findings of fact concerning sentencing.

**Guideline Range Determined by the Court:**

Total Offense Level:  32

Criminal History Category:  V

Imprisonment Term:  240 months

Supervised Release Term:  10 years

Fine Range:  $17,500  to  $8,000,000

The fine is waived because of the defendant's inability to pay.

Total Amount of Restitution:  None.

The sentence is within the guideline range, that exceeds 24 months, and the sentence is imposed for the following reasons:

Punishment, deterrence and protection of the public.

23.     CARLOS JOHNSON,
24.     DWAYNE VAN DYKE,
            a/k/a "NM",
25.     THURMAN DOUGLAS McKNIGHT,
            a/k/a "Doug",
26.     CHARLES YOUNG,
27.     BRIAN HARRIS,
            a/k/a "BeeZee",
28.     DAYNA DREW,
29.     TOMMY JONES,
            a/k/a "Soul",
30.     DAWAN EUGENE SMITH,
31.     ANGELA HERNANDEZ, and
32.     SANDRA DAVIS,

        Defendants.

---

## SECOND SUPERSEDING INDICTMENT

21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii), (B)(iii), and (C)

21 U.S.C. § 848

21 U.S.C. § 846

21 U.S.C. § 843(b)

21 U.S.C. § 844(a)

18 U.S.C. § 922(g)(1)

18 U.S.C. § 924(a)(2)

18 U.S.C. § 1956(a)(1)(A)(i)

18 U.S.C. § 4

18 U.S.C. § 2

---

THE GRAND JURY CHARGES:

## COUNT ONE
21 U.S.C. § 846
21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii)
18 U.S.C. § 2

From on or about September, 2000 through or about June 7, 2001, within the State and

District of Colorado, and elsewhere, the defendants,

WILLIE SMALL,
a/k/a "Pops",
KEYONNA DAVIS,
ALVIN GREEN,
a/k/a "Mel Dog",
THEOLIAN LLOYD,
a/k/a "Big Foot",
CURTIS HAWKINS,
ZEBEDEE HALL,
a/k/a "Zee",
a/k/a "Zeke",
JAMES STARKEY,
a/k/a "Chip",
EDWARD PALMER,
a/k/a "Dog",
FREDRIC WILLIAMS,
a/k/a "Chicago",
HERBERT LEWIS, JR.
a/k/a "JR",
MAX COOPER,
a/k/a "Red",
GEORGE MURRAY,
a/k/a "Little Man",
ERNEST GADDIS,
a/k/a "Sheik",
VICTOR MENDINGHALL,
a/k/a "Vic",
SAMMY LEE WOODS,

RONALD CLARK,
    a/k/a "Blue",
TIMOTHY CHANDLER,
CARLOS JOHNSON,
DWAYNE VAN DYKE,
    a/k/a "NM",
CHARLES YOUNG,
BRIAN HARRIS,
    a/k/a "BeeZee",
DAYNA DREW,
TOMMY JONES,
    a/k/a "Soul",
DAWAN EUGENE SMITH,
ANGELA HERNANDEZ, and
SANDRA DAVIS,

knowingly conspired and agreed together with each other and with others to the Grand Jury known and unknown, that one and more than one of them knowingly would distribute and possess with intent to distribute quantities of a mixture and substance containing a detectable amount of cocaine base, "crack cocaine", a Schedule II controlled substance, weighing more than fifty grams, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A)(iii), and intentionally did aid, abet, encourage, help and cause the same.

All in violation of Title 21, United States Code, Section 846, Conspiracy, and Title 18 United States Code, Section 2.

## COUNT FOURTEEN
21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii)
18 U.S.C. § 2

On or about April 7, 2001, within the State and District of Colorado, the defendants,

WILLIE SMALL,
a/k/a "Pops", and
THEOLIAN LLOYD,
a/k/a "Big Foot",

knowingly distributed and possessed with intent to distribute more than five grams of a substance and mixture containing a detectable amount of cocaine base, a Schedule II controlled substance, to wit: approximately 14 grams of a cocaine base mixture, "crack cocaine", and intentionally did aid, abet, help, encourage and cause the same.

All in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(iii) and Title 18, United States Code, Section 2.

## COUNT FIFTEEN
21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii)
18 U.S.C. § 2

On or about May 9, 2001, within the State and District of Colorado, the defendants,

WILLIE SMALL,
a/k/a "Pops", and
VICTOR MENDINGHALL,
a/k/a "Vic",

knowingly distributed and possessed with intent to distribute more than five grams of a substance and mixture containing a detectable amount of cocaine base, a Schedule II controlled substance, to wit: approximately 7 grams of a cocaine base mixture, "crack cocaine", and intentionally did aid, abet, help, encourage and cause the same.

All in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(iii) and Title 18, United States Code, Section 2.

## COUNT SIXTEEN
21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii)
18 U.S.C. § 2

On or about March 30, 2001, within the State and District of Colorado, the defendants,

**WILLIE SMALL,**
a/k/a "Pops", and
**THEOLIAN LLOYD,**
a/k/a "Big Foot",

knowingly distributed and possessed with intent to distribute more than five grams of a substance and mixture containing a detectable amount of cocaine base, a Schedule II controlled substance, to wit: approximately 7 grams of a cocaine base mixture, "crack cocaine", and intentionally did aid, abet, help, encourage and cause the same.

All in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(iii) and Title 18, United States Code, Section 2.

## COUNT SEVENTEEN
21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii)
18 U.S.C. § 2

On or about March 31, 2001, within the State and District of Colorado, the defendants,

**WILLIE SMALL,**
a/k/a "Pops", and
**THEOLIAN LLOYD,**
a/k/a "Big Foot",

knowingly distributed and possessed with intent to distribute more than five grams of a substance and mixture containing a detectable amount of cocaine base, a Schedule II controlled substance,

to wit:  approximately 14 grams of a cocaine base mixture, "crack cocaine", and intentionally did

aid, abet, help, encourage and cause the same.

All in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(iii) and

Title 18, United States Code, Section 2.

## COUNT EIGHTEEN
21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii)
18 U.S.C. § 2

On or about March 31, 2001, within the State and District of Colorado, the defendants,

> WILLIE SMALL,
> a/k/a "Pops", and
> EDWARD PALMER,
> a/k/a "Dog",

knowingly distributed and possessed with intent to distribute more than five grams of a substance

and mixture containing a detectable amount of cocaine base, a Schedule II controlled substance,

to wit:  approximately 7 grams of a cocaine base mixture, "crack cocaine", and intentionally did

aid, abet, help, encourage and cause the same.

All in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(iii) and

Title 18, United States Code, Section 2.

## COUNT NINETEEN
21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii)
18 U.S.C. § 2

On or about May 25, 2001, within the State and District of Colorado, the defendant,

> DWAYNE VAN DYKE,
> a/k/a "NM",

knowingly possessed with intent to distribute more than fifty grams of a substance and mixture

containing a detectable amount of cocaine base, a Schedule II controlled substance, to wit:

Second Superseding Indictment, Page 14 of  47

FD-302 Rev 10-6-95

*[handwritten: ...To Wilcox i-dru ...Kani...]*

# FEDERAL BUREAU OF INVESTIGATION

- 1 -

Date of transcription   07/19/2001

        The following is a transcript of a recorded telephone conversation between Willie Small and Theolian Lloyd.  It took place on March 30, 2001 at 21:53 hours:

```
Target Telephone Number:    (720) 291-7113
Call Number:                0025
Date:                       March 30, 2001
Time:                       21:53
Incoming/Outgoing:          Incoming
In/Out telephone number:    (720) 339-4713
```



GOVERNMENT
EXHIBIT
4
01-CR-214-D

        This transcript has been compared to the audio tape recording from which it was made and, to the best of my ability, the transcript is a true, complete and accurate record of the recording.

**WORK COPY**
**DO ... E**

Investigation on   03/30/2001   at   Denver, Colorado

File #   245D-DN-56081 Sub T-6°   *[handwritten]*   Date dictated   03/30/2001

by   Officer Steven Stanton, Aurora PD/kah

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;

245D-DN-56081

__Willie Small & Theolian Lloyd__ , On __03/30/2001__ , Page __2__

(Phone tones)

(Unintelligible background conversation)

WILLIE SMALL:      Hello, hello.

THEOLIAN LLOYD:    Hello.

SMALL:             What's up?

LLOYD:             This Big Foot.

SMALL:             Yeah, what's up?

LLOYD:             Where you at?

SMALL:             Down at the Mixx right now.

LLOYD:             Um...I'm, I'm gonna be, I was over by your house.

SMALL:             Well I'm down by the Mixx.

LLOYD:             Can I come up there?

SMALL:             Yeah, alright, I ain't gonna leave up out of here.

LLOYD:             I'm gonna come up there, I'm, I'm on my way up that way though.

SMALL:             Hey, look man, ah, ah, this work that I got man, it went up a little bit.

LLOYD:             What?

SMALL:             The work it went up a little bit, I had to pay more money for that shit.

LLOYD:             I can't hear you homey.

SMALL:             Well if you can't hear me I'll tell you when you get here, but I said it went up.

FD-302a Rev 10-6-95

245D-DN-56081

Continuation of FD-302 of   **Willie Small & Theolian Lloyd**   On 03/30/2001   Page   3

| | |
|---|---|
| LLOYD: | Alright. |
| SMALL: | I had to pay more money for this shit. |
| LLOYD: | Alright. |
| SMALL: | So...call me when you get down here. |
| LLOYD: | Alright. |
| SMALL: | Alright. |
| | (END OF CONVERSATION) |

FD-302 (Rev. 10-6-95)

*T. Wilcox i-drive
200kgh07.oth*

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription     07/19/2001

          The following is a transcript of a recorded telephone
conversation between Willie Small and Theolian Lloyd.  It took
place on March 31, 2001 at 15:01 hours:

Target Telephone Number:   (720) 291-7113
Call Number:               0044
Date:                      March 31, 2001
Time:                      15:01
Incoming/Outgoing:         Incoming
In/Out telephone number:   (720) 339-4713

          This transcript has been compared to the audio tape
recording from which it was made and, to the best of my ability,
the transcript is a true, complete and accurate record of the
recording.

Investigation on   03/31/2001   at   Denver, Colorado

File #  245D-DN-56081 Sub T        1/8/02         Date dictated   03/31/2001

by   Officer Steven Stanton, Aurora PD/kah

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

*Gov't Ex 20*          **29413**

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of ___Willie Small & Theolian Lloyd___ , On _03/31/2001_ , Page __2__

| | |
|---|---|
| | (Phone tones) |
| | (Unintelligible background conversation overheard) |
| WILLIE SMALL: | Hello. |
| THEOLIAN LLOYD: | Hey, what's up homey? |
| SMALL: | What's up? |
| LLOYD: | Shit, chilling man, just trying to get through, some things together man, I got like four dollars and twenty-five cents man, I wanted two man, ah...and I'll take of the rest later on, I'm just trying to get about, I'm just trying to get on my feet man. |
| SMALL: | That's what I like about you man, you be handling your business man, as long as I'll work with you like that man, as long as you know...that you understand that I have to have my ends man you know? |
| LLOYD: | I'll be, I'll be up there, I'll be, I'll call you from Peoria in minutes, I'll be coming, I'll call you when I get, I'm almost right there. |
| SMALL: | Alright. |
| LLOYD: | Late. |
| | (END OF CONVERSATION) |

29414

FD-302 (Rev. 10-6-95)

*T. WILCOX i-Drive*
*212 lsj09.041*

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   07/31/2001

The following is a transcript of a recorded telephone
conversation between Willie Small and Theolian Lloyd which took
place on April 3, 2001, at 17:35 hours:

Target Telephone Number:      (720) 291-7113
Call Number:                  0081
Date:                         April 3, 2001
Time:                         17:35
Incoming/Outgoing:            Incoming
In/Out Telephone Number:      (702) 339-4713
In/Out Subscriber:            Theolian Lloyd



GOVERNMENT
EXHIBIT
28
01-CR-214-D

This transcript has been compared to the audio tape
recording from which it was made, and to the best of my ability,
the transcript is a true, complete, and accurate record of the
recording.

**WORK COPY
DO NOT FILE**

_____

Investigation on   04/03/2001   at Denver, Colorado

File #  245D-DN-56081 Sub T-504   3/7/0     Date dictated  04/03/2001

by   Officer Steven Stanton, Aurora PD/lsj

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of    __Willie Small & Theolian Lloyd__    , On __03/31/2001__ , Page __2__

|  |  |
|---|---|
|  | (Telephone tones) |
|  | (Static) |
| WILLIE SMALL: | Hello. |
| THEOLIAN LLOYD: | What's happenin'? |
| SMALL: | Hey... |
| LLOYD: | What's happenin'? |
| SMALL: | ...what, what's goin' on? |
| LLOYD: | Can you meet me over by Red's? |
| SMALL: | No, man, I'm way down here by, by, uh, Thirteenth and Xenia right now. |
| LLOYD: | Should I come over that way? |
| SMALL: | Yeah. |
| LLOYD: | Oh man, I'm, I'm right around the corner from you, man.  I was on my way... |
| SMALL: | Oh. |
| LLOYD: | ...towards your house, man. |
| SMALL: | Then, you'll see my Benz parked out there, uh, and I just come down there and meet you.  Just call about when you get to the car.  It's parked on, uh, Thirteenth... |
| LLOYD: | Yeah. |
| SMALL: | ...and, uhm, I'm right on the corner. |
| LLOYD: | (Unintelligible) right on the side, wh-, wh-, where I came that one day with you (unintelligible)... |
| SMALL: | Oh yeah, yeah, yeah.  Okay. |

0028_002

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of     **Willie Small & Theolian Lloyd**     , On 03/31/2001 , Page    3

| | |
|---|---|
| **LLOYD:** | **I'll call you when I get right.  I'm gonna call you when I get a minute away.  Two minutes away.** |
| **SMALL:** | **Alright.** |
| **LLOYD:** | **Alright.** |
| | **(Rustling)** |
| | **(Beeping sound)** |
| | **(END OF CONVERSATION)** |

FD-302 (Rev. 10-6-95)

T. Wilcox i-Drive
220VKP06.0th

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription   08/08/2001

The following is a transcript of a recorded telephone
conversation between Willie Small and Theolian Sy Lloyd.  It took
place on April 7, 2001, at 13:29 hours:

Target Telephone Number: (720) 291-7113
Call Number:             0182b
Date:                    April 7, 2001
Time:                    13:29
Incoming/Outgoing:       Incoming
In/Out Telephone Number: (720) 339-4713
In/Out Subscriber:       Theolian Sy Lloyd



GOVERNMENT
EXHIBIT
76
01-CR-214-D

This transcript has been compared to the audio tape
recording from which it was made, and to the best of my ability,
the transcript is a true, complete and accurate record of the
recording.

WORK COPY
DO NOT FILE

Investigation on   04/07/2001   at Denver, Colorado        (telephonically)

File # 245D-DN-56081 Sub T-548        2/7/02   Date dictated   04/07/2001

by   Officer Steven Stanton, Aurora PD/vkp

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of ___Willie Small & Theolian Sy Lloyd___ , On 04/06/2001 , Page  2

 

(Switches to call waiting)

SMALL:                Hello.

THEOLIAN LLOYD:       Hey, what's up?

SMALL:                Hey, what's happenin'?

                      (Call waiting beeping tones heard)

LLOYD:                (UI).

SMALL:                Huh?

LLOYD:                (UI) I'm up here on, uh, I'm about...I'm about
                      to be up here on, uh, on Havana.

SMALL:                Okay, man, you're gonna have to give me a
                      minute 'cause I'm doin' somethin' else right
                      now.  I mean just call me when you're ready.
                      I'm...I'm...I'm...I'm...

                      (Overlapping unintelligible conversation)

LLOYD:                (UI) uh, I'm close.

SMALL:                Well call me when you're ready, man.
                      I'm...I'm doin' somethin' else right now.  I'm
                      meetin' somebody else right now.

LLOYD:                Okay.

SMALL:                I gotta go back to the house.

LLOYD:                Okay.

SMALL:                But I can't stay on the phone, man.

LLOYD:                Okay.

SMALL:                Just call me when you're ready.

LLOYD:                Okay.  Hey!

0076_002

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of  __Willie Small & Theolian Sy Lloyd__  , On __04/06/2001__  , Page  __3__

| | |
|---|---|
| SMALL: | Yes. |
| LLOYD: | Uh, I need one of them and half though. |
| SMALL: | What? |
| LLOYD: | You know like I... what I normally do? |
| SMALL: | Uh huh. |
| LLOYD: | Split that for me. |
| SMALL: | Just that? |
| LLOYD: | No, I want two. But like I normally do mine, split one of 'em though fo... |
| SMALL: | Okay. |
| LLOYD: | (UI) thank you. I want two of 'em though. |
| SMALL: | All right. |
| LLOYD: | I'm a... uh, I'll call you back in about... you wanna meet me at Red's house? |
| SMALL: | No, man, you need to come down here and I'm busy as hell and I'm in the middle of traffic, man, so just... |
| | (Overlapping unintelligible conversation) |
| SMALL: | ...call me when you're ready. |
| LLOYD: | I'll be up that way in about three minutes. |
| SMALL: | All right. |
| LLOYD: | All right. |
| | (DISCONNECTS) |

0076_003

FD-302 (Rev. 10-6-95)

*T. Wilcox i-Drive*
*220vkp04.04h*

-1-

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription      08/08/2001

    The following is a transcript of a recorded telephone conversation between Willie Small and Theolian Sy Lloyd.  It took place on April 7, 2001, at 13:36 hours:

```
Target Telephone Number:  (720) 291-7113
Call Number:              0183
Date:                     April 7, 2001
Time:                     13:36
Incoming/Outgoing:        Incoming
In/Out Telephone Number:  (720) 339-4713
In/Out Subscriber:        Theolian Sy Lloyd
```



GOVERNMENT
EXHIBIT
78

    This transcript has been compared to the audio tape recording from which it was made, and to the best of my ability, the transcript is a true, complete and accurate record of the recording.

**WORK COPY
DO NOT FILE**

Investigation on   04/07/2001   at  Denver, Colorado        (telephonically)

File #  245D-DN-56081 Sub T-543        2/7/02     Date dictated  04/07/2001

by   Officer Steven Stanton, Aurora PD/vkp

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency, it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of   __Willie Small & Theolian Lloyd__   , on 04/06/2001 , Page   2

 

(Beeping tones)

(Rustling/rattling sounds heard)

(Music heard in background)

WILLIE SMALL:   Hello.

THEOLIAN SY LLOYD:   Hey, uh... I'm up here.

SMALL:   Okay, I gotta go.  I'm almost to the house now.
You want me to make that like three point five,
three point five and then a seven?

LLOYD:   Yeah.

(Overlapping unintelligible conversation)

LLOYD:   Yeah, I want... I want 'em just like you said
but I want one for me so I want two total.

SMALL:   Yeah.

LLOYD:   Okay.

SMALL:   One of 'em seven, the other one three and a
half, three and a half.

LLOYD:   Yeah, gimme...gimme just a, uh, (UI) waitin'
for you at the Kentucky Fried Chicken.  I can
go in and get me somethin' to eat.

SMALL:   What Kentucky Fried Chicken?

LLOYD:   Right there.

SMALL:   On Havana?

LLOYD:   Yeah, right there.  Right up there by you.

SMALL:   Oh, okay.  Yeah.

(Overlapping unintelligible conversation)

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of ___Willie Small & Theolian Lloyd___ , On _04/06/2001_ , Page ___3___

| SMALL: | Yeah... |
| | (Voices cutting out) |
| LLOYD: | I'll be... I'll... I'll be inside eatin'. |
| SMALL: | All right. |
| LLOYD: | Or I'll meet you out in the parkin' lot. |
| SMALL: | I'll be there, man.  Just let me... I gotta get home and do this. |
| LLOYD: | All right.  Come on. |
| SMALL: | I'll be there.  All right. |
| | (DISCONNECTS) |

*DN81312, KAH*

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    07/09/2001

      The following is a transcript of a recorded telephone conversation between Willie Small and Theolian Lloyd.  It took place on April 11, 2001 at 16:56 hours:

```
Target Telephone Number:  (720) 291-7113
Call Number:              0293
Date:                     April 11, 2001
Time:                     16:56
Incoming/Outgoing:        Incoming
In/Out telephone number:  (720) 339-4713
```



GOVERNMENT
EXHIBIT
106
01-CR-214-D

      This transcript has been compared to the audio tape recording from which it was made and, to the best of my ability, the transcript is a true, complete and accurate record of the recording.

Investigation on    04/11/2001    at Denver, Colorado

File # 245D-DN-56081 Sub T  -18    Date dictated    04/11/2001

by    SA Todd C. Wilcox/kah   *TW   10/11/01*

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of    **Willie Small & Theolian Lloyd**    . On 04/11/2001    . Page    2

(Phone tones)

**WILLIE SMALL:**          Hello.

(Unintelligible background conversation static, scratching, rustling noise)

**SMALL:**                Hello.

**THEOLIAN LLOYD:**       Hey, what's up homey?

**SMALL:**                Hey, what's going on?

**LLOYD:**                Nothing what's going on with you man?

**SMALL:**                Nothing, just chilling man what's up?

**LLOYD:**                Man, I need a favor man, I'm, I'm paying, man, man, I, I've ran, man I've ran into some bad my, my fucking truck broke down on me today man, I had to spend a hundred, I had to spend ah eighty, eighty-five dollars to get a tow and the dude's gonna charge me like ah, like, like one twenty, like one twenty-five to fix ah my part on my truck, you know what I'm saying?

**SMALL:**                Um-hum.

**LLOYD:**                And ah, I was just probably gonna try to do some of that with you this morning man and I had to use all of that, you know to take care of that man and I'm, I'm, I'm hurt, I'm hurt probably 'til after this weekend, I'll probably have that for you no later than Sunday night, Monday morning get it Monday morning I'll have that for you player.

**SMALL:**                Well if we do that man it's gotta be later on though man.

**LLOYD:**                Huh?

0106_002

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of __Willie Small & Theolian Lloyd__ , On 04/11/2001 , Page 3

SMALL:             I said I could, I could do it but I can't
                   do it now.  Huh?

                   (Unintelligible background noise)

                   (Phone tones)

                   (END OF CONVERSATION)

0106_003

*DN81315, KAH*

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription   07/09/2001

The following is a transcript of a recorded telephone conversation between Willie Small and Theolian Lloyd.  It took place on April 11, 2001 at 16:56 hours:

```
Target Telephone Number:    (720) 291-7113
Call Number:                0294
Date:                       April 11, 2001
Time:                       16:58
Incoming/Outgoing:          Incoming
In/Out telephone number:    (720) 339-4713
```



GOVERNMENT
EXHIBIT
108
01-CR-214-D

This transcript has been compared to the audio tape recording from which it was made and, to the best of my ability, the transcript is a true, complete and accurate record of the recording.

Investigation on   04/11/2001   at  Denver, Colorado

File #  245D-DN-56081 Sub T-17          Date dictated  04/11/2001
                           tw   10/11/01
by   SA Todd C. Wilcox/kah

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of ___ **Willie Small & Theolian Lloyd** ___ ,On 04/11/2001 ,Page ___ 2 ___

          (Phone tones)

| | |
|---|---|
| **WILLIE SMALL:** | Hello. |
| **THEOLIAN LLOYD:** | Yeah, I think my signal went out on my phone man. |
| **SMALL:** | Ah yeah. |
| **LLOYD:** | Yeah, man it, yeah man hey man you know what I mean man no later, no later, no later than Sunday morning, Sunday afternoon man, I'll, I'll be ready, I got some people right now, you know what I'm saying that, that, you know, that, that's waiting on something. I ain't trying to put you in no bind or nothing buddy, but I need some help man, you know I don't even come at you like that man, like I'm straight up. |
| **SMALL:** | Yeah, I understand that, but what I'm telling you man is ah I can't really do right now, I mean I can do it but not now.<br><br>(Pause) |
| **LLOYD:** | Like okay, what if I come over with a couple dollars man cause I'm hurt man.<br><br>(Pause) |
| **SMALL:** | I'm telling you I...I can't really, well...it just ain't ready yet man is what I'm telling ya. |
| **LLOYD:** | Oh, okay.<br><br>(Pause) |
| **LLOYD:** | So you're talking about five or six?  Well I mean... |

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of    __Willie Small & Theolian Lloyd__    , On __04/11/2001__    , Page __3__

| | |
|---|---|
| SMALL: | I'm talking, look man, I'm waiting on...my home boy supposed to came and put it together last night and he didn't make it...so I'm still waiting on him. |
| LLOYD: | Uh-huh. |
| SMALL: | So...as soon as I get it together man you can get it man, but I...I, I can't do it, I, you know, I can't cook it. |
| LLOYD: | Okay so you give me a call back around seven? |
| SMALL: | Ah, yeah, ah yeah that'll give me some time to get it together, I mean, you know. |
| LLOYD: | Okay, okay. |
| SMALL: | Okay then. |
| LLOYD: | Alright. |
| SMALL: | Alright. |

(END OF CONVERSATION)

0108_003

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   07/09/2001

The following is a transcript of a recorded telephone conversation between Willie Small and Theolian Lloyd.  It took place on April 13, 2001 at 11:21 hours:

Target Telephone Number:   (720) 291-7113
Call Number:               0327
Date:                      April 13, 2001
Time:                      11:21
Incoming/Outgoing:         Incoming
In/Out telephone number:   (720) 339-4713



GOVERNMENT
EXHIBIT
112
01-CR-214-D

This transcript has been compared to the audio tape recording from which it was made and, to the best of my ability, the transcript is a true, complete and accurate record of the recording.

Investigation on   04/13/2001   at Denver, Colorado

File #  245D-DN-56081 Sub T-54                    Date dictated   04/13/2001

by   SA Todd _ _Wilcox/kah

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of ___Willie Small & Theolian Lloyd___ .On 04/13/2001 .Page 2

(Phone tones)

(Unintelligible background conversation overheard)

WILLIE SMALL:            Hello.

THEOLIAN LLOYD:          Hey what's up homey?

SMALL:                   What's happening man?

LLOYD:                   Nothing, what's going with you?

SMALL:                   Not much man, same 'ol, same 'ol.

LLOYD:                   Huh?

SMALL:                   Same 'ol, same 'ol.

LLOYD:                   (Unintelligible) can I still hollar at you man about what we talked about yesterday?

SMALL:                   Well I had one yesterday, but ah...man you gotta have some kind of money to put with it man cause we already seventy-five dollars in the red man.  I can't continue to stack money on top of money man, but, didn't have the money then you could pay that shit off and then me and you don't have to go through this.

LLOYD:                   I know it homey.

SMALL:                   (Talking to someone in the background) hey, I love you.

                         (Unintelligible background conversation overheard)

LLOYD:                   So hey.

SMALL:                   Yeah.

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of  __Willie Small & Theolian Lloyd__  , On __04/13/2001__  , Page  __3__

| | |
|---|---|
| LLOYD: | Hey homey. |
| SMALL: | Yeah. |
| LLOYD: | Yeah, I got, I got, I got a dollar right now. |
| SMALL: | Yeah, well. |
| LLOYD: | Um, where do you want me to go? |
| SMALL: | I don't know, up there at the spot where we normally go. |
| LLOYD: | Um...at the Texaco? |
| SMALL: | Yeah, just, that would be good. |
| LLOYD: | Okay, I'll call you when I get right there. |
| SMALL: | Alright. |
| LLOYD: | Alright. |
| | (END OF CONVERSATION) |

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___07/11/2001___

The following is a transcript of a recorded telephone conversation between Willie Small and Theolian Lloyd.  It took place on April 15, 2001 at 20:21 hours:

```
Target Telephone Number:    (720) 291-7113
Call Number:                0406
Date:                       April 15, 2001
Time:                       20:21
Incoming/Outgoing:          Incoming
In/Out telephone number:    (303) 587-1857
```



This transcript has been compared to the audio tape recording from which it was made and, to the best of my ability, the transcript is a true, complete and accurate record of the recording.

Investigation on ___04/15/2001___ at __Denver, Colorado__

File # __245D-DN-56081, Sub T__ ___  Date dictated ___04/15/2001___

by __Officer Steven Stanton, Aurora PD/kah__

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency.

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of ___Willie Small & Big Foot___ , On 04/15/2001 , Page 2

| | |
|---|---|
| | (Phone tones) |
| UNKNOWN FEMALE: | Hello. |
| THEOLIAN LLOYD: | Yeah, is Willie there? |
| UNKNOWN FEMALE: | Yeah, who's this? |
| THEOLIAN LLOYD: | This is Big Foot. |
| UNKNOWN FEMALE: | Hold on a minute. |
| | (Pause) |
| WILLIE SMALL: | Hello. |
| THEOLIAN LLOYD: | Hey, what's up? |
| SMALL: | What's up Travis? |
| THEOLIAN LLOYD: | What's going on peoples? |
| SMALL: | Not much man. |
| THEOLIAN LLOYD: | Ah one, one of, one of my ah, one of my peoples, ah what the whole, what the whole one going for? |
| SMALL: | Nine. |
| THEOLIAN LLOYD: | For me right now man. |
| SMALL: | Man. |
| THEOLIAN LLOYD: | I'm hurt man. |
| SMALL: | What you get, man you got allow me to make mine, I can't give it away man.  If they can't pay that then ah... |
| THEOLIAN LLOYD: | Why won't, won't, will, will you, will do the half for four two five or something or four? |

0122_002

FD-302a (Rev. 10-6-95)

245D-DN-56081

Continuation of FD-302 of    Willie Small & Big Foot                    ,On  04/15/2001   ,Page    3

| | |
|---|---|
| SMALL: | I need my money from you. |
| THEOLIAN LLOYD: | I know this ain't for me homey. |
| SMALL: | Yeah, but what I'm telling ya man, goddam...ah... |
| THEOLIAN LLOYD: | I know homey I got you, you know I got you covered man. |
| SMALL: | I give you a whole one for eight fifty. |
| THEOLIAN LLOYD: | Okay man. |
| SMALL: | Now? |
| THEOLIAN LLOYD: | I'll, I'll call you right back on that. |
| SMALL: | Alright. |
| THEOLIAN LLOYD: | Right, right back, okay? |
| | (END OF CONVERSATION) |

0122_003

FD-302 (Rev. 10-6-95)

ISOHLB US. SUL
7. Wilcox & Drive

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  05/10/2001

           The following is a transcript of a recorded telephone
conversation between Willie Small and Theolian Lloyd.  It took
place at approximately 1243 hours on April 25, 2001, in Denver,
Colorado.

    Target telephone number: (720) 747-4732
    Call number: 0239
    Date: April 25, 2001
    Time: 12:43 hours
    Outgoing call to number: (720) 339-4713



        This transcript has been compared to the audio tape
recording from which it was made, and to the best of my ability,
the transcript is a true, accurate, and complete record of the
recording.

# WORK COPY
# DO NOT FILE

Investigation on  04/25/2001    at  Denver, Colorado                (telephonically)

File #  245D-DN-56081, Sub T - 951   2                 Date dictated  04/25/2001

by  Officer Steven Stanton, Aurora PD/alb

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

0172_001

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of __Willie Small and Theolian Lloyd__ , On __04/25/2001__ , Page __2__

|  |  |
|---|---|
|  | (Background noise) |
|  | (Phone ringing) |
|  | (Background noise) |
| Theolian Lloyd | Hello. |
| Willie Small | Hey what's up? |
| Lloyd | What's up? |
| Small | Hey, this big Willie man, what's happening? |
| Lloyd | Hey what's up Willie? |
| Small | Shit nothing man, I was just checking to see if everything alright, I hadn't heard from ya goddamn. |
| Lloyd | Man, I just got from seeing my P, O, my, my P, O... |
| Small | Yeah. |
| Lloyd | Man, that boy, that boy, messing with me, man.  Yeah he came by my Mom's house, my goddamn, my goddamn sister go and tell the mother fucker that I don't live there no goddamn more. |
| Small | Yeah. |
| Lloyd | And, and that mother fucker call me last night and he told me to report to him first thing in the morning... |
| Small | Mmmm... |

0172_002

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of   Willie Small and Theolian Lloyd         , On 04/25/2001   , Page    3

Lloyd
...so I had to see him anyway.
I go down there this mother
fucker tell me, this was last
week, tell me, hey man uh,
your sister say you don't live
there, where the hell you live
at?  You know that's a felony,
I mean that'll send you back,
if we don't know where you
live at.

Small
Yeah, that damn sure is.

Lloyd
I'm saying man, I gotta, I, I'm
living over here at my mom's
still, you can't, well,
according to your, according
to your sister you don't stay
there no more.  Well every
night I want you to be in, I
want you to uh, I want you to
go home and uh, don't have me,
pop up over there and you
ain't there.

Small
Mmm, mmm.

Lloyd
So it's seen fucking my
fucking (UI) for the last
fucking week and a half man.

Small
Yeah.

Lloyd
I can't believe my little
sister did that shit, I
couldn't believe it.  I told
her when these people come
over here tell them I went to
go get me something to eat.

(Background noise)

0172_003

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of __Willie Small and Theolian Lloyd__ , On 04/25/2001 , Page 4

| | |
|---|---|
| Small | That's crazy there. (Sighs) Well I got everybody programmed about that shit. (Sighs) |
| Lloyd | Yeah man, so I'm, I, I'm stressing. I'm gonna be back on, I'm gonna be back on target probably uh, either later on tonight or probably tomorrow. I went to see him today he was like hey man, just be honest with me man, (UI) another girl (UI), night let me know right now, (background noise) yes got a girl but I don't, I, let, I go there at night sometimes but I normally go home uh, about one or two o'clock in the morning, you know what I'm saying? |
| Small | Mmm, mmm. |
| Lloyd | I'm (UI), hey just be straight with me. He thought I was trying to go behind his back. |
| Small | Yeah. |
| | (Call minimized) |
| Small | You're outta the place so you know I'm still there, then uh, he moves back in, and then you know with all of his domestic shit so I had to move up outta there. |
| Lloyd | Oh really? |

0172_004

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of  **Willie Small and Theolian Lloyd**          On 04/25/2001   Page   5

| | |
|---|---|
| Small | Yeah, so, that's why I, I moved out from down there by Captain D's. So I... |
| Lloyd | Oh, okay... |
| Small | Yeah, so I was going through the same shit.<br><br>(Background noise) |
| Lloyd | Man, (UI), I'll, I'll, I'll have some of that same, if not tonight, tomorrow for sure, and then I'm gonna have to decide, be more careful with my P's and Q's, but my sister God, you know she got the goddamn picture now. |
| Small | Yeah, well sometime...<br><br>(Talking over one another) |
| Lloyd | (UI)... |
| Small | ...we just get a little careless man when, when things is going good and you got everything set up the way you want to have it set up. Sometimes we get a little careless. Cause I would have been still going back and forth over there you know, keeping a (UI) that shit. |
| Lloyd | Well are you gonna talk to uh, Alex about me getting (background noise) in the Mixx? |

0172_005

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of   __Willie Small and Theolian Lloyd__   . On __04/25/2001__ . Page __6__

Small                              Yeah, I, shit I was gonna talk
                                   to him uh, yeah I will though.
                                   Yeah, I'd sure like for you to
                                   be there, cause them niggers
                                   ain't having no shit down
                                   there.

                                   (Background noise)

Small                              They ain't having a goddamn
                                   thing down there, Spoon and
                                   them, I don't know what they
                                   doing.

                                   (Background noise)

Lloyd                              Niggers act like they using.

Small                              Yeah, they act like it.  They
                                   run outta work.

Lloyd                              Huh?

Small                              They keep running outta work
                                   and then uh, I don't know
                                   what's going on down there,
                                   every time I give Red some he
                                   gives it to Melvin or some
                                   mother fucking body.  You
                                   know?  He fucks it off like
                                   it's his and I shhh...

Lloyd                              I, I (UI), uh, I was with Joe
                                   Hightower last night,
                                   yesterday...

Small                              Yeah.

Lloyd                              ...and I told my girl (UI),
                                   you know, he, he told me that
                                   uh, that he gave Red one of
                                   them, one of them little ones
                                   like me and you normally do

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of  Willie Small and Theolian Lloyd    .On 04/25/2001 .Page  7

|  |  |
|---|---|
|  | and he said he ain't seen him since. |
| Small | Yeah, I know. |
| Lloyd | He said that ain't like Red. He asked me he said man Red ain't fucking around is he?, I said (UI), he came and begged me for some for a good day. |
| Small | Mmmmm.... |
| Lloyd | ....and then he's (UI) come back over there and then Joe said Red brought him the money back one time and then Joe was, like okay it's on, and he gave Red another one without no money and then he said he ain't heard from Red. |
| Small | Yeah.  He done did me like that two or three times. |
|  | (Background noise) |
| Small | So I just stopped giving it to him, you know, I, ain't nothing I can do to help him if he gonna fuck my money off, I don't know if he's smoking or not but uh, whatever he doing I know he ain't bringing my money back and that shit costs money and, and uh, you know shit it'd be a different thing if he was turning this shit over you know, but if you ain't turning it over you just don't take the, (UI), and my goddamn uh, uh money.  You know shit.  The whole goddamn |

0172_007

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of  **Willie Small and Theolian Lloyd**  . On 04/25/2001 . Page    9

| | |
|---|---|
| Lloyd | You go on Sherman? |
| Small | Uh, no, I go to uh, I out on Galapago. |
| Lloyd | Oh, okay. Well you know I (UI) fucking up with weed, and all that? |
| Small | Yeah. |
| Lloyd | My P, O, tell me today. |
| Small | Mmm, mmm. |
| Lloyd | That mother fucker told me, he goes oh, yeah by the way Theolian, he said man you've been doing real good, he said you smoke another mother fucking joint (UI), he said he gonna ride the shit out of me. He said (UI) arrested one time (UI) out the county jail I'm gonna ride you like a mother fucker. |
| Small | Yeah. And a nigger don't need that, that's why I, (sighs), be try to stay on my P's and Q's. I don't really suppose to drink, you know? |
| Lloyd | Yeah. |
| Small | So uh, (sighs)... |
| Lloyd | I'm gonna leave that weed alone man. |
| Small | You gonna have to man, if a nigger want to stay out here, |

0172_009

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of  <u>Willie Small and Theolian Lloyd</u>  , On <u>04/25/2001</u> , Page  <u>10</u>

|  | that shit ain't that important. |
|---|---|
|  | (Background noise) |
| Lloyd | Well I definitely want to stay out here man. |
| Small | Yeah.  Alright man well look I was just checking on ya, I hadn't heard from ya I... |
| Lloyd | Yeah, man I, (UI) couple, a couple fucking problems last night, seen Khacki, I was with Khacki last night for a little bit. |
| Small | Yeah. |
| Lloyd | Yeah. |
|  | (Background noise) |
| Small | Yeah, that little old nigger there, man he went and cried to Shug and uh,  Malcolm and all those, talking 'bout a nigger gonna do something to 'em, or something I don't know what, he went and told Shug and Malcolm came to me to, uh, uh, the day we was gambling out there in the parking lot, last week sometime.  And, and asked me to uh, you know just give a nigger a break, (background noise) so I did. |
| Lloyd | I know that's right. |
| Small | Hold on man. |

0172_010

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of __Willie Small and Theolian Lloyd__ . On __04/25/2001__ . Page __11__

|  |  |
|---|---|
|  | (Background noise) |
| Small | (Talking to someone else on his cell phone) |
| Small | Hello. |
| Lloyd | Yeah |
|  | (Background noise) |
| Small | What's happening? |
|  | (Background noise) |
| Lloyd | Hello? |
|  | (Background noise) |
| Small | Who is this?  Who is this? |
|  | (Background noise) |
| Small | Yeah. |
|  | (Background noise) |
| Small | Huh? |
|  | (Background noise) |
| Small | Ho', hold on.  Hello. |
| Lloyd | Yeah. |
| Small | Hey man let me get back at ya man. |
| Lloyd | Okay. |
| Small | Alright. |
|  | (Background noise) |

FD-302a (Rev. 10-6-95)

245D-DN-56081, Sub T

Continuation of FD-302 of  __Willie Small and Theolian Lloyd__  , On 04/25/2001 , Page  12

(End of call)

(End of tape)

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

Criminal Case No. 01-CR-214-D

NOV 1 3 2003

UNITED STATES OF AMERICA,

GREGORY C. LANGHAM
CLERK

      Plaintiff,

v.

THEOLIAN LLOYD,
      a/k/a "Big Foot",

Defendant.

---

## VERDICT FORM

### COUNT ONE

We, the jury, upon our oaths, unanimously find the defendant, THEOLIAN

LLOYD, in Count One of the indictment:

    _____ Not Guilty

    __X__ Guilty

### COUNT FOURTEEN

We, the jury, upon our oaths, unanimously find the defendant, THEOLIAN

LLOYD, in Count Fourteen of the indictment:

    _____ Not Guilty

    __X__ Guilty

## COUNT SIXTEEN

We, the jury, upon our oaths, unanimously find the defendant, THEOLIAN LLOYD, in Count Sixteen of the indictment:

  X   Not Guilty

____   Guilty

## COUNT SEVENTEEN

We, the jury, upon our oaths, unanimously find the defendant, THEOLIAN LLOYD, in Count Seventeen of the indictment:

____   Not Guilty

  X   Guilty

## SPECIAL VERDICT

## Count Fourteen

If you find Defendant THEOLIAN LLOYD guilty of Count Fourteen, please

answer the following questions (your answers must be unanimous):

1.  Do you find that the government proved beyond a reasonable doubt that the

defendant, THEOLIAN LLOYD, distributed or possessed with intent to distribute, five

grams or more of a mixture or substance containing a detectable amount of crack

cocaine?

____X____ Yes

_____ No

2.  If your answer to Question No. 1 is "No", do you find that the government

proved beyond a reasonable doubt that the defendant, THEOLIAN LLOYD, distributed

or possessed with intent to distribute, a quantity less than five grams of a mixture or

substance containing a detectable amount of crack cocaine?

_____ Yes

_____ No

## Count Sixteen

If you find Defendant THEOLIAN LLOYD guilty of Count Sixteen, please answer

the following questions (your answers must be unanimous):

1.  Do you find that the government proved beyond a reasonable doubt that the

defendant, THEOLIAN LLOYD, distributed or possessed with intent to distribute, five

grams or more of a mixture or substance containing a detectable amount of crack

cocaine?

\_\_\_\_\_ Yes

\_\_\_\_\_ No

2.  If your answer to Question No. 1 is "No", do you find that the government proved beyond a reasonable doubt that the defendant, THEOLIAN LLOYD, distributed or possessed with intent to distribute, a quantity less than five grams of a mixture or substance containing a detectable amount of crack cocaine?

\_\_\_\_\_ Yes

\_\_\_\_\_ No

## Count Seventeen

If you find Defendant THEOLIAN LLOYD guilty of Count Seventeen, please answer the following questions (your answers must be unanimous):

1.  Do you find that the government proved beyond a reasonable doubt that the defendant, THEOLIAN LLOYD, distributed or possessed with intent to distribute, five grams or more of a mixture or substance containing a detectable amount of crack cocaine?

\_\_\_X\_\_ Yes

\_\_\_\_\_ No

2.  If your answer to Question No. 1 is "No", do you find that the government proved beyond a reasonable doubt that the defendant, THEOLIAN LLOYD, distributed or possessed with intent to distribute, a quantity less than five grams of a mixture or substance containing a detectable amount of crack cocaine?

\_\_\_\_\_ Yes

\_\_\_\_\_ No

Dated this _13th_ day of _November_ , 2003.

_[signature]_

Foreperson

_[signature]_                          _[signature] Juan Arias_

_[signature]_                          _[signature] Suzanne Martin_

_[signature]_                          _[signature]_

_Lynda Vassar_                         _[signature] Richard F. Meyer_

_Pamela A. Blair_                      _[signature] David_

_[signature]_                          _[signature]_

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

**F I L E D**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR 0 6 2004

GREGORY C. LANGHAM
CLERK

Criminal Case No. 01-CR-214-D

UNITED STATES OF AMERICA,

Plaintiff,

v.

WILLIE SMALL,
        a/k/a "Pops",
ALVIN GREEN,
        a/k/a "Mel Dog",
THEOLIAN LLOYD,
        a/k/a "Big Foot",
ZEBEDEE HALL,
        a/k/a "Zee",
        a/k/a "Zeke", and
SAMMIE LEE WOODS,

Defendants.

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 CONCERNING COUNT ONE OF THE SECOND SUPERSEDING INDICTMENT

---

THIS MATTER comes before the Court on Defendants' consolidated and individual motions for judgment of acquittal on Count One of the Second Superseding Indictment filed October 29, 2003. The Government filed a written response to these motions on October 31, 2003. Defendants also filed other motions for judgment of acquittal and/or for new trial that were addressed in another Order issued this same date as to the other counts in the Second Superseding Indictment. To the extent those motions address Count One, this Order also encompasses those motions.

The parties were ordered to file proposed findings of fact and conclusions of law with respect to Count One. The Government and the Defendants filed their Proposed Findings of Fact and Conclusions of Law which this Court has considered. The Court has also considered all the evidence in this case, the jury instructions and verdict forms, the various motions and responses thereto seeking a judgment of acquittal, and the case law cited by the parties. For the reasons stated below, Defendants' motions for judgment of acquittal on Count One of the Second Superseding Indictment are **DENIED**.

A.  **FINDINGS OF FACT**

1.      The evidence presented at the trial showed that Willie Small was at the core of a conspiracy whose objective was to distribute crack cocaine for money. More specifically, the evidence showed that Willie Small ran a crack cocaine business subject to requirements and market features which resembled those applicable to conventional small business organizations, including substantial overhead expenses. To achieve its business objectives, Willie Small's crack cocaine business had to address matters such as staffing, raising and maintaining sufficient working capital, obtaining raw materials (cocaine HCL), transportation (automobiles, insurance, travel expenses), manufacturing (cooking the cocaine HCL into crack cocaine), maintaining a location (rent expense), storage (keeping stockpiles in several locations to limit the exposure arising from having crack cocaine in a vehicle for delivery), physical security (obtaining weapons to protect inventory and funds generated from robbery or theft), communications (cell phones and

-2-

hardline phones), collecting on accounts receivable, maintaining quality control and product consistency, and evading law enforcement.

2.     Willie Small indicated repeatedly through the evidence that there were thousands of dollars to be made in the crack cocaine business.  Testimony revealed that a distributor reasonably could expect to double his investment by buying and then selling quantities of crack cocaine.  *(Testimony of: Brian Harris, October 3, 2003, p. 90; Charles Young, October 10, 2003, pp. 24-25; Ronald Clark, October 8, 2003, p. 176; James Starkey, October 3, 2003, pp. 16-17; and Curtis Hawkins, October 9, 2003, p. 18.)*

3.     The evidence showed that to further his business purposes, Willie Small set up an enterprise employing "family" members, long time friends, and personal associates whom he had known and trusted for a substantial amount of time.  Some persons were qualified to participate because they had been previously convicted of felonies and had done their time.  Some were on parole or probation while participating in the conspiracy.  *(Exhibit 176R, p. 5, Small tells George Murray "a couple of mother fuckers went to jail, this one nigger on parole he'd been having problems cause he changed his address, so he can't get out the way he normally get out . . . .")*

4.     Employing persons so situated gave Willie Small a degree of confidence since they were less likely to cooperate with authorities if caught by law enforcement.  (Exhibit 146R, p. 3, Small discusses with Murray the dangers of selling crack cocaine; Small states, "you ain't got no business rushing then" and Murray replies, " I'm trying to, I'm trying to dodge the motherfucking jail man"; Exhibit 176R, p. 4, again between

-3-

Murray and Small, where Murray tells Small, "the last time I saw you . . . man I got $200 worth of shit over here, the motherfucking street police ain't letting a motherfucker do nothing. I'm scared, I've been scared as a mother fucker"; Exhibit 260, p. 2, a conversation between Small and Cooper where Small confides, " It's been so goddamned dead on my end, I'm tryin' to figure out what's goin' on" and then states, "I may have to start breakin' some of this shit down cause it's been so slow, man." Cooper replies, "I ain't gettin' out on no corner" and Small says, "I'm scared down there." Cooper admits that he, too, is scared to sell on the corner; Exhibit 220R, p. 9, Murray states, ". . . I had some shit in my hand, he wanted a $50, but he wanted a dub on it, but I'm gettin him $80 worth of shit, police turned the car on me and I throwed the shit.")

     5.     Employing other persons as retail sale representatives allowed Willie Small to avoid selling individual rocks of crack cocaine to crack consumers on "the street" himself. This arrangement provided protection for him from getting caught by routine police activity and limited his exposure to only a select group of persons, his "regular clientele". *(Exhibit 176R, p. 5, Small tells Murray, "he [Zebedee Hall] bought a couple of zips and then he come back and bought another one if it don't be for him none of my regular clientele have reported in; Exhibit 192, p. 2-3, Small tells Mississippi, "everybody, half my little old clientele is in jail . . . ."; Exhibit 220R, p. 5, Small tells Murray, "all of my peoples in jail . . . 3 to 4 other motherfuckers . . . that I was doin' business with . . . I'd fronted 'em, let 'em get on"; Exhibit 342, p. 11, Willie Small and Shirley Davis "all of the east side niggers was calling me tonight and I was cuttin*

-4-

*they ass off, too . . . I deal with my people only*).  Further, Small did not have to sell as

frequently if he could sell in larger quantities to fewer people.

6.      To stimulate the business, Small would  "front", or give on consignment

without payment of money or with only partial payment of money, crack cocaine to retail

distributors.  Fronting creates reciprocal financial dependence.  *United States v.*

*Raymer*, 941 F.2d 1031, 1044 (10th Cir. 1991) (cocaine consignment arrangement

created link to co-conspirator).  Evidence showing Small fronted crack cocaine to the

defendants on trial without full payment can be found in the following exhibits:

**Zebedee Hall -**  <u>Exhibit 328, pp. 2 -3, Zebedee Hall to  Willie Small,</u>
**Zebedee Hall** *"I was intend in to come back by last night with them little chips and shit. . . I might as well just wait till tomorrow and just do that whole thing plus that."*

**Theolian Sy Lloyd -** <u>Exhibit 106, p. 2, Theolian Lloyd to Willie Small</u>
**Theolian Lloyd** "Man I need a favor, my truck broke down . . . I had to use all of that to take care of that . . . I'll have that for you no later than Sunday night, Monday morning"
**Willie Small** "I could do it but not right now"

<u>Exhibit 108, p. 2, Theolian Lloyd to Willie Small</u>
**Theolian Lloyd** "No later than Sunday morning, afternoon
**Willie Small** "it just ain't ready yet."

<u>Exhibit 112, pp. 2-3, Theolian Lloyd to Willie Small</u>
**Theolian Lloyd** "can I hollar about what we talked about yesterday?"

**Willie Small** "I had one yesterday but you gotta have some kind of money to put with it man we already $75 in the red, I can't continue to stack money on top of money."

**Theolian Lloyd** "I got a dollar right now where do you want to meet?"

<u>Exhibit 568, pp. 3-4, Willie Small to Bridget Johnson</u>
**Willie Small** "the man [Theolian Lloyd] owe me $75 from the shit I

done give him months ago. . . he tell me he need some work to get it and then he turn around and turn that over and give me $50 on another one."

Exhibit 584, p. 2, Max Cooper to Willie Small
**Max Cooper** "Bigfoot he win five to $7,000"
**Willie Small** "he say he don't owe me nothing. . .he owe me $275."

Exhibit 586, p. 5, Willie Small to Timothy Chandler
**Willie Small** "this nigger Bigfoot owe me $300 and some dollars but now he quit fucking with me."

**Bridget Johnson**, testimony, 10/24/03, p. 77, "Willie Small said he and Bigfoot had a misunderstanding cause Theolian Lloyd buying dope from someone else and Theolian Lloyd owed Willie Small money."

**Sammie Woods -**   *Sandra Davis, testimony 10/9/03, p. 156, "Willie Small said he was helping Sammie Woods out and that Sammie Woods needed money to pay his child support or he would just give Sammie Woods money or drugs to try to help him get his child support together."*

*Bridget Johnson, testimony, 10/24/03, p. 73, "sometimes Sammie Woods would pay for the drugs (he got from Willie Small). Willie would give it (drugs) to Sammie Woods on consignment. . . fronting. . . giving someone dope on credit"*

7.     Often, the original quantity of drugs would be "fronted" to persons just re-entering society after serving a sentence of confinement. *(Testimony of Victor Mendinghall, 10/08/03, p. 94, that the "law of the street" was that you would "help out" a newly released felon with money or crack cocaine to get them back on their feet.)*

8.     As evidenced in *Exhibit 114R*, once the new distributor had sold that original amount of crack cocaine and re-paid the original purchase price, he could receive more crack cocaine, again on consignment, and re-sell that to make another profit. *(Exhibit 20, p. 2, Theolian Lloyd is planning on paying Small the money he owes*

*so he can get more crack cocaine. Lloyd says, ". . . trying to get through, some things together, I got like 4 dollars and 25 cents, I wanted 2 and I'll take the rest later on, I'm trying to get back on my feet." Small agrees stating, "That's what I like about you, you be handling your business man,. . . I'll work with you like that. . . as long as you understand that I have to have my ends. . . .")*

9.      The evidence showed that even though many of the retail sellers working with Small were actually paying Small's price at the time of any given sale, they were actually always one payment behind because of the original quantity of crack cocaine given to them on consignment. This arrangement allowed the new distributor to get a "stake" or a loan to start out his business, but also insured Small that his retail distributors would return to him to purchase crack cocaine the next time they needed to re-stock their supply. Evidence disclosed a pattern in which retail distributors never would pay the first "front", because they were always one payment behind. However, if a retail distributor decided to buy his crack cocaine from a supplier other than Small, that distributor still owed Small for the first front and would have to pay Small even though he got no further crack cocaine. *(Exhibit 220R, p. 5, Small tells Murray, "I really wouldn't mind [fronting] if things going well. . . three or four other motherfuckers I'd fronted them and let 'em get on and then once they got on they start buying their own . . . . ." Small acknowledged this problem, stating, "they spending their money somewhere else so they don't have to pay that front money.")*

10.     A conspirator could move up in the business, selling increased quantities of crack cocaine to higher and higher level re-distributors, and operate his own

"franchise" in a more professional manner. *(Exhibit 20, p. 2, when Lloyd and Small actually conduct two transactions in one day, Small compliments Lloyd stating, "that's what I like about you, you be handling your business man, . . . I'll work with you like that . . .as long as you understand that I have to have my ends.")*

11.   The evidence supported the fact that Willie Small's exposure to arrest would be minimized if he did not have to drive far while in possession of the crack cocaine he was planning to distribute. *(Exhibit 46R, p. 2, arranging to meet Theolian Lloyd, Small stated, "I don't want to come way up there, I don't like to drive that far with that shit.")* All conspirators would have suffered disruptions in their crack cocaine distribution enterprise if Willie Small had been arrested.

12.   Several people alleged to be involved in the conspiracy, including Sammie Woods and Zebedee Hall, were sufficiently trusted associates that they were allowed to come to Small's residence to buy crack cocaine, thereby lessening the burden on Small to travel and lessening Small's exposure outside; by the same token, rather than having their specific activities known to Dachaun Davis or some other go-between, Sammie Woods and Zebedee Hall had a smaller number of persons in a position to compromise them and thus benefitted from the privacy of Small's home. *(Testimony of Dachaun Davis; Exhibits 733, 738, 743, 748, 751, 754, 755, 758, videotapes of Woods arriving at 1939 S. Quebec Street after arranging for a drug distribution over the telephone; Exhibits 722, 741, 742, 748, 758, videotapes of Hall arriving at 1939 S. Quebec Street after arranging for a drug distribution over the telephone).* Several others, including Theolian Lloyd, were under certain restraints as a result of their former convictions

which made it more likely they were not dealing openly or with a large number of persons. Further, persons under parole or probation officer supervision were likely to not be using the product since such use would violate the terms of any probation or parole and they would be subject to chemical tests to determine illegal drug use.

13. Some members assisted the venture as a whole by identifying other persons who could act as outlets. The volume of business was important to the Small enterprise, as it would be to any small business, permitting the allocation of fixed expenses over a larger number of sales. In a number of intercepted calls, Small discussed, explained and complained about the fixed overhead expenses he needed to cover each month. It was important that the group of distributors remain at a certain level. If distributors were disabled from working for a period of time, for instance if one went to jail, it was important that a new distributor be developed so that the sales could continue at the same pace and income would not be lost. *(Exhibit 178, p. 5, and Exhibit 194, p. 17, Small tells others that Sammie's in jail; Exhibit 578R, p. 12, Small and Bridget Johnson discussing how Small had given Murray $300 and some "work" [crack cocaine] and now Murray was in jail and unable to pay Small back; Exhibit 192, p. 2, Small tells Mississippi, "I ain't made no money in 2-3 weeks, everybody half my clientele in jail. . . A couple of people went to jail and a couple of people done fell off" and then continues, "The only nigger that call me was Little Man, and he was short"; and Exhibit 176R, p. 6, where, in addition to the section quoted above about Theolian Lloyd having parole problems, Small laments to Murray, "It all happened at one time, I got this one dude [Zebedee Hall] he bought a couple of zips and then came back and bought*

-9-

another one, *if it don't be for him some of my regular clientele have reported in, this shit been going on 2-3 weeks"*).

14.     Small and his co-conspirators operated out of several locations including the Club Mixx and the residence of Sandra Davis, aunt to Dachaun and Keyonna Davis. Small would simply bring his supply of crack cocaine in his "can" with him while he played cards with his "family", and persons could call him and meet to receive their crack cocaine. *(Exhibit 110, p. 3, Small explains to Sandra Davis that he would like to just come to her house and play cards, stating "I'll probably call Mel . . . and hang out with you all and that way I can sit and work if I have any action.")* Some of the distributors were allowed to come inside the Davis residence (Sammie Woods) where they were taken to a back bedroom to do business. *(Testimony of Sandra Davis, October 9, 2003, pp. 137-138; Shayla Ferguson, October 24, 2003, pp. 7-8.)* Others simply called and Small would meet them outside. *(Id.)*

15.     In addition, Small stored crack cocaine at the home of Bridget Johnson as well and would direct people to her house if he was there. By that manner, Small was able to turn any location where he was into a mobile distribution center. Given the amount of crack cocaine which was being manufactured at any one time, it was important that the crack cocaine be divided and hidden in various locations as well to minimize any potential loss which might be incurred should anything happen to any "stash house". *(Exhibit 178R, p. 3, Small tells Bridget Johnson, while trying to figure out how much crack cocaine he has stored at various locations, "I have shit everywhere"; Testimony of Keyonna Davis, October 2, 2003, pp. 101-102, crack cocaine was stored*

under stove; Testimony of Dachaun Davis, September 29, 2003, p. 235, crack cocaine

was stored under sink in hiding place; Exhibits 1017, 1019, 1020, 1028, and 1030,

crack cocaine, digital scale and false bottom cans where crack cocaine was hidden.)

16.    Inventory turn over was critical to the long term health of the business.

Small indicated repeatedly in intercepted calls that the expenses continued to accrue

although sales were down.  In addition, any extended interruption in supplies could

result in attrition to the customer or consumer base, who could find different sources.

The success of both Small and the retail distributors depended upon the steady flow of

products and the steady income generated by sales.  (Exhibit 586, p. 5, Small tells

Timothy Chandler about the situation with Theolian Lloyd, stating, "this nigga Bigfoot

owe me three hundred and some dollars but now he quit fucking with me. . . I don't

mind him moving on but make sure you clear your bill.")

17.    When a retail distributor discontinued buying crack cocaine from Small

and did not repay him for the original front, as noted in the above referenced situation

with Theolian Lloyd, this caused significant problems for all the conspirators and

hampered Small's ability to provide that "helping hand" to other potential conspirators.

(Exhibit 578R, p. 13, Small said, ". . . he [Little Man] didn't understand that I got so

many motherfuckers pulling at me. . . ."; Exhibit 220R, p. 6, Small complains to George

Murray that his distributors are "spending their money somewhere else so they don't

have to pay that front money.")

18.    An example of the breakdown of the process occurred with Theolian Sy

Lloyd.  Lloyd began getting further and further in debt to Small.  (Exhibit 106, p. 2, in

addition to the original front, Lloyd asked Small for further "fronts" of crack cocaine.

Lloyd stated, "Man I need a favor. . . my truck broke down. . . I was going to do that with

you this morning and I had to use all of that to take care of that. . . I'll have that for you

no later than Sunday night, Monday morning." Small agreed, stating, "I could do it but I

can't do it now.")

19.    Lloyd stopped dealing with Small at one point during the wiretap

interceptions. Small complained at first that Lloyd was suffering gambling and parole

problems, but further opined on several occasions that Lloyd owed him money and was

not buying from Small because he owed Small money. (Exhibit 112, p. 2, Small

complained directly to Lloyd that Lloyd was going to have to pay the money Lloyd owes

Small, saying, ". . . you gotta have some kind of money to put with it man cause we

already $75 in the red. I can't continue to stack money on top of money man but didn't

have the money then you could pay that shit off and then me and you don't have to go

through this"; Exhibit 568, p. 3, Small tells Bridget Johnson, speaking of Lloyd, ". . . the

man owe me like $75 from the shit that I done give him months ago. . . he tell me he

need some work to get it and then he turn around and turn that over and give me $50

on another one. . . he just got hooked up with somebody else that let him handle some

weight or something"; Exhibit 586, p. 5, Small tells Timothy Chandler, "this nigga Bigfoot

owe me $300 and some dollars but now he quit fucking with me. . . I don't mind him

moving on but make sure you clear your bill.")

20.    Small called to see what the problem was with Lloyd. (Exhibit 172, p. 2,

Small said to Lloyd, "I was just checking to see if everything alright," and reminded

Lloyd that "the whole thing is for a nigger to get on and get on his own."[1] If Lloyd could

continually change suppliers, he could sell the crack cocaine from the first "front", then

not repay the supplier (in this case Willie Small) and could be said to be making his

money off other people without taking care of his own business. If that behavior

became chronic, no one would deal with Lloyd, and Lloyd would find himself without a

supply of crack cocaine. (Exhibit 568, p. 3, Small tells Bridget he is mad because

someone, "owe me $75 from the shit that I done give him months ago. . . he tell me he

need some work to get it and then he turn around and turn that over and give me $50

on another one. . . he just got hooked up with somebody else what let him handle some · ·

weight or something.")  The supplier, who had fronted the crack cocaine (in this case

Willie Small), would suffer a business loss and Lloyd (the defaulting distributor) would

wind up without a source to obtain the product he needed to make money.  Similar

situations arose with Sammie Woods.  (Exhibit 542, p. 2, Woods says, "I got somebody

who want to get one . . . about 20 minutes to get the money.  Small tells him "you got to

send the money Sammie, I ain't got time for that bullshit, you don't want to send the ·

money. . . I ain't trying to fuck with it.")

     21.     Business vitality required stock turnover. (Exhibit 220R, p. 7, Small tells

Murray, "I got the work but I got to turn the work." In other words, if Small could not sell

his crack cocaine quickly, he could not make enough money to accomplish his business

goals.)  Evidence disclosed the importance of sales representatives to stock turnover

when Sammie Woods and others were unable to work because they had gone to jail.

---

[1]  Small was talking about Max Cooper, however, the message was being given to Lloyd who at the time was significantly in debt to Small.

-13-

*(Exhibit 578R, p. 12, Small says, "he calling me from jail . . . I give him $300 at the gambling shack and some work . . . no he ain't got no goddamn money"; Exhibit 244, p. 3, Small told Woods the day Woods got out of jail, "I'm so glad you're home. . . I fell off when you've been gone. . . man I fell off. . . All my people down there something happened all at one time"; Exhibit 236, p. 3, Small told Woods "I need money. . . I ain't made no money since you left" to which Woods replied, "Alright, I'll start puttin something together tomorrow for ya" and Small repeated, "I ain't made no money since, I ain't lyin.")*

22.     At least one of Willie Small's distributors had brought himself up to a higher level and, at the time of the investigation, expressed the ambition to be a supplier on the level of Small himself.  That was Zebedee Hall.  Hall still needed Small's patronage, however, because Hall had no dependable quality source of supply of cocaine HCL.  Although interested in developing a relationship with a good source of supply for cocaine HCL, during the period of the wiretap Hall was buying crack cocaine from Small in large quantities.  *(Exhibit 64, p. 2, Hall wants to obtain four ounces of crack cocaine, stating "I was wonderin' if you could get like four of 'em?"; Exhibit 72, p. 2, Hall asks Small, "I'm in dire straits, why don't you just let me get a couple of 'em – can you do like 1550 for two . . . two for like 1600?"  Small agrees, but says, "That's the best I can do.")*  Even at the relatively high prices Small was charging Hall for an ounce of crack cocaine, Hall could still make a profit from resale if he broke the ounces he was buying down to give to retail distributors himself.  *(Exhibit 66, p. 3, Small tells Hall "I'll give 'em to you for nine although I'm getting two and a quarter, this shit straight up it*

-14-

and none of that mix." Small explains to Hall, "[California] he got to understand that it got to be under twenty for the whole thing and then if I get it for that number I can give it to you and Shug and all.")

23.    Hall continued to want to deal with Small and tried for more of a partnership arrangement in the raw material, the cocaine HCL powder, so he could "put his own twist on it." *(Exhibit 90, p. 4, Hall states, "I want it Sunow [in powder form], that way I can put my own twist on it.")* Small gave some indication he might let Hall in on a purchase of cocaine in powder form, highlighting the functional importance of the associate who can be counted upon to obtain the cocaine HCL and the possibility of sharing the overhead expenses for transportation and acquisition of the cocaine HCL. *(Exhibit 536, p. 3, Hall asks, "When you do your thing let me know" and Small replies, "I went in with the homeboy on this thing, but next time if you want to get down, you know he goes to California . . . I trust him because he always come back with the thing.")* However, Small also benefitted in the short term by keeping Hall as a paying crack cocaine purchaser for redistribution. *(Exhibit 316, p. 2, Hall asks Small, "On that yellow thing, is it workin'?" and Small states, "I haven't even broke it down." Hall asks, "Did you put the thing on it?" but is disappointed when Small replies, "It's already up, it's not soft"; Exhibit 524, p. 2, Hall asks Small, "You think I can get on that four and a half thing?" and Small says, "No, not on this shit, me and this old nigger went in on this shit." Hall continues to implore Small, "Can you like reach out . . . I want it straight though." Small refuses, stating "ain't nobody gonna give it to you like that though.")*

24.     Regardless of the fact that Small resisted letting Hall in on a purchase of cocaine powder that was already in Colorado, Hall continued to need Small in order to obtain a product with which he could make a profit. *(See Exhibit 96R, p. 2, where Hall went to another dealer for cocaine powder and then complained to Small that the ounce of cocaine (28 grams) he had obtained came out to only 17 grams when fully processed, stating "This thing over here ain't shit . . . I only got two of them mother fuckers and I fucked with one . . . It was like 17.")* Hall needed Small to get him 10 more grams of cocaine to try to re-manufacture (or cook) with the inferior cocaine HCL which Hall evidently had obtained somewhere else.

25.     Small repeatedly told his distributors that the costs of obtaining cocaine powder would determine the price they would have to pay for the crack cocaine. *(Exhibit 832R, p. 4, Small tells Roz Parker, "think I'm gonna be able to get it for a little cheaper on this next one. The white shit I got . . . for 52 so you know I did 'em for two"; Exhibit 846RR, p. 5, Small tells Roz Parker, "My prices here got a lot better . . .If I get another price reduction, see I got these one boys that bring it in but my boy here, he don't want me to cut him loose, you know but I'm telling him that I gotta have a better price from my people"; Exhibit 4, p. 2, Small to Lloyd, "this work that I got went up a little bit. . . I have to pay more money for that shit"; Exhibit 66, p. 4, Small to Zebedee Hall, "he got an understanding that it got to be under 20 for the whole thing [kilogram] and then if I get it for that number I can give it to you and Shug and all".)*

26.     Although Small developed several sources of supply during the period of the investigation, his most constant and important source was Alvin Green. Green went

to California approximately once a month to purchase cocaine. *(Exhibits 921 and 932, airplane ticket receipts February and March, 2001; Exhibit 154R, p. 5, Mel is leaving on April 20 or 21; Exhibit 747, videotape of Alvin Green travel to California on May 23, 2001; Exhibit 180, p. 2, 4/26/01, Alvin Green is in California.)* Green had a large family in California, including a brother-in-law, Troy Anderson, who had been involved in drug distribution in a very large way. *(Testimony of Dwayne VanDyke, October 10, 2003, pp. 57-58.)* Green was able to provide a quality product at a reasonable price; this was essential to the ability of Small and Small's sales force to make money. Quality and price were key components of the success of the business. *(Exhibit 64, p. 2, Small had to turn away Hall's offer to purchase four ounces of crack cocaine because the price Small had to sell it in order to make any profit would be too high for Hall to make money as well.)*

27.     Small's other suppliers of cocaine were not as dependable as Green. Dwayne VanDyke took a long time to set up a deal for four and one-half ounces. *(Testimony of Dwayne VanDyke, October 10, 2003, p. 87; Bridget Johnson, October 24, 2003, p. 74; Exhibit 398, Small forced to put Sammie Woods on hold stating, "dude's supposed to be bringing that shit to me in about an hour, so if you can hold on, hold on, if not then I'll catch you on the next round, he called and said he'd be through here between an hour and hour and a half, check with me back in an hour and a half. Then later, Exhibit 400, p. 2, Small tells Woods he does not have the crack cocaine yet, stating, "dude coming through, man, he said he want to wait until it gets dizark, it'll be here as soon as it gets dark, so hold on if you can"; Exhibit 380, p. 3, Small tells Green,*

-17-

"I really don't want to fuck with Ian [Dwayne VanDyke].) VanDyke did show up the next day, but he only sold Small four and one-half ounces of crack cocaine. *(Testimony of VanDyke, 10/10/03, p. 93.)*

     28.    On other occasions, evidence shows, VanDyke made promises to bring the product but failed to show up in a timely manner. *(Exhibit 454R, p. 3, Small tells Shirley Davis, "I'm waiting on this nigger N to call me cause I was trying to do that"; Exhibit 464, p. 2, Small tells James Starkey, "I ain't even got nothin I'm waiting on Dude to get back, I ran out yesterday. . . this motherfucker here, it's a local boy and my people are gone out of town. . . he be gone for a few days.")* Often, before VanDyke came to resupply Small, Small's need for cocaine from VanDyke would pass because Green would return from California with kilogram quantities of cocaine. *(Exhibit 498, p. 2, Small finally tells Dwayne VanDyke, "I'm straight, Mel got back last night" and VanDyke stops looking for cocaine to supply to Small.) (See also Exhibit 590, p. 3, Small tells "Bobby", "tell him [Soul] I sent like 20, 20 large up to Caly. . . the same day the shit happened to him and I ain't retrieved my package yet, so my ends are tighter than a motherfucker"; Testimony of Steve Stanton, October 21, 2003, pp. 78-79, a kilogram of cocaine cost approximately $20,000.00; Exhibit 194RR, p. 11, Small states "I got one and a half and another one on the way" after having discussed a "bird" [kilogram of cocaine].)* Small's suppliers early on in the conspiracy, "Bear" and "P", lived out of state and apparently ran into legal difficulties causing them to simply stop coming to Colorado. *(Testimony of Bridget Johnson, October 24, 2003, p. 72.)*

29.     The quality of the cocaine HCL powder was essential to the success of the venture as a whole. If the cocaine was of poor quality, the crack produced would be "short". (*Testimony of Steve Stanton, 10/21/03, pp. 88-91*). On occasions where the crack was of poor quality the distribution cycle would be disrupted and money would have to be refunded rather than making its way back up the chain to purchase more cocaine. (*Exhibit 270, p. 2, Woods tells Small, "everybody's complainin. . . I had four complaints." Small replied, "Shit I ain't had none. . . well you guys always get the complaints" and then asked, "do they bring it back?" Woods said, "I got two of the pieces back. . . I got two of the pieces back, they didn't look good and called 'em and tell 'em I had to come and get it." Small said, "what did they say?" and Woods responded, "it ain't no good, it's just nothin." Small protested, "that shit's better than a motherfucker, I watched the motherfuckers cook it. . . maybe we'll pick a different one . . .when they cook it they add soda to it, they blend the shit with a blender."*)

30.     Just as it was essential for the venture as a whole for Small's distributors to pay him in a timely manner for the crack cocaine he supplied, as a part of the supply chain, it was essential for Small to timely pay Green for the cocaine HCL powder brought in from California. (*Exhibit 514, p. 3, Small tells Alvin Green, I got a little scratch for you too, yeah, you know I'm trying to rush it so we can stay on track without having to fall off." Small also reassures Green, "I want you to get back so bad cause . . . that thing gonna come up where it ain't nothing. . . we want to be able to take care of our business until it get back on."*) It was important that Small have money to at least partially pay for large quantities of cocaine. (*Exhibit 530R, p. 4, Small confides to*

-19-

Sandra Davis, "Man I ain't got no money, shit I gave Mel all that money, and that fucked me because I wanna make sure he's able to take care of his, if he can't take care of his end, I sure can't take care of mine, so I try to get the money to him as fast as possible . . . so that's why . . . I give him all that money at one time so that way he can get back and I'll still have some while he gone"; Exhibit 438, p. 2; Small tells his creditor (Clarence Threatt), ". . .I sent all the little money I had out to get those things," and "I got everything tied up with what I got out of town"; Exhibit 590, p. 3, Small sent twenty large to California; Exhibit 536, p. 3, Small tells Hall, "I went in with my homeboy on this thing. . . he goes to California. . . I trust him cause he always comes back with the thing.")

31.    It was also an important step in the process for Small and Green, partners in the purchase of  kilogram quantities of cocaine, to be able to obtain as much cocaine as possible without prepayment. *(Exhibit 180, p. 2, Small and Green discuss purchasing the cocaine in California.  Green tells Small, "it's you know, like a desert[2]."  Small replies, "it's been so ugly on my end, I got all that wizerk, I just ain't go nobody biznying, I still got that same thing, Tizen, ain't no work down there."  Green tells Small, "No, it ain't that much, they get a few in their hands and it's first come first serve. . . . I don't want to jump out there with anybody."  Small agrees, not wanting to expose either one of them to undue risk and says, "Nigger can't stand no wrecks, it gotta be for sure, can't stand no wreck right now, not like this.")*  As with a legitimate business, not having too much capital tied up in raw materials allowed Small to "front" his distributors to get

---

[2]  Dachaun Davis states this means there is a low supply of cocaine, pp. 138-9.

them started, putting more of his product into the market place, and eventually resulting in everyone making more money off the sale of the crack cocaine. .

32      Green, in turn, depended upon Small to help convert the cocaine into crack cocaine and provide a location to accomplish this task. (*Testimony of Dachaun Davis, September 29, 2003, pp. 226-238 and September 30, 2003, pp. 25-26; Testimony of Shayla Ferguson, October 24, 2003, pp. 18-20.*) Green provided specialized utensils and skills to cook the crack cocaine *(Exhibit 988 , beaker; Exhibit 484, p. 2, Small tells Brewer she can come get her crack cocaine but, "My friend is here but we still gotta put it together, he is (here), but I'm saying he gotta cook it")*, and participated with Small in cooking the cocaine at Small's residence. While Small depended on Green's going to California and purchasing the cocaine, Green depended on Small to find outlets for the crack cocaine which belonged to Green as his share in the venture. *(Exhibit 272, p. 3, Small instructs Dachaun Davis, "We need to get somethin going man. Mel's got work that we need to try to get to, if he ain't downed it already."; Exhibit 350, p. 2, when Hall wanted two additional ounces, Small called Alvin Green to get some of his supply to sell to Hall; Exhibit 248, p. 3, Small tells Sandra Davis, "normally I do all that for his. . . I can't give away what I got. . . ."; Exhibit 342, p. 11, Small tells Shirley Davis, "I got the little shit that Mel gave me but that shit'll be gone and I don't think he got no more".)*

33.      Green and Small had interlocking financial interests in the cocaine HCL supply. As partners, it was important for Green to have Small's portion of the purchase price when he went to California, so that Green could get at least some of the cocaine

-21-

for himself on consignment. (*Exhibit 182R, p. 7, Small told Sandra Davis that Mel was taking a bit longer than anticipated in California, stating, "he [Green] said he wasn't complete with the job he went to do, shit wasn't there, he gonna be there a while I believe. . . I told him how slow it was on my end and/ he said it ain't gonna be slow long . . . he said shit pop up but it be gone before you know it." Further, Small explained, "I think he [Green] get his kind a like half and half, half up front and half you know cash, so whoever get the full cash is most likely the one who get the package.")*

34.    Small paid expenses incurred in Green's buying trips. At Green's request, Small wired money to Green needed to get the cocaine to Colorado. (*Exhibit 940-002 through 005, Western Union wire transfer; Exhibit 440, p. 5, Small tells Bridget Johnson he had to send money to Green for expenses stating, "you know I had to give Mel a grand . . . but he need to take care of business up there and then come back"; Exhibit 432, p. 3, Green directs Small to send the expense money to a name different from his own in California, "I'm going to need one . . . to Dejon Durden in LA, California . . . any King Soopers"; Exhibits 426, p. 3; 432, p. 3; 436, p. 2; 446, p. 2; 448, p. 2; 450, p. 2; and 452, p. 2) (See testimony of Steve Stanton, 10/23/03, pp. 194-195.)*

35.    Small depended on Green to arrange for the purchase and delivery of cocaine; Green depended on Small for financial backing. (*Exhibit 472, p. 2, Small explains to Threatt, "it just take time to put it together, we've never had no problems cause he [Green] really don't even bring it back, somebody else bring it back ere, so I'm waitin on him to get here, it usually takes 3-4 days, he left Thurs, I thought he was going to be back yesterday, he kind of hinted. . . I don't ever want to know what date*

*you know, so if anything ever do happen, motherfucker can't say 'Well, Willie was the only one who knew'. . . When my dude gets back, I have work.")*

## B.   CONCLUSIONS OF LAW

1.      On a motion for acquittal under FED. R. CRIM. P. 29, the court considers whether, taken "in the light most favorable to the government," there is substantial evidence from which a reasonable jury might properly find the defendant guilty beyond a reasonable doubt. *United States v. Almaraz*, 306 F.3d 1031, 1040 (10th Cir. 2002), *cert. denied*, 537 U.S. 1241 (2003); *see also United States v. Peveto*, 881 F.2d 844, 160 (10th Cir.), *cert. denied*, 493 U.S. 943 (1989); *United States v. Johnson*, 911 F.2d 1394, 1399 (10th Cir. 1990), *cert. denied*, 498 U.S. 1050 (1991).

2.      Count One of the Second Superseding Indictment charges, from on or about September 2000 continuing until on or about June 7, 2001, the Defendants and others conspired to distribute and possess with intent to distribute crack cocaine. At the close of the Government's case, Defendants filed motions to dismiss pursuant to Rule 29. The Court reserved ruling on the motions with respect to Count One and submitted the case to the jury after defense presentation of evidence. As stated previously, on November 13, 2003, the jury rendered verdicts on Count One, finding Defendants George Murray and Max Cooper not guilty and the remaining Defendants guilty. The not guilty verdicts with respect to Murray and Cooper render their Rule 29 motions with respect to Count One moot.

3.      Since the jury did render verdicts, the Court will use a standard applicable to directed verdicts and to judgment notwithstanding the verdict. This standard requires

-23-

that the court view all the evidence in the light most favorable to the government and determine whether the evidence establishes the elements of the crime. *United States v. Rangel-Arreola*, 991 F.2d 1519, 1521 (10th Cir.1993). Respect for the jury's role as fact-finder and judge of credibility means that the court cannot "overturn a jury's finding unless no reasonable juror could have reached the disputed verdict." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir.1997), *cert. denied*, 523 U.S. 1144 (1998). The court must give the benefit of the doubt to the government, "and assume the jury found its evidence, both direct and circumstantial, to be credible." *United States v. Chavez-Palacios*, 30 F.3d 1290, 1294 (10th Cir.1994). Nevertheless, "the evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt," and the court "may not uphold a conviction by piling inference upon inference." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir.1998). Admission of co-onspirator statements under FED. R. EVID. 801(d)(2)(E) is not, by itself, a proper basis for a Rule 29(a) motion. *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir.), *cert. denied*, 513 U.S. 977 (1994). The proper basis for a Rule 29(a) motion for judgment of acquittal is a claim of insufficient evidence in light of the elements of the offense charged. See Rule 29(a); *Urena,* 27 F.3d at 1490; *Johnson*, 911 F.2d at 1399; *United States v. Appawoo*, 553 F.2d 1242, 1244 (10th Cir.1977); *Lowther v. United States*, 455 F.2d 657, 662 (10th Cir.), *cert. denied*, 409 U.S. 887 (1972); *see also United States v. Ellison*, 684 F.2d 664, 665 (10th Cir.) (pointing out that prosecutorial misconduct is not grounds for action under Rule 29(a)), *vacated on other grounds*, 722 F.2d 595 (10th Cir.1982).

-24-

4.     The Tenth Circuit has spelled out the standard of review for a grant of a

motion for acquittal

> We must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime.

*United States v. White*, 673 F.2d 299, 301-02 (10th Cir.1982), *United States v. Downen*,

496 F.2d 314, 318 (10th Cir.), *cert. denied*, 419 U.S. 897 (1974); *Goff v. United States*,

446 F.2d 623, 624 (10th Cir.1971).

5.     In other words, the Tenth Circuit permits a district court to enter a

judgment of acquittal only if the evidence that defendant committed the crime is

nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable

doubt. *United States v. Brown*, 50 Fed.Appx. 970, 976, 2002 WL 31529016, 6 (10th

Cir. 2002), *cert. denied*, ___ S. Ct. ___, 2004 WL 322892 (2004).  If the government

has met that standard, the trial court must defer to the jury's verdict of guilty. *Id.*

6.     The right of the jury to determine credibility and to find the facts must be

maintained. *White*, 673 F.2d at 301.  In this case the jury deliberated over a ten day

period, returning a number of guilty verdicts and several not guilty verdicts.  Questioning

at the time of the return of the verdicts showed that the jury was careful in their

deliberations and understood the instructions and the verdict forms.

7.     Turning to the law of conspiracy, to obtain a conviction for conspiracy

under 21 U.S.C. § 846, the government must prove as to each defendant:  (1) that two

or more persons conspired or agreed to distribute quantities of crack cocaine; (2) that

the defendant knew at least the essential objectives of the conspiracy; (3) that the

-25-

defendant knowingly and voluntarily became a part of it; and (4) that the alleged

coconspirators were interdependent. *United States v. Eads*, 191 F.3d 1206, 1210 (10th

Cir. 1999), *cert. denied*, 530 U.S. 1231 (2000); *United States v Evans*, 970 F.2d 663

(10th Cir. 1992), *cert. denied*, 507 U.S. 922 (1993).[3]

      8.     "The core of a conspiracy is an agreement to commit an unlawful act."

*United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir.1991), *cert. denied*, 502 U.S.

1036 (1992); *see also United States v. Kelly*, 892 F.2d 255, 259 (3d Cir.1989) ("The

essence of a conspiracy is an agreement"), *cert. denied*, 497 U.S. 1006 (1990). The

co-conspirators on trial must have had a common, illicit goal. *See United States v.*

*Dickey*, 736 F.2d 571, 582 (10th Cir.1984). An agreement may be inferred from a

variety of circumstances, such as sharing a common motive, presence in a situation

where one could assume participants would not allow bystanders, repeated acts,

mutual knowledge with joint action, and the giving out of misinformation to cover up the

illegal activity. *See Evans*, 970 F.2d at 669; *United States v. Davis*, 810 F.2d 474, 477

(5th Cir. 1987); *United States v. Cropp*, 127 F.3d 354, 361 (4th Cir. 1997) (single

conspiracy found despite the existence of multiple sources of supply based on

combination of circumstances including selling crack in the same area); *see also United*

*States v. Piche*, 981 F.2d 706, 717 (4th Cir. 1992), *cert. denied*, 508 U.S. 916 (1993);

*United States v. Ellis*, 595 F.2d 154, 160 (3d Cir.), *cert. denied*, 444 U.S. 838 (1979).

---

[3]    In a conspiracy charged under 21 U.S.C. § 846, no overt acts need be alleged and no instructions regarding overt acts need be given. *United States v. Shabani*, 513 U.S. 10 (1994); *United States v. Johnston*, 146 F.3d 785, 789 (10th Cir. 1998), *cert. denied*, 525 U.S. 1008 (1999).

9.     I find that the co-conspirators on trial in this case and for whom the jury rendered guilty verdicts, Small, Green, Hall, Lloyd, and Woods (among others who had previously entered guilty pleas) had an agreement to distribute quantities of crack cocaine and that they knew at least the essential objectives of the conspiracy.  In other words, they had a unity of purpose and a common design and understanding to possess with the intent to distribute and to distribute crack cocaine.  *See United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir.) (quoting *United States v. Kendall*, 766 F.2d 1426, 1531 (10th Cir.1985)), *cert. denied*, 498 U.S. 874 (1990).

10.     Of the five defendants convicted on Count One, there is no evidence that any of them were **only** users of crack cocaine.  The caveat of the word "only" is important because if a person is a user **and** distributor, he cannot avail himself of the "buyer-seller" defense.  "The purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy."  *United States v. Flores*, 149 F.3d 1272, 1277 (10th Cir. 1998) (emphasis added), *cert. denied*, 525 U.S. 1092 (1999).  It is not enough to eliminate responsibility for conspiratorial behavior, or to demonstrate that a distributor might have used a portion of the crack cocaine but distributed the remainder of the crack for a profit.  The evidence supports the jury's conclusion that Willie Small, Alvin Green, Theolian Lloyd, Sammie Woods and Zebedee Hall all shared the distribution objective and planned to distribute drugs for profit.

-27-

11.     In addition to the evidence already summarized herein, the following

exhibits are evidence that each of the co-conspirators shared the common purpose of

selling crack cocaine for profit and  was re-selling at least a portion (if not all) the crack

cocaine they obtained from Willie Small:

**Sammie Woods -**  *Exhibit 244, p. 3, Small states, "I fell off when you've been gone."*
*Woods states, "I'll call ya later. . . cause I'm definitely goin to have*
*to pick up my tags for my car. . . cause I had a few people that*
*want to get with the party. . . ."*

*Exhibit 236, p. 2, Woods states, "it's kind of slow right now."  Small*
*states, "I ain't made no money since you left."  Woods states, "I'll*
*start puttin something together for you."*

*Exhibit 270, p. 2, Woods states, "everybody's complainin'. . . I had*
*4 complaints."  Small states, "I ain't had none. . . well you guys*
*always get the complaints."  Woods states, "I got two of the pieces*
*back, they didn't look good."  Small states, "that shits better than a*
*motherfucker, I watched the motherfuckers cook it."*

*Exhibit 542, p. 2, Woods states, " I got somebody that want to get*
*one. . . it take me 20 minutes to get the money."*

*Exhibits 963, 964, 965.  Crack cocaine packaged in twenty dollar*
*rocks individually wrapped for re-sale.*

*Testimony of Steve Stanton, 10/23/03, p. 170*

**Theollan Lloyd -**  *Exhibit 700, videotape of Lloyd meeting with others at Barneys*
*after meeting with Small.*

*Exhibit 710, videotape of Lloyd meeting immediately with others for*
*short period of time after meeting with Small.*

*Exhibits 76, p. 3, and 78, p. 2, Lloyd orders crack cocaine*
*separately packaged so that he does not have to cut and weigh it*
*before selling it to others.*

*Exhibit 122, p. 2, Lloyd negotiates with Small, "one of my peoples,*
*what the whole one going for?"  Small replies, "nine."  Lloyd says,*
*"for me right now. . . I'm hurt man."  Small says, "you got to allow*

me to make mine." Lloyd says, "will you do the half for 425 or 4. . .this ain't for me?" Small says, "I give you a whole for 850" and Lloyd says, "I'll call you right back."

*Exhibit 172, p. 6*, Small states, "I'd sure like for you to be there (Mixx) cause those niggers ain't having no shit down there. . . they run outta work."

*Testimony of Steve Stanton, 10/20/03, p. 60*

**Zebedee Hall -**   *Exhibit 86, p. 2*, Hall and Small talk about their last transaction. Hall says, "Them folks kinda likin' that one there." Small replies, "I knew they would. . . .That one there come off the top of the skizno. Hall then said, "Them mother fuckers liked that, they lovin' that one, man."

*Exhibit 90, p. 4*, Hall states, "I want it Sunow that way I can put my own twist on it."

*Exhibit 96R, p. 5*, Hall states, "I'm gonna find someone to dump this motherfucker on."

*Exhibit 104, p. 2*, Hall said to Small, "It came back better after I slowed it down, I went through a couple of 'em and the mother fuckers liked it. I had a houseful of crazy people in one spot last night."

*Exhibit 1034*, Ohaus Scale with residue

*Exhibit 1035*, Electronic scale with residue

12.   I further find that the five Defendants who were found guilty of the conspiracy knowingly and voluntarily became a part of the conspiracy. With respect to this element, the government is not required to show that each member of the conspiracy knew all the details about the drug distribution or even how it functioned. *United States v. Mendoza-Salgado*, 964 F.2d 993, 1005-06 (10th Cir. 1992). Once a conspiracy is established, only "slight evidence" is needed to connect a person to it, if there is sufficient evidence to establish that connection beyond a reasonable doubt. *Id.*

at 1006; *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1992). Further, "'a defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role' in the conspiracy." *Mendoza-Salgado*, 964 F.2d at 1006 (quoting *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir. 1998)). All that is required is that the defendant possessed a general awareness of the scope and objective of the conspiracy and joined into it with the intent to further those objectives. *Id.*

13.    I also find that the evidence supported a finding of interdependence. The essential element of "[i]nterdependence may be found if a defendant's actions facilitated the endeavors of other coconspirators or facilitated the venture as a whole." *United States v. Mata*, 59 F.3d 179, 1995 WL 386494, **3 (10th Cir. (Okla.) (quotation omitted); *see also United States v. Rangel- Arreola*, 991 F.2d 1519, 1523 (10th Cir. 1993); *United States v. Morehead*, 959 F.2d 1489, 1500 (10th Cir.1992).

14.    Here, I find that each of the five Defendants undertook activities, *i.e.*, actions, which facilitated the endeavors of each other and facilitated Willie Small drug distribution business as a whole. Thus, the essential element of interdependence is met. *See United States v. Powell,* 982 F.2d 1422, 1429 (10th Cir. 1992) (interdependence element of conspiracy to distribute marijuana was established where major buyer's retailing expertise complimented illegal drug wholesaler's capabilities), *cert. denied*, 507 U.S. 946 (1993); *see also Mata*, 1995 WL 386494 at *3; *Rangel-Arreola*, 991 F.2d 1519,1523 (10th Cir.1993); *Morehead*, 959 F.2d at 1500. However "diverse and far ranging," *United States v. Daily*, 921 F.2d 994, 1007 (10th Cir.

-30-

1990), *cert. denied*, 502 U.S. 952 (1991), the activities of each coconspirator may be,

"so long as there is sufficient proof of mutual dependence and assistance," *United*

*States v. Maldondado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990), *cert. denied*, 514

U.S.1044 (1991), a single conspiracy exists. *United States v. Roberts*, 14 F.3d 502,

511 (10th Cir. 1993).

15.    I also find that the evidence supports the existence of a single conspiracy

rather than multiple conspiracies, and that a rational trier of fact could have so found.

In cases involving transactions between a single drug trafficking organization and

multiple drug suppliers, courts have found a single conspiracy if the continued health of . .

the trafficking and distribution network necessarily depends on the continued efforts of

multiple suppliers and distributors.  *See United States v. Harrison*, 942 F.2d 751,

756-57 (10th Cir. 1991) (multiple suppliers in competition with each other may be part

of one conspiracy so long as they have not worked towards and succeeded in the total

exclusion of the other suppliers); *United States v. Morris*, 46 F.3d 410, 416 (5th Cir.)

(competing multiple suppliers nonetheless part of a common plan; purchases other than

from one regular supplier may be necessary to keep a larger common plan in

existence), *cert. denied*, 515 U.S. 1150 (1995).

16.    The success of the organization in this case was measured not just in

terms of how much money each co-conspirator made, but in a mutual understanding

that at the root of the organization was a business practice designed to facilitate new

distributors who may have had past ties or associations with drugs to start in the drug

distribution again and, hopefully, be able to tap into distribution chains long established.

-31-

Each co-conspirator depended on each new member being able to re-open channels of

distribution such that the new distributor could quickly "get on his feet" and thereby start

contributing to the "bank" from which new loans and therefore new franchisees, could

grow.

17.     "The goals of all the participants need not be congruent for a single

conspiracy to exist, so long as their goals are not at cross purposes. . . [A] single

conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that

it may involve two or more phases or spheres of operation, so long as there is sufficient

proof of mutual dependence and assistance." *Harrison*, 942 F.2d at 755 -756 (quoting

*United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir.1990)); *see also United

States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181, 1192 (2d Cir.1989), *cert. denied,*

493 U.S. 933 (1989); *United States v. Glenn*, 828 F.2d 855, 859 (1st Cir.1987); W.

LaFave & A. Scott, Jr., HANDBOOK ON CRIMINAL LAW § 62, at 470 (1972).

18.     Clearly, the five Defendants in this case are not at cross-purposes.  Each

phase of the operation, from acquisition of the cocaine at a reasonable price and

partially (if not fully) "fronted" (Green for operation and Small for finances),

transportation to Colorado (Green for operation and Small for finances), preparation of

the cocaine into crack cocaine (Small and Green along with others), packaging and

weighing for distribution (Small), cultivation of reliable distributors (Small), distribution in

wholesale quantities to sales and ultimate retail sales (Woods, Hall, Small and  Lloyd)

are all interrelated.  For Small's business enterprise to have been successful, each

phase must have been properly performed so that the cycle could continue.  Money

from the sales force must funnel back up to the core (Small), so that the money can accumulate to acquire more cocaine HCL (Green), to be cooked (Small & Green), to be packaged (Small), to be delivered to distributors and sold on the street to generate income.

19.     Persons may be parties to a single conspiracy even if they have never directly communicated with one another. W. LaFave & A. Scott, Jr., HANDBOOK ON CRIMINAL LAW § 62, at 470 (1972). Limiting direct contact serves a business purpose in a criminal conspiracy. Given the secretive nature of a criminal conspiracy, controlling the dissemination of information reduces the chance of being exposed to law enforcement scrutiny; by choosing staff carefully and limiting available information according to an organizational need to know, the organization can protect itself from the effects of a single conspirator's being arrested. *(See Exhibit 484, p. 2, Small told Angela Brewer that the crack cocaine had yet to be cooked, and advises her, "You can leave and you can come sit here with me, but you know a lot of people don't like to be seen.")* The question is whether each conspirator is aware of the participation of others in a general way and have a community of interest. *Id.* In this case, the evidence in this case, including the evidence discussed in this Order, shows that several of the co-conspirators did know of each other personally, and certainly knew the functions others in the organizations were performing.

20.     Further, the evidence showed that Small kept his business associates informed in a general way about the health of the organization and its general structure. *(Exhibit 172, p. 6, Small and Lloyd; Exhibit 260, p. 2, Cooper and Small; Exhibit 568,*

-33-

p. 3, Johnson and Small; and other exhibits already more specifically described herein.)
Besides direct commentary concerning the foibles of other distributors, there was
conversation about the opportunity for business development. (Exhibits 316, p. 2; 524,
p. 2; and 536, p. 3, Hall trying to persuade Small to let him in on a cocaine partnership
so Hall could make his own crack cocaine for resale.)

21.     Small also informed his distributors that he was working with additional
other distributors in a similar way and that he had a supplier.  The evidence showed
that distributors were advised that Small was obtaining his cocaine powder from one or
more sources and most were told that he had a local source, VanDyke, and a source
who went to California. (Exhibit 454R, p. 3, Small states to Shirley Davis "I was waiting
on N cause I was trying to do that little thing one more time before Mel get back";
Exhibit 464, p. 2, Small tells James Starkey, "I'm waitin on dude to get back. . . this
motherfucker here is a local boy and my people are gone out of town"; Exhibit 470, p. 5,
Small tells Victor Mendinghall "This ain't my regular people. . . I sent for my thing
Thursday. . . dude ain't got back yet.")

22.     Each of the distributors was told by Small that he was having trouble
because other distributors were not performing at the appropriate level for one reason
or another, thus demonstrating that the distributors were all aware that there were
others in the distribution network. (Exhibit 230, p. 2, Small tells Hall, "my homeboy
done got back from LA with that other thing, hell I can't even get to that"; Exhibit 172R,
p. 6, Small tells Lloyd, talking about Max Cooper, "every time I give Red some he gives
it to Melvin, he fucks it off like its his. . . he ain't bringing his money back"; Exhibit 260,

p. 3, Small tells Cooper, about Lloyd, "if you see Bigfoot, tell him to call me, he just fell off."; Exhibit 220R, p. 5, Small tells Murray, "three to four motherfuckers, I'd fronted them and let them get on and then once they got on they start buying their own"; Exhibit 244, p. 3, Small tells Woods, "I'm so glad you're home. . . I fell of when you been gone - all my people down there something happened all at one time.")

23.     Green, Small's primary source of supply, was told by Small about the retail distributors in the organization.  Further, Green was informed when Small's distributors were having trouble of various kinds and were not performing in the manner expected by Small and Green.  (Exhibit 180, p. 2, Small tells Green, "it's been so ugly on my end, I got all that wizerk, I just ain't go nobody biznying; I still got that same thing, Tizen, ain't no work down there.")  Green was informed that there might be difficulty in selling the crack cocaine on hand and cocaine that Green was bringing in.  Green would be affected by this turn of events because his share of the crack cocaine, made from the cocaine he brought in from California, also would not be sold.

24.     It does not undermine the single conspiracy charged in Count One that Small was able to and did occasionally obtain cocaine from sources other than Green to keep the distribution process going.  In cases involving transactions between a single drug trafficking organization and multiple drug suppliers, courts have found a single conspiracy if the continued health of the trafficking and distribution network necessarily depends on the continued efforts of multiple suppliers and distributors.  See Harrison, 942 F.2d at 756-57 (multiple suppliers in competition with each other may be part of one conspiracy so long as they have not worked towards and succeeded in the total

-35-

exclusion of the other suppliers); *Morris*, 46 F.3d at 416 (competing multiple suppliers nonetheless part of a common plan; purchases other than from one regular supplier may be necessary to keep a larger common plan in existence); *United States v. Pou*, 953 F.2d 363, 369-370 (4th Cir.) (existence of several sources of supply "does not lead one to the conclusion that each time a new source for cocaine joined the conspiracy, a new conspiracy was born. . . . [d]istributors and mules came and went, as well as sources, and did not necessarily know of each other's involvement in the overall scheme, but the overall illegal goal of the enterprise -- to distribute cocaine in Omaha – never changed"), *cert. denied*, 504 U.S. 926 (1992). *Accord United States v. Roach*, 164 F.3d 403, 412 (8th Cir.), *cert. denied*, 528 U.S. 845 (1999). The evidence, in fact, showed that Small was not adverse to letting Green know that he was attempting to fill distributor orders with cocaine obtained from a local source when Green was experiencing difficulty in obtaining enough cocaine in California. Green made no effort to sabotage or disrupt Small from garnering cocaine from other sources to keep the organization functioning smoothly.

25.     The fact that a number of separate transactions occurred between Small and his distribution sales force does not establish the existence of a number of separate conspiracies, so long as the activities were aimed at a common, illicit goal. *See United States v. Ailsworth*, 138 F.3d 843, 851 (10th Cir.), *cert. denied*, 525 U.S. 896 (1998). Lloyd, for instance, was aware of and knew about the activities of other distributors and their association with Small. (*Exhibits 76, p. 3, potential meeting place at Red's house; Exhibit 28, p. 2, potential meeting place at Red's house; Exhibit 172R,*

p. 6, Lloyd and Small talking about Cooper; Exhibit 260, p. 3.) Green and Hall knew one another and each knew what the other's position was in terms of dealing with Small. (Exhibit 742, videotape of Hall, Green and Small arriving at Small's apartment; Exhibits 338, p. 2; 336, p. 2; and 340, p. 4, Hall needing more crack cocaine and Small calling Green to bring extra quantities over right away; Exhibit 536, p. 3, Small tells Hall, regarding Green, "this time, I went in with the homeboy on this thing, that's the only thing, but next time if you want to get down, you know he goes to California and give it to 'em, now, you know, that would be up to you on that. . . I trust him cause he always come back with the thing.")

26.　Woods, Hall, Cooper, and Murray were long time friends of Willie Small, based on the testimony of numerous witnesses. (See Exhibit 220R, p. 6, Small told Murray you are my oldest friend.) Green and Small associated closely with the Davis family with Green dating Keyonna Davis and being friends with Shirley, Sandra and Dachaun Davis and Willie Small being the former boyfriend of Shirley Davis and the stepfather, at least in name, of Dachaun and Keyonna Davis. (Testimony of Dachaun, Keyonna, and Sandra Davis.) Small's girlfriend, Bridget Johnson, had children by Small's old friend, Sammie Woods. (Testimony of Bridget Johnson, October 24, 2003, p. 58.) Each of the distributors engaged in repeated distributions with Willie Small and the evidence showed that Murray, Lloyd, Cooper and Woods all were comfortable dealing with Small's underage child, Dachaun Davis, when receiving their crack cocaine supply from Small.

-37-

27.     In *United States v. Evans*, 970 F.2d 663 (10th Cir. 1992), the Tenth Circuit reviewed the evidence of conspiracy regarding an elaborate drug distribution network. The *Evans* court upheld the convictions of three defendant drug dealers and their supplier. As proof of the conspiracy, besides the individual drug transactions between the four defendants, other coconspirators testified that the three dealer defendants had been present at meetings with the main defendant supplier in which transactions and payments were discussed. *Id.* at 671-674. The evidence did not place the three dealer defendants all together at any meetings or establish that they participated in conversations amongst themselves. *Id.* Yet, the Court held that the evidence showed that the connection between the defendant supplier and three dealer defendants was sufficient to demonstrate that these defendants had knowledge of the general nature and scope of the illegal enterprise and that they all shared the distribution objective. *Id.* at 672-673.[4] The person whose conviction was reversed in *Evans* was a mere buyer. *See United States v. Wiggins*, 104 F.3d 174, 176-77 (8th Cir. 1997)(mere buyer seller instruction not appropriate when there is evidence of multiple drug transactions).

28.     Like the defendants whose convictions were affirmed in *Evans,* the evidence in the case at bar is sufficient to prove that each Defendant in this case facilitated the enterprise as a whole. Viewing the evidence presented during this lengthy trial "in the light most favorable to the government," there is substantial

---

[4]     The Court dismissed the conspiracy conviction against one defendant who, according to the evidence, on a *single* occasion had purchased four ounces of crack and on another occasion, lent scales to another defendant dealer knowing they were to be used to weigh drugs. The single purchase of drugs without showing the defendant resold the drugs, was deemed insufficient to demonstrate that the defendant agreed to join the conspiracy. Further, the evidence regarding the lending of the scales did not reflect any benefit for the lender, thus potentially making the act a gratuitous favor.

evidence from which a reasonable jury might properly find the defendants Willie Small, Alvin Green, Zebedee Hall, Sammy Woods and Theolian Lloyd guilty beyond a reasonable doubt.

## C.   CONCLUSION

I find that the evidence in this case, including the evidence discussed in these Findings of Fact and Conclusions of Law, the Government's oral and written responses to the various motions for judgment of acquittal as to Count One, and the remaining evidence in this case supported the existence of a single conspiracy. I certainly cannot find, based on the evidence and the instructions given in this case, that no reasonable jury could have found Defendants guilty of the conspiracy alleged in Count One.

Defendants essentially ask me to reweigh the evidence and substitute my judgment for that of the jury's, which I cannot do. I also find that Defendants have not provided any basis for a new trial under FED. R. CRIM. P. 33 ("[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice").[5]

Based upon the foregoing, it is

ORDERED that Defendants George Murray and Max Cooper's Motions for Judgment of Acquittal on Count One of the Second Superseding Indictment are **DENIED AS MOOT** in light of the fact that the jury found these Defendants not guilty on Count One. It is

---

[5] I note that these Findings of Fact and Conclusions of Law reflect the Court's modification of the Government's proposed findings of fact and conclusions of law which the Court found to be inadequate in certain respects, including an incomplete discussion of all the elements of a conspiracy and an incomplete reference to certain citations, *i.e.*, failing to note that the Supreme Court had denied certiorari on certain cases.

FURTHER ORDERED that Defendants Willie Small, Alvin Green, Theolian Lloyd, Zebedee Hall and Sammie Lee Wood's Motions for Judgment of Acquittal on Count One of the Second Superseding Indictment filed October 29, 2003 (docket #2612-1), are **DENIED**.  It is

FURTHER ORDERED that all other motions for judgment of acquittal and/or for new trial filed by Defendants Small, Green, Lloyd, Hall and Woods, including those that were deferred as to Count One in an Order dated April 5, 2004, are **DENIED** as to Count One.

DATED this ___6th___ day of April, 2004.

BY THE COURT:

Wiley Y. Daniel
U. S. District Judge

-40-

Dated:  April 6, 2004

Copies of this Order were mailed on April 6, 2004 to the persons listed on the attached Certificate of Mailing:

Secretary/Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 01-CR-214-D

## CERTIFICATE OF MAILING

Kathleen M. Tafoya
Assistant U.S. Attorney

Matthew C. Golla
Assistant Federal Public Defender
*(Attorney for Defendant Willie Small)*

John M. Richilano
Richilano & Ridley, PC
1800 15th Street, Suite 101
Denver, CO  80202
*(Advisory Attorney for Defendant Willie Small)*

Richard J. Banta
1720 Emerson Street
Denver, CO 80218
*(Attorney for Defendant Alvin Green)*

John Henry Schlie
John Henry Schlie & Barry A.
Schwartz, PC
1700 Broadway, #1770
Denver, CO 80290
*(Attorney for Defendant Theolian Lloyd)*

Zebedee Hall
#30428-013
FDC
9595 W. Quincy Ave.
Littleton, CO  80123

David Joyce
1860 Race Street
Denver, CO  80206
*(Attorney for Defendant Zebedee Hall)*

Ronald Gainor
6414 Fairways Drive
Longmont, CO  80503
*(Attorney for Defendant Sammy Lee Woods)*

Wade H. Eldridge
1471 Stuart Street
Denver, CO 80204
*(Attorney for Defendant George Melvin Murray)*

David Savitz
1660 Wynkoop Street, Suite 1100
Denver, CO 80202-1160
*(Attorney for Defendant Max Cooper)*

U.S. Marshal

Probation Department (Kurt A. Thoene)

Probation Department (Dee A. Clark)

Pretrial Services

1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
   Criminal Action No. 01-CR-214-D
 3                                          FILED
   UNITED STATES OF AMERICA,          UNITED STATES DISTRICT COURT
 4                                          DENVER, COLORADO

        Plaintiff,                       MAY 1 0 2004
 5
   vs.                                GREGORY C. LANGHAM
 6                                                   CLERK

   ALVIN GREEN, a/k/a "Mel Dog,"      _____
 7
        Defendant.
 8
</pre>

---

<pre>
 9
                      REPORTER'S TRANSCRIPT
10                          Sentencing
</pre>

---

Proceedings before the HONORABLE WILEY Y. DANIEL, Judge, United States District Court for the District of Colorado, commencing at 10:08 a.m., on the 7th day of April, 2004, in Courtroom 15, United States Courthouse, Denver, Colorado.

APPEARANCES

KATHLEEN TAFOYA, Assistant United States Attorneys, 1225 17th Street, Suite 700, Denver, CO 80202, for plaintiff.

RICHARD BANTA, 1720 Emerson Street, Denver, CO 80218, and MICHAEL WILLIAMS, 1720 Emerson Street, Denver, CO 80218, for defendant.

Proceeding Reported by Mechanical Stenography, Transcription Produced via Computer by Kara Spitler, RMR, CRR, 901 19th Street, Denver, CO, 80294, (303) 623-3080

2

1                          PROCEEDINGS

2       (In open court at 10:08 a.m.)

3            THE COURT:  You may be seated.

4            This is 01-CR-214, U.S.A. vs. Alvin Green.

5            Would counsel enter their appearances.

6            MS. TAFOYA:  Good morning.  Kathleen Tafoya, assistant

7   United States attorney, on behalf of the United States.

8            MR. BANTA:  Richard Banta on behalf of Alvin Green,

9   who is present.

10           THE COURT:  We're here in connection with a sentencing

11  hearing for the defendant, Alvin Green.  Have both sides

12  received and reviewed the presentence investigation report?

13           MS. TAFOYA:  Yes, Your Honor.

14           MR. BANTA:  We have, Your Honor.

15           THE COURT:  In connection with the presentence

16  investigation report, including all addenda, does the

17  government have any objections?

18           MS. TAFOYA:  No, Your Honor.

19           THE COURT:  Okay.  Mr. Banta, let me -- I've read all

20  these files, including yours, but let me understand

21  specifically what objections you're raising today.

22           MR. BANTA:  And Judge, just perhaps for the record

23  before we get to that.  I did, in my March 19 letter to

24  Miss Clark, address paragraphs 132 and 136 which dealt with the

25  restitution issue.  We don't have an issue with that, but I

3

1   want to put that on the record.

2          We disagree with the government's sentencing

3   statement, which was incorporated wholesale into the

4   presentence report.  I think there's a huge issue before this

5   Court with respect to the quantities of drugs that can be

6   attributable to Mr. Green as a part of this conspiracy.

7          THE COURT:  I don't want you to argue.  I want you to

8   just tell me what your objections are.

9          MR. BANTA:  That, Judge, I think is the essence of my,

10  my concern today.  We had raised a question about, in

11  paragraphs 55 and 56, it wasn't clear whether that was

12  Mr. Green that was being referred to.  I've been provided some

13  information by Miss Tafoya that leads me to think that that's

14  not really an issue.

15         The rest of the stuff that I put in there, Judge, I

16  don't think really impacts the Sentencing Guidelines.  And when

17  I say that, I'm referring to my April 19, 2004 letter to

18  Miss Dee Clark of the probation office.

19         THE COURT:  What about the two-level increase under

20  section 2D1.1(b)(1) for possession of a firearm.

21         MR. BANTA:  Yeah, I believe that's an issue, too.

22         THE COURT:  And you raised it.  Are you sticking with

23  that objection?

24         MR. BANTA:  Yes, sir.  Yes, sir.

25         THE COURT:  The final one was there was an enhancement

1 filed by the government in all of these cases, and we're

2 dealing with Alvin Green now.  Is there any objection to the

3 enhancements?

4           MR. BANTA:  Absolutely.

5           THE COURT:  Okay.  Okay.  All right.

6      I want to make some general comments, and I'll do this

7 for each of the sentencings because I think each of these is

8 being treated separately.

9      I want to talk about the enhancement first.  And

10 21 U.S.C. section 841(b)(1)(D) provides a penalty enhancement

11 for those convicted of manufacturing, distributing, et cetera,

12 schedule IV controlled substances.

13      Now, within the specifics of 841(b)(1)(D), it provides

14 that a criminal defendant who previously has been convicted of

15 a felony under state, federal, or foreign law is subject to

16 enhanced sentencing.  However, to the extent that the

17 conviction is under 21 U.S.C. section 843(d), the provision of

18 that statute makes it clear that the enhancement only applies

19 if there is a prior federal drug conviction.  And in looking at

20 some case law, I think that to the extent that an enhancement

21 is sought because of 843(d), unless there is a qualifying

22 federal drug conviction, there cannot be an enhancement.  Under

23 841(b)(1)(D), if in fact there's a state conviction, it could

24 qualify for enhancement.

25      So that's the -- that's the -- and I'll let anybody

1   make a record they want to.  But that's the test I'm going to

2   apply.  I looked at the cases, and I think it's clear that

3   Congress elected, when it amended these statutes several years

4   back, to apply as a predicate offense for 841(b)(1)(D) an

5   enhancement for prior state convictions, but they didn't do the

6   same for 843(d), and there's case law that makes it clear that

7   that distinction does make a huge difference regarding the

8   availability of enhancements.

9         Then the firearm issue, we'll come back to with some

10   argument.

11         And then I want to talk a little bit about the

12   quantity of drugs.  Unfortunately -- and I'm not criticizing

13   probation -- probation accepted the government's sentencing

14   statement for their quantity purposes, but I don't think that's

15   sufficient under the law.  There is Tenth Circuit law which

16   makes it clear -- and the case I'm citing from is **United States**

17   **of America vs. Evans**, 970 F.2d 663, decided in 1992.  There the

18   Tenth Circuit noted -- and I'm going to read this because I

19   think it's going to apply to what the government is going to

20   have to demonstrate today through this hearing and hopefully

21   we'll have witnesses that will give the Court some

22   understanding of the drug quantities that are properly

23   attributable to Mr. Green, even though he was found a member of

24   the conspiracy.

25         But anyway, this case notes as follows.  The jury did

1   not make any findings as to how much crack cocaine the

2   conspiracy handled or the amount of crack that was foreseeable

3   to each defendant.  Rather, the sentencing court undertook this

4   task.  Calculating the quantity of drugs attributable to a

5   defendant in a large-scale conspiracy for sentencing purposes

6   is not an easy task.  Section 2D1.4 of the Sentencing

7   Guidelines, which governs attempts and conspiracy, provides

8   that, quote, The offense level for a defendant convicted of

9   conspiracy shall be the same as if the object of the conspiracy

10  had been completed.

11        The application notes then reference application note

12  1 in section 1B1.3 of the Guidelines, which provides:  In a

13  case of criminal activity undertaken in concert with others,

14  whether or not charged as a conspiracy, the conduct for which

15  the defendant would be otherwise accountable includes conduct

16  of others in furtherance of the execution of the jointly

17  undertaken criminal activity that was reasonably foreseeable by

18  the defendant.  Because a count may be broadly worded and

19  include the conduct of many participants over substantial

20  period of time, the scope of the jointly undertaken criminal

21  activity, and hence relevant conduct, is not necessarily the

22  same for every participant.  Where it is established that the

23  conduct was neither within the scope of the defendant's

24  agreement nor was reasonably foreseeable in connection with the

25  criminal activity the defendant agreed to jointly undertake,

1  such conduct is not included in establishing the defendant's

2  offense level.

3       Then in the case itself the court further notes,

4  quote, A defendant is not necessarily liable for the entire

5  quantity of drugs involved in a drug conspiracy. Then applying

6  the Guidelines, courts have focused on, quote, The reasonable

7  foreseeability, unquote, to the defendant that a particular

8  quantity of drugs would be involved in the conspiratorial

9  activity.

10       So and I'm not going to read more from this case

11  because presumably all of you have read this. But I think that

12  in this hearing, since the jury was not asked, nor was the jury

13  request -- nor was the Court requested to have the jury do it,

14  by either party, to determine counts attributable to each

15  defendant, then I think the burden is on the government to

16  demonstrate what quantities of drugs should be properly

17  attributable to Alvin Green under the existing legal tests.

18  And I think I've got to do that because I can't accept the

19  government's sentencing statement as dispositive proof in light

20  of the objection.

21       So with that in mind, Miss Tafoya, I'll let you make

22  your presentation on relevant conduct for Alvin Green.

23       MS. TAFOYA:  Your Honor, I concur with the Court that

24  it's the government's burden.  It is the burden by

25  preponderance of the evidence to establish the drug quantities

1  as to each separate defendant, and I also agree that the case

2  law is very clear that that could be different, depending on

3  where a person is situated in the conspiracy.

4       So we are prepared to do that today, as to each of

5  these defendants.  Now, I had not prepared to put on witnesses

6  because the Court heard the trial.

7       THE COURT:  But, Miss Tafoya, that isn't going to

8  work.  I heard this trial from September to November.  I

9  haven't reviewed transcripts.  With the exception of Mr. Small,

10 who was found guilty of everything but one count, the

11 convictions only relate to discrete counts, and I think I need

12 to determine the relevant conduct for each defendant based on

13 the evidence at trial.  And hopefully before -- if we're not

14 going to have witnesses, do you have excerpts from transcripts

15 that I could look at?

16      MS. TAFOYA:  Yes, Your Honor.  I intend to direct the

17 Court to certain exhibits and transcripts.  I have everything

18 here from the trial.  I was not planning, of course, on

19 retrying the case in an hour's worth of time.  But I can

20 direct -- I'm going to base my presentation on the evidence at

21 trial, and I will tell the Court what that evidence actually

22 was.

23      THE COURT:  Do you have copies for me of either trial

24 exhibits or transcript excerpts, because I have neither in

25 front of me at this time.

1  bring it back to me from California.  That's not how these

2  calls went and it's not what was there.  This is what was

3  presented.

4          THE COURT:  Plus the other question is how are Small

5  words, as I'm looking at them, attributable to Alvin Green.

6          MS. TAFOYA:  Well, they're coconspirator statements,

7  for one thing, and the testimony all around this and the

8  exhibits all around this is this is during the time that Alvin

9  Green is in California, he's seen by numerous surveillance

10 officers who came in and testified, there was a videotape of

11 him getting on the plane.

12          And then there was a videotape of him coming -- not

13 coming back at the airport, I believe, but he was seen at the

14 airport and he was followed and various surveillance officers

15 followed him back to the apartment of Willie Small on the day

16 he got back.

17          THE COURT:  Let me just note something here, because I

18 think it's worth noting.  In the **Torres** case, which is the more

19 recent, 53 F.3d 1129, decided by the Tenth Circuit in 1995, the

20 Tenth Circuit notes, In determining the quantity of drugs

21 attributable to particular members of the conspiracy, the

22 sentencing court must focus on each defendant's own relevant

23 conduct.  When several defendants are convicted of a

24 conspiracy, the relevant conduct for purposes of sentencing is

25 not necessarily the same for every participant.  In essence,

1   then, the Guidelines require examination of the scope of the

2   defendant's agreement to undertake joint activity and of the

3   reasonable foreseeability of coconspirators' criminal conduct,

4   although the defendant need not have been indicted or convicted

5   by the jury for the qualities for which he is ultimately held

6   responsible.

7        Then it notes, quote, The government bears the burden

8   of proving by a preponderance of the evidence the quantity of

9   drugs attributable to each defendant.  In reviewing the

10  sentencing court's factual findings for clear error, to

11  constitute clear error, we must be convinced that the

12  sentencing court's finding is not plausible or permissible in

13  light of the entire record on appeal, remembering that we're

14  not free to substitute our judgment for that of the district

15  judge.

16       All right.  We're going to take -- what time is the

17  next sentencing?

18            THE COURTROOM DEPUTY:  Eleven o'clock.

19            THE COURT:  And who is the next defendant?

20            THE COURTROOM DEPUTY:  Theolian Lloyd.

21            MS. TAFOYA:  Your Honor, while we're taking a break,

22  if I could reference the Court to a recent Tenth Circuit case,

23  **Topete-Plascencia**.  The reference is 351 F.3d 454.  It's a 2003

24  case, and in the section that's in headnote 10, for easy

25  reference for the Court, is the information about calculating

35

1  drug quantities and how the district court may rely on

2  factually supported estimates when the actual drugs underlying

3  the offense are not seized.

4       THE COURT:  All right.  We're going to take no more

5  than a ten-minute break, and when we come back, Miss Tafoya,

6  I'm going to give you a chance to summarize your argument as to

7  the drug quantities that are applicable to Alvin Green, I'll

8  let Mr. Banta respond, and I'll just have to make a ruling.

9  Because, as I said earlier, this Court's -- the Court has an

10 obligation to find relevant conduct.  I'm not going to continue

11 anything, and if I can't conclude that there's sufficient

12 evidence to support a level 38, then I'm going to reduce the

13 level to an amount that the Court feels comfortable with based

14 on the evidence that's known to the Court from this record.

15 And then if I do that, I would make an explicit finding that

16 the government has failed to meet its burden of proof by a

17 preponderance of the evidence for a higher amount.

18      So we'll start again in ten minutes.

19      (Recess at 11:04 a.m.)

20      (Reconvened at 11:28 a.m.)

21      THE COURT:  All right.  I'm going to throw out an idea

22 here because we need to move this along.  We've got other

23 sentencings.  And then I'll have somebody make a record in

24 response to what I'm about to say.  I'm not making a finding,

25 but I'm making some observations.

THIS CERTIFIED COPY IS
PERMANENT RECORD OF
THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLORADO

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 01-CR-214-D

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

THEOLIAN LLOYD, a/k/a "Big Foot,"

        Defendant.

**F I L E D**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR 1 9 2004

**GREGORY C. LANGHAM**
CLERK

---

REPORTER'S TRANSCRIPT
Sentencing

---

        Proceedings before the HONORABLE WILEY Y. DANIEL,
Judge, United States District Court for the District of
Colorado, commencing at 2:33 p.m., on the 7th day of April,
2004, in Courtroom 15, United States Courthouse, Denver,
Colorado.

APPEARANCES

        KATHLEEN TAFOYA, Assistant United States Attorneys,
1225 17th Street, Suite 700, Denver, CO  80202, for plaintiff.

        JOHN SCHLIE, John Henry Schlie & Barry A. Schwartz,
P.C., 1700 Broadway, Suite 1820, Denver, CO  80290, for
defendant Lloyd.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

3033

2

PROCEEDINGS

(In open court at 2:33 p.m.)

THE COURT:  All right.  This is 01-CR-214, U.S.A. vs. Theolian Lloyd, also known as Big Foot.

Counsel enter their appearances.

MS. TAFOYA:  Good afternoon; Kathleen Tafoya, assistant United States attorney, on behalf of the United States.

MR. SCHLIE:  Good afternoon.  John Schlie representing the defendant, Theolian Lloyd.  Mr. Lloyd is present in the courtroom, Your Honor; we are ready to proceed.

THE COURT:  Have both sides received and reviewed the presentence investigation report, including all addenda?

MS. TAFOYA:  Yes, Your Honor.

MR. SCHLIE:  Yes, Your Honor.  I have, and I have reviewed it with Mr. Lloyd as well.

THE COURT:  All right.  Does the government have any objections to the contents of the report, including the Guideline calculations?

MS. TAFOYA:  No, Your Honor.

THE COURT:  Mr. Schlie, would you identify on the record what objections you're asserting today that have some bearing on Guideline calculations and/or the sentence.

MR. SCHLIE:  Yes, Your Honor.  We are objecting to the calculation of the offense level in this case, the calculation

3

1  of drug quantities under 2D1.1.  And 1(b)(3).  I would note for

2  the record, Your Honor, that we raised an objection as to

3  calculation of time served; however, that is an issue that is

4  calculated by the Bureau of Prisons at a later date.  It

5  doesn't affect substantive determination by this Court of the

6  sentence to be involved and therefore we'll deal with that at

7  the very end and I would only note for the record, Your Honor.

8  So the issue that we are dealing with here today is the

9  calculation of drug quantity.

10       THE COURT:  Now, as you know, the government, as to

11  Mr. Lloyd, also filed a sentencing-enhancement information on

12  August 6, 2003.  Is there an issue there that you are raising

13  at all on behalf of Mr. Lloyd?

14       MR. SCHLIE:  No, Your Honor.  I would note for the

15  record that his conviction is for an attempted possession of a

16  controlled substance.  However, it would appear by reading of

17  the definition of prior drug offense that it is a limitation --

18  or it fits within that definition so, no, we have not raised

19  that issue.

20       THE COURT:  All right.

21       Miss Tafoya, let me have you make your record based on

22  the preponderance of the evidence test as to the relevant

23  conduct that applies to Mr. Lloyd as it relates to the drug

24  quantities that should be used for purposes of determining the

25  base offense level under section 2D1.1 of the Guidelines.

4

1    MS. TAFOYA:  Your Honor, at this point I'm going to

2  refer to some pages of transcripts.  I am told that probably

3  the most readily available transcript to the Court and as was

4  to the government is the Live Note transcript that all of us

5  got.  So that's my page numbers.  They're on the computer so

6  that we all probably have those.

7      The Live Note pages I will tell the Court, too, there

8  is a page at the bottom of the Live Note transcript which

9  appears on the screen.  There's also kind of breaking page

10  numbers that are in between.  So I can refer to either one.  I

11  have both of those pages numbers, so whatever the Court is more

12  comfortable with.

13      I want to start out by saying that the government has

14  proved that Theolian Lloyd was involved in ten transactions

15  that occurred during the period of the wiretap.  I'm going to

16  go through those, and also quote from exhibits as to what those

17  transactions show.  I'm not going to tell the Court that we

18  stopped Theolian Lloyd on any occasion and actually got the

19  drug amounts from him.  As the Court knows from the trial, that

20  did not happen.  So these, the analysis that I'm going to give

21  as to drug quantities involved in each of these transactions is

22  based on the words of the parties in the exhibits and the

23  testimony of Dachaun Davis, among others.

24      As to Dachaun Davis, I want to start out with some

25  general things that Dachaun Davis said.  I talked about these

5

1  in our last hearing, and I have now found some page references.

2  On September 29 of 2003, on page 207, Dachaun Davis talked

3  about how he and Willie Small packaged their drugs in quarters,

4  that that was the standard packaging methodology before anyone

5  had even really ordered drugs, that they packaged everything in

6  quarters.

7       On September 30 of 2003, at page 31 and again at --

8  it's a different day, so I'll do these separately -- on the

9  30th of September, at page 31, Dachaun Davis said that a price

10  of a quarter was between 225 and $250 depending on who the

11  customer was.  He again repeated the quarter analogy and a

12  quarter's cost on pages 43 and 44 of that same day.

13       On October 1, Mr. Davis also again talked about a

14  quarter ounce being 7 grams of crack cocaine.  He weighed this

15  out, and a price for a quarter or 7 grams of crack cocaine was

16  typically 225.  $225.

17       I want to draw the Court's attention to all of the

18  exhibits of the various actual drug quantities that were

19  received in this case.  I can lay them out again, but the

20  amounts that I talked about and the exhibit numbers in the 800

21  series in Alvin Green's hearing, what I'm talking about is each

22  and every transaction that occurred with Roz Parker.

23       As to each of those transactions, many of which were,

24  for instance, for an ounce of crack cocaine, if it was an

25  ounce, what was received and testified to and what was actually

6

the exhibit in front of the Court was for little bags of crack cocaine.  So an ounce or anywhere near around 28 grams was always delivered in four little packages.  When it was more than an ounce, it was five little packages.  That's not only testimonial, but that is the exhibit itself.  That's how it looked when it was taken out of the bag.  So that substantiates Dachaun Davis's testimony that what they sold and how they packaged was quarters.  And he said that was what one generally was was a quarter, which is 7 grams.

That becomes important for most of the other calculations that we do on sentencing because when people order one or something like that, that's what it meant, given Dachaun Davis's testimony.

Fortunately, with Mr. Lloyd, however, we have a better representation of exactly what his normal amount was.  And so I want to start with that, even though it's a little bit out of order chronologically.  In Exhibit 77, there is a series of calls, Mr. Lloyd actually sets forth himself what he normally buys and what he normally wants.  In Exhibit 75, this is a call between Willie Small and Theolian Lloyd, Theolian Lloyd orders what I normally do, split it, though, I want two of them.

The next call is Exhibit 77, and in that call, Mr. Lloyd is apparently afraid that he didn't make himself quite clear enough, and he says -- Willie Small says, Well, you want me to make that like 3.5 3.5 and 7.

1        Theolian Lloyd says, Yeah, I want them just like you

2   said, but I want one for me, so I want two total.

3        And Willie Small says, One of them, 7, the other 3 and

4   a half, 3 and a half.

5        So that is very, very clearly laid out that the normal

6   is exactly as Dachaun Davis said, it is a quarter and

7   occasionally he orders a half.

8        Now, as to Theolian Lloyd in particular, Dachaun Davis

9   testifies on September 30 of 2003, pages 146 and 147, that he

10  delivered to Theolian Lloyd quite a few times and then he says,

11  five or ten times.  Each time a quarter.

12       On October 1 of 2003, at page 139, Dachaun Davis says,

13  Small is a seller of quarters.

14       So now going back to the trial, as the trial

15  progressed, it was apparent that the government had started its

16  wiretap on the very end, the tail end of Mr. Lloyd's dealings

17  with Mr. Small.  The dealings between Mr. Lloyd and Mr. Small

18  actually pretty much stopped on April 13 of 2001.  There was

19  various testimony, there was various calls that were played

20  that all indicated that Mr. Lloyd owed Mr. Small quite a bit of

21  money and so he stopped dealing with him.  So for the idea of

22  foreseeability and relevant conduct as far as what we can prove

23  that Mr. Lloyd touched, okay, and that is not the standard for

24  relevant conduct, but what we can prove that Mr. Lloyd touched,

25  I'm going to focus on March 28, 2001, through April 13 of 2001.

8

1       THE COURT:  Let me interrupt you here.  Before you get

2  to those dates, I have in my notes, these are my trial notes,

3  that Dachaun Davis -- well this was in the context, I think, of

4  Exhibit 207 that was played.  I have a notation that says

5  something to the effect that drug-dealing with Lloyd, that

6  Dachaun Davis and/or Willie Small delivered crack cocaine to

7  Lloyd for money.

8       Can you amplify that notation?

9       MS. TAFOYA:  Yes.  There were several -- well,

10  everybody delivered for money.  There was some fronting

11  behavior, and there was a exchange of money.  The crack cocaine

12  cost $225 a quarter.  Apparently, judging from the phone calls,

13  Mr. Small was willing to front Mr. Lloyd some crack cocaine, so

14  he was willing to give him some, without prepayment.  But then

15  he expected to be repaid the next time.

16       THE COURT:  All right.  Go ahead to your March time

17  frame.

18       MS. TAFOYA:  All right.

19       So keeping in mind that the wiretap doesn't go up

20  until March 28, the very first call, Exhibit No. 1, is between

21  Mr. Lloyd and Mr. Small.  This is a transaction where there is

22  a call, Exhibit 1, and there is surveillance by Joe Davidson of

23  the transaction which occurred.  There was a meeting between

24  Mr. Small and Mr. Lloyd on March 28 of 2001.  And that is

25  supported by Exhibit 1.

9

1   On the -- basically Exhibit 1 says, this is Big Foot,

2   I'm going to be heading towards your way within the next 20

3   minutes.

4          And the response is I'll be in the parking lot.

5          So -- and then Officer Joe Davidson observes the

6   Suburban that we saw in numerous videos meeting with the black

7   Mercedes for just a few seconds and then leaving.

8          Moving on to the March 30, I'm not going to cover all

9   of the calls on March 30 because that was one of the counts for

10  which Mr. Lloyd was acquitted.  Now, I don't think that really

11  means that this Court can't find by a preponderance of the

12  evidence that there wasn't a drug transaction then, so I will

13  just remind the Court that this was the incidence where

14  Mr. Lloyd met at Club Mixx with Willie Small and then was

15  followed by Officer Stanton to Barney's where he met briefly

16  with some other people.  That, we are contending, was part of a

17  regular 7-gram transaction, so -- but I don't want to mislead

18  the Court about that particular transaction.  That would be the

19  one that we believe the jury acquitted on.  It was supported by

20  videotape, and the exhibits that supported that transaction

21  were Exhibits 3, 5, 7, 9, and 11.

22         One thing that is important about these calls, though,

23  is that Mr. Lloyd and Mr. Small are talking in Exhibit 7, and

24  Mr. Small says that he has another customer for the one.  And

25  that whoever gets it, it will be the first one.  Now, we think

10

1  that's important because that shows that Mr. Lloyd had to know

2  there was at least one other person buying drugs from Willie

3  Small at that point.  That shows that there is some

4  foreseeability, that someone else is also getting orders from

5  Mr. Small.

6        On March 31, there is -- there are actually two deals

7  that occur that are supported by exhibits and by videotape.

8  The exhibits are 13, 15, and 17, Exhibit 973, and the

9  videotapes 701-001 and 002.  This is an interesting deal

10  because the first particular deal on March 31 was a 7-gram

11  deal.  But the second -- and we are saying that because of the

12  general testimony of Dachaun was that he dealt with him over

13  and over, it was always 7 grams.

14        Interestingly, though, this second deal that occurred

15  at the Conoco was supported by Exhibit 13, and it says, I'm

16  about to get at you, man.

17        And Mr. Small says, But you got to get that number

18  right.

19        Mr. Lloyd says -- or Mr. Small says, you know, the

20  225.

21        The same as normally before, right.

22        And Small says, yes.

23        Lloyd says, I ain't got no problem especially if it's

24  a little better.

25        And Small says, It's a lot better.

11

1    Lloyd says, I'll stick with you, and when we go down,

2    you know, I ain't had a problem about bringing it down.

3    So, again, this is a reference to 225, supporting the

4    fact that this first deal in Exhibit 13 is a 7-gram

5    transaction.

6    Now, there are a couple of other calls and then we get

7    to Exhibit 19.  And as I'm sure the Court is aware, without me

8    saying, the transcripts that underlie these are the next

9    following numbers.  So Exhibit 19 and 20 is the transcript.

10   This supports the second deal where Mr. Lloyd is seen

11   meeting with Mr. Small, and this is interesting because

12   Mr. Lloyd says I'm trying to get through, I'm trying to get

13   some things together.  I got 425.  I wanted two.  And I'll take

14   the rest later on.  I'm trying to get back on my feet.

15   This is where Mr. Small says, That's what I like about

16   you, you be handling your business, I'll work with you like

17   that.

18   The amount of money clearly denotes that this time he

19   wants two, so that's 14 grams.  Now, it doesn't mean 2 ounces,

20   but two quarter-ounce deals, so that is 14 grams that occurs on

21   the second deal at the Conoco station.

22   Again, there are Exhibits 976, 974, and 975, 977.

23   These are pictures of Mr. Lloyd meeting with Mr. Small and

24   701-003 is a video clip of them meeting.

25   Next, and I would like the Court to keep in mind, too,

1   these were occurring with like maybe one day in between.  These

2   are bam, bam, bam.  Then we go to April 2; this is at a car

3   wash at Iliff and Havana.  This call that supports this meeting

4   is Exhibit 23, and this meeting between the two are -- is

5   surveiled by Archie Singleton, who testified at trial that

6   basically they go, meet very, very quickly, they don't talk or

7   anything.  Theolian Lloyd goes immediately to another car and

8   leans in the window of the other car right after meeting with

9   Mr. Small.

10          The very next day is the 3d of April, and Mr. Lloyd

11   calls again to meet with Mr. Small, and this was interesting

12   because Exhibit 27 shows that Mr. Lloyd knows that Bridget

13   Johnson is also part of this conspiratorial group.  And the way

14   that he knows that is that Willie Small tells him to meet

15   Bridget -- to meet at Bridget Johnson's.  This is the reference

16   to 1313 Xenia.  There is also a reference at this point to

17   Mr. Lloyd being with Mr. Cooper.  And so therefore he knows

18   that Mr. Cooper knows about what's going on and Bridget Johnson

19   knows about what's going on, so we've got two other people that

20   he's aware of are participating in dealings with Mr. Small.

21          There is a series of calls in here, and I'll remind

22   the Court that Dachaun Davis talked about this and that the

23   videotapes showed it.  Dachaun Davis and Shayla Ferguson, his

24   girlfriend who said she saw all the big amounts of money at

25   Mr. Small's house, actually bring an ounce quantity of crack

13

1  cocaine, packaged in four little bags, to Mr. Small on that

2  date at Bridget's house.  So we have Mr. Lloyd wanting to get

3  something, being told to meet at Bridget's, Dachaun going to

4  Bridget's and bringing the zip over there, that's Exhibit 29,

5  and the videotapes, 704-003.  Interestingly, on Exhibit 35,

6  Willie Small calls Dachaun back and says bring two more zips,

7  'cause I need even more.

8          On April 5, which is two days later -- that was on the

9  3d -- there is another deal between Mr. Lloyd and Mr. Small on

10  the 5th of April at the Amoco station.  And this is

11  exhibit -- supported by Exhibit 45.  Mr. Lloyd calls Mr. --

12  Mr. Lloyd says, I'm up at fall's market.

13          Small says, I don't want to come all the way up there,

14  I don't like to drive all that far with this shit.  Then he

15  says, I'll come to Havana.

16          And then Mr. Lloyd says, And now I wouldn't go get an

17  estimate on my goddamn Suburban.

18          Willie Small says, The Amoco, all right.

19          The reference to the Suburban is important only

20  because that's the car that we see repeatedly showing up

21  meeting with Mr. Small for very, very short amounts of time and

22  then Mr. Lloyd getting back in it and meeting on occasion with

23  other people.  The videotape is 708-003.

24          On April 6, there is another transaction that is

25  supported by quite a bit of videotape evidence.  The calls are

14

Exhibits 59 and 61.  There is a photo exhibit, 978, and there are videotape exhibits, 709-001, 711, 709-002, and 710.  In Exhibit 60, Mr. Lloyd says, Can you meet me.

And Mr. Small replies, My son is going to come by. The video meeting is of Dachaun coming by.  So again, this substantiates the transaction that Mr. Dachaun Davis talked about where he met with Mr. Lloyd a number of times and it was always 7 grams or a quarter.

THE COURT:  Let me ask you a question.  What quantity of drugs is the government asserting should be attributable to Mr. Lloyd for purposes of relevant conduct under the law?

MS. TAFOYA:  Well, when I get to the end, with the support, I believe we can show 84 grams that he himself touched.  And I will cite the Court to **Williams** and several other cases that say that the amount that a coconspirator touches himself is not an appropriate measure of his relevant conduct, that you have to take other things into account, so I will be arguing that it's more than 84 grams, but that is what these exhibits, I believe, show that he touched.

THE COURT:  How many more exhibits do you have?

MS. TAFOYA:  Just a few.

THE COURT:  All right.  I want you to expedite your presentation, please.

MS. TAFOYA:  Okay.  On 4-7, this is the one that I've already talked about at the Kentucky Fried Chicken where the

15

1  calls say I want the same as I always get, 7, and then I want

2  two, I want 7, 3.5 and 3.5.  So we're attributing 14 grams to

3  that particular transaction based on what he said.

4          And then finally, we have April 13 of 2001, where the

5  meeting is at the Texaco station.  And Mr. Lloyd is -- calls

6  Mr. Small and says that he wants to meet with him.  This is

7  Exhibit 111.  Mr. Small says, You got to have some kind of

8  money to put with it, man, because we already have 75 in the

9  deal.  I can't continue to stack money on top of money, man.

10  But if he didn't have the money, he could pay him off and you

11  don't have to go through this shit.

12          So that is talking about some of the fronting

13  behavior, and the exhibits that support that again are also

14  121, 171, 718-001, 002 and 003.

15          So those are the transactions that we believe, and

16  those add up to -- there are two half-ounce deals, and the rest

17  are quarters.  That adds up to quarter grams.

18          Our argument is this:  There are a number of people,

19  some that I have referenced just now, that it is foreseeable to

20  Mr. Lloyd were also participating in this drug transaction.

21  There is, by name, Bridget Johnson, there is DayDay, and there

22  is Max Cooper, known as Red.  So he knows about at least those.

23  There is also evidence in the record that he knew about

24  Mr. Hawkins, that Mr. Hawkins was kind of instrumental over

25  there at Club Mixx and was participating at Club Mixx.  And the

1  Court may remember the testimony of Alex, who is the owner of

2  Club Mixx, who said that Theolian Lloyd was a regular there

3  until he got kicked out for doing something in the parking lot

4  in about April of 2000 -- excuse me, October of 2000.

5      So we believe that it is foreseeable to Mr. Lloyd that

6  at least three to five other people are doing the same thing

7  he's doing with Mr. Small.  We have only a snapshot of time

8  with what Mr. Lloyd was doing because of when the wiretap went

9  up, so we have from March until -- March 28 until April 13.

10  That's about a two-week period he's doing quarter grams.  So in

11  a month, if he was doing the same thing, he's doing, you know,

12  150 grams a month.  We have testimony that he's doing it back

13  into October.  So we have 150 times the five months that we can

14  prove for what he was doing based on his own behavior, what he

15  was touching.  If other people were doing the same amount that

16  he was doing, then those amounts would be attributable to him

17  as well.

18      So I believe that attributing the people that you can

19  put with him, including Bridget Johnson, Curtis Hawkins,

20  Dachaun Davis, and Max Cooper, you come up with approximately a

21  thousand grams of crack cocaine between those people alone, if

22  they were doing the same amount that he was doing.  And again,

23  there's the references in there to, you know, first come first

24  served, that sort of thing.

25      THE COURT:  All right.  Mr. Schlie.  Respond.

17

1    MR. SCHLIE:  Your Honor, let me begin by saying that

2    there is absolutely no evidentiary support in the record for

3    the statement that if other people are doing what Mr. Lloyd is

4    doing.  That's absolutely unsupported.  And should be

5    disregarded in its totality by the Court in this calculation.

6        It's somewhat confusing in terms of how the government

7    is coming up with its numbers; but if we deal with it by date,

8    there were two counts of conviction, one on the 7th of April

9    and one on the 30th of March.  Those are counts 14 and 17.  I

10   concede that there is evidence in the record to support

11   14 grams on each occasion.  So there is, admittedly,

12   evidentiary support for 28 grams.

13       Moving beyond that, however, and again dealing with

14   the evidence in the record by date, the phone calls to which

15   Ms. Tafoya referred on March 28 refer to a meeting with

16   Mr. Small.  There's no discussion of drugs.  There's no

17   discussion of quantities, there's no discussion of money.  And

18   as this Court is well aware, because I've mentioned it on a

19   number of different occasions, all the officers and agents in

20   this case testified that they never observed Mr. Small handing

21   controlled substances to Mr. Lloyd, they never observed any

22   money transactions between the two, they never observed

23   Mr. Lloyd transferring controlled substances to third parties.

24       So, Your Honor, we would make that argument in

25   regard -- with regard to each and every other transaction aside

18

1  from those occasions that constitute counts 14 and count 17 of

2  the indictment.

3      On March 30, Your Honor, that is the count of

4  acquittal and relate to the transaction in the parking lot or

5  alleged transaction in the parking lot outside of Club Mixx.  I

6  would refer the Court to the conversation that was recorded on

7  the next morning at 10:33 a.m. on the 31st of March, which

8  would have been Exhibit 14, Your Honor.  And I would submit to

9  the Court that the context of that conversation makes it clear

10 that Mr. Lloyd did not in fact receive any cocaine or crack

11 cocaine from Mr. Small on the previous occasion, and I would

12 further submit to the Court that on the basis of that

13 conversation is why the jury acquitted Mr. Lloyd of that

14 distribution count.

15     There is a later series of conversations on the 31st

16 of March.  None of them refer to drugs.  None of them refer to

17 money.  There is a reference to a meeting on April the 2d; and

18 aside from the conversation on the 7th of April, which we've

19 already dealt with, which was a count of conviction, none of

20 those other conversations involve any discussion of drugs or

21 money or any such references at all, Your Honor.  So we would,

22 therefore, suggest that there is no evidentiary support to

23 include quantities from those events into the calculations.

24     I would suggest to the Court that the conversation

25 that Miss Tafoya referred to on April 3 illustrates the point.

1 Miss Tafoya says that Bridget Johnson was brought into the

2 conversation.  If the Court will review the transcript from

3 that date, Bridget Johnson is not mentioned.  13th and Xenia

4 location is mentioned, not Bridget Johnson, not by name, not by

5 reference.

6 And she further tries to bring in Shayla Ferguson and

7 DayDay bringing over additional quantities of controlled

8 substances.  Your Honor, those conversations occurred at 2008

9 on that day.  2008 would equate with 8:08 p.m. where the

10 conversation with Mr. Lloyd occurred at 5:35 p.m.  So obviously

11 Mr. Lloyd is not present at any occasion where Ms. Ferguson or

12 Mr. Davis come over with additional quantities of drugs.  And

13 therefore there's no evidentiary basis to suggest that those

14 drugs are reasonably foreseeable by him.

15 With regard to Mr. Cooper, Your Honor, Mr. Cooper was

16 acquitted of the conspiracy count in this case.  So the jury

17 defined the scope of the conspiracy so as not to include

18 Mr. Cooper.  So the government's argument in that regard is not

19 supported by the evidence.

20 Mr. Hawkins being instrumental at Club Mixx, there was

21 no citation to the record in any form, Your Honor, about

22 Mr. Lloyd being familiar with Mr. Hawkins.  No citation

23 whatsoever.  And therefore that argument must fail.

24 With regard to the testimony of Alex, the owner of

25 Club Mixx, he only testified that there was some occasion in

1  October where Mr. Lloyd was banned from his facility and that

2  he thought it had something to do with the parking lot.  As the

3  Court may recall, there was later testimony by a Mr. Burdette,

4  a rather burly fellow called by Mr. Cooper, who was the head

5  bouncer at Club Mixx.  And he testified on October 29, 2003,

6  page 123, line 3, that he remembered that Mr. Lloyd was barred

7  from Club Mixx because he got drunk and got into a dispute with

8  a bartender.  So I would refer the Court to that section for

9  that reference.

10          So, Your Honor, what we have here, which has been

11  established in the record, is two occasions where there are

12  14 grams of crack cocaine each.  We're dealing with a 28-gram

13  scenario.  Beyond that, there is no evidentiary support for

14  additional quantities.

15          And I would refer the Court, as I did in my

16  objections, to 1B1.3, which is the Guideline section on

17  relevant conduct and the application notes to that section.

18  And which the Sentencing Commission has set forth how the

19  relevant-conduct provision is to be applied.  Under subsection

20  C, subsection -- sub subsection 4, is an illustration regarding

21  a conspiracy; and although it relates to child pornography, it

22  is particularly illustrative in this situation.  And I have

23  cited in my objections, if the Court simply substitutes "crack

24  cocaine" for "child pornography," it sets forth how the

25  Sentencing Commission envisioned this relevant-conduct

1  provision to work.

2          And it says, Defendant K is a wholesale distributor of

3  crack cocaine.  In this situation, Defendant K could be Willie

4  Small.

5          Defendant L is a retail-level dealer who purchases

6  crack cocaine from the defendant K and resells it but otherwise

7  operates independently of defendant K.  Defendant L in this

8  situation could be Mr. Lloyd.  Under the factual scenario

9  developed at trial.

10         Similar, Defendant M is a retail-level dealer who

11 purchases crack cocaine from defendant K and resells it, but

12 otherwise operates independently of defendant K.

13         Now, again, in this situation, Your Honor, Defendant M

14 could be either -- it could be either Mr. Sammy Woods or it

15 could be Zebedee Hall.  There is no evidence in the record, and

16 there wasn't any evidence at all at trial that Mr. Woods or

17 Mr. Hall knew of or associated in any way with Mr. Lloyd or

18 vice versa.  And similarly, there is no evidence in the record

19 that Mr. Small in any way controlled the activities of

20 Mr. Lloyd.

21         Going back to the illustration, Your Honor, defendants

22 L and M are aware of each other's criminal activity but operate

23 independently.  So even if they had known about each other, as

24 long as they operate independently, a distinction is to be

25 drawn.

22

1    Defendant N is defendant K's assistant who recruits

2    customers for defendant K and frequently supervises the

3    delivery of defendant K's customers.  Defendant N in this

4    situation is Dachaun Davis.

5    Each defendant is convicted of a count charging

6    conspiracy to distribute crack cocaine.  Defendant K's

7    accountable under subsection (a)(1)(A) for the entire quantity

8    of crack cocaine sold to defendant L and M.  Defendant N,

9    Dachaun Davis, also is accountable for the entire quantity sold

10   to those defendants under subsection (a)(1)(B) because the

11   entire quantity was within the scope of his jointly undertaken

12   criminal activity and reasonably foreseeable.

13   Defendant L, Mr. Lloyd, is accountable under

14   subsection (a)(1)(A) only for the quantity of crack cocaine

15   that he purchased from defendant K because the scope of his

16   jointly undertaken criminal activity is limited to that amount.

17   Your Honor, that is the scenario the Sentencing

18   Commission envisioned for the application of this guideline.

19   And that is a quantity for which Mr. Lloyd should be sentenced.

20   It is correct that the Court's determination is not limited

21   solely to the amounts that he dealt with personally.  That part

22   is true.  But the government has the burden to show what

23   additional quantities can be attributed to him.  And in this

24   situation, Your Honor, they have failed to do so.  And,

25   therefore, we would submit that 28 grams, in this scenario, is

1  the appropriate quantity to apply.

2          Thank you.

3          THE COURT:  All right.  This is -- let me go off the

4  record.

5      (Discussion off the record.)

6          THE COURT:  I don't want to hear a rebuttal from the

7  government.

8          Looking at the totality of the facts here, I want to

9  observe a couple things.  First, Mr. Lloyd was found guilty of

10 count one, the conspiracy count.  Mr. Schlie has admitted on

11 behalf of his client that because of the convictions in

12 counts -- of counts 15 and 17, that Mr. Lloyd, at a minimum,

13 should be attributed 28 grams for relevant-conduct purposes as

14 it relates to conspiracy.  Obviously there have to be

15 additional quantities of crack cocaine that are attributable to

16 the conspiracy of Mr. Lloyd or Mr. Lloyd wouldn't have been

17 convicted.  So the question is what is that number.

18         Based on the government's proffer and considering

19 Mr. Schlie's response on behalf of Mr. Lloyd, I find that the

20 government has proved by a preponderance of the evidence that

21 84 grams should be attributed to Mr. Lloyd for purposes of

22 relevant conduct under the law that I articulated fully in the

23 sentencing for Alvin Green.

24         Does either side wish for me to rearticulate that law

25 from that record?

24

1        MR. SCHLIE:  No, Your Honor.  I think it would be

2   sufficient if the Court just incorporate the statements made.

3   For the record, Mr. Lloyd was not present during those

4   statements, but I was.

5        THE COURT:  All right.  I want to incorporate by

6   reference the recitation of the case authorities and the

7   standard the Court believes applies to determination of

8   relevant conduct in a conspiracy case.  And what I want to just

9   say is that despite the conspiracy conviction, the Court must

10  make a more refined assessment of the actual relevant conduct

11  as it relates to drug quantities that would have been

12  foreseeably known to the defendant in this case, Mr. Lloyd.

13  So, again, the Court finds that the government has proven by a

14  preponderance of the evidence that 84 grams would apply.  And

15  so therefore, with 84 grams, the base offense level is 32 under

16  section 2D1.1 of the Guidelines.

17        Is there any other issue that we need to decide for

18  sentencing for Mr. Lloyd?

19        MS. TAFOYA:  Your Honor, I don't have another issue,

20  but I would just like to read these cites into the record

21  because I'm sure there will be appeals.  These were trials, so

22  there will be appeals.

23        THE COURT:  What cites are you talking about?

24        MS. TAFOYA:  The cites that I mentioned earlier that,

25  **United States vs. Bernaugh**, which is 969 F.2d 858.  And **United**

1  **States vs. Ruiz-Castro,** 92 F.3d 1519. And **United States vs.**
2  **Williams,** 897 F.2d 1034. All three of those Tenth Circuit
3  cases say that it is not appropriate to only take what the
4  coconspirator touched, it is appropriate to see what was
5  reasonably foreseeable to him in concert with his codefendants
6  and coconspirators that he knew about. And I'm not arguing
7  with the Court. I understand you made a ruling. I just want
8  to have the record complete.

9      THE COURT: Let me just say, so the record is clear,
10  to the extent that the government has argued that 1,000 grams
11  should be applicable between Johnson, Hawkins, Davis, and
12  Cooper, I just don't find support in the record to elevate any
13  of those drugs above 84 grams for purposes of Lloyd. And I
14  should have added Lloyd to that group of defendants as well.

15      All right. Mr. Schlie, is there anything else you
16  want to raise with the Court regarding sentencing before I hear
17  from your defendant, or your client, meaning Mr. Lloyd?

18      MR. SCHLIE: Yes, Your Honor. The only remaining
19  issue is the application of the sentencing enhancement, Your
20  Honor.

21      THE COURT: All right.

22      MR. SCHLIE: And the issue was raised by Mr. Banta
23  earlier based on the case of **U.S. vs. Colon-Solis,** and there's
24  an abbreviation (sic) between those two. Your Honor, as
25  Mr. Banta stated, the First Circuit, the Sixth Circuit, the

1  Ninth Circuit, and the Fourth Circuit have all ruled that the

2  mandatory minimums under the sentencing enhancement only apply

3  if the -- I take that back.

4      Because the Court found over 50 grams, the sentencing

5  enhancement will apply here.

6      I stand corrected.  It would only -- I would only have

7  had an argument had it been less than 50 grams.

8      So there are no further issues, Your Honor.

9      THE COURT:  All right.  Mr. Lloyd --

10     MS. TAFOYA:  Your Honor, if I might, just submit the

11  certified copy of Government's Exhibit 1, which is the

12  conviction from Arapahoe County that is relied upon by the

13  government in its information.  And I have provided a copy to

14  Mr. Lloyd -- or excuse me, to Mr. Schlie.

15     THE COURT:  And the parties agree that for all of the

16  convictions, regarding my enhancement for Mr. Lloyd, we're only

17  talking about an enhancement under 841; is that correct?

18     MS. TAFOYA:  Your Honor, the government -- that's

19  correct.  Your Honor, 841(a)(1) and (b)(1)(A).

20     THE COURT:  I understand.

21     All right.  We'll make that exhibit as part of the

22  record.

23     Mr. Lloyd, this is your opportunity as part of the

24  criminal sentencing proceeding to make a statement to the

25  Court.  So if you'd like to make a statement, do it at this

1    time.

2              THE DEFENDANT:  I really don't have nothing to say.

3    It's just been a long three years, and I still feel that the

4    government didn't prove nothing on me and I just feel that I

5    been railroaded under this and I just hope I get the bottom of

6    the Guidelines.  And that's all, Your Honor.

7              THE COURT:  All right.

8              Does probation have a revised sentencing statement to

9    give me?

10             MR. THOENE:  Yes, I do, Your Honor.

11             THE COURT:  Let me ask Mr. Lloyd and his counsel to go

12   to the lectern.

13             In the matter, then, of United States of America vs.

14   Theolian Lloyd, case no. 01-CR-214.  The Court makes the

15   following finding concerning the objections to the presentence

16   report.  Relevant conduct, based on the evidence and testimony

17   adduced at trial, the Court finds that the defendant's relevant

18   conduct involved 84 grams of cocaine base, which establishes a

19   base offense level of 32 under the Guidelines.  The Court

20   determines that no finding is necessary concerning the

21   remaining objections to the presentence report because the

22   controverted matters will not be taken into account in imposing

23   sentence or will not affect the sentence.  Neither the

24   government nor the defendant has challenged any other aspect of

25   the presentence report.  Therefore, the remaining factual

28

1  statements and Guideline applications are adopted without

2  objection as the Court's findings of fact concerning

3  sentencing.

4          The Court finds that the total offense level is 32 and

5  the defendant's criminal history category is V.  Which results

6  in an imprisonment range of 188 to 235 months and a fine range

7  of $11,500 -- or 17,000?

8          MR. THOENE:  17,000.

9          THE COURT:  $17,500 to $8 million.

10         Based on the mandatory minimum sentence of 240 months,

11 which is dictated and required by 21 U.S.C. section 841 and the

12 applicable subsections therein, the Guideline range becomes 24

13 months pursuant to section 5G1.1(b).

14         MR. THOENE:  240 months.

15         THE COURT:  Let me do this again.  Based upon the

16 mandatory minimum sentence of 240 months, which is by operation

17 of law, the Guideline range becomes 24 months pursuant to

18 5G1.1(b).

19         MS. TAFOYA:  I think that's 240 months.

20         THE COURT:  What did I say?

21         MS. TAFOYA:  24.

22         THE COURT:  Did I say 24 again?

23         Let me do it again.

24         The Court will enhance this sentence pursuant to

25 21 U.S.C. section 841.  As a result of that and based on the

29

1  mandatory minimum sentence of 240 months, the Guideline range

2  becomes 240 months.  Also refer to guideline section 5G1.1(b).

3  The statutorily required supervised release term for count one

4  is ten years.  The statutorily required supervised release term

5  for counts 14 and 17 is eight years.  The Court finds no reason

6  to depart from the Guideline range which exceeds 24 months and

7  will impose a sentence within that range.  The sentence is

8  imposed for the following reasons:  Punishment, deterrence, and

9  protection of the public.

10       Pursuant to the Sentencing Reform Act of 1984, it is

11  the judgment of the Court that the defendant, Theolian Lloyd,

12  is hereby committed to the custody of the Bureau of Prisons to

13  be imprisoned for a term of 240 months as to counts one, 14,

14  and 17, with the terms of imprisonment to run concurrently.

15       If you wish for me to recommend any particular

16  facility for his client to serve his sentence, Mr. Schlie.

17       MR. SCHLIE:  Your Honor, Mr. Lloyd has considerable

18  family members in Texas and would ask that the Court recommend

19  a facility, appropriate facility in the state of Texas.

20       THE COURT:  The Court will recommend to the Bureau of

21  Prisons that the defendant be incarcerated in the appropriate

22  facility within the state of Texas.

23       Upon release from imprisonment, the defendant shall be

24  placed on supervised release for a term of ten years.  This

25  term consists of ten years as to count one and eight years as

30

to counts 14 and 17.  All terms of supervised release are

ordered to run concurrently.  Within 72 hours of release from

the custody of the Bureau of Prisons, the defendant shall

report in person to the probation office in the district to

which the defendant is released.  While on supervised release,

the defendant shall not commit another federal, state, or local

crime; shall not illegally possess controlled substances; shall

not possess a firearm or destructive device; and shall comply

with the standard conditions adopted by this court.

If this sentence includes a fine or restitution

obligation, it shall be a condition of supervised release that

the defendant pay any such fine or restitution that remains

unpaid at the commencement of the term of supervised release in

accordance with the schedule of payments set forth in the

judgment.

The defendant shall refrain from the unlawful use of a

controlled substance and submit to one drug test within 15 days

of release on supervised release and at least two periodic

tests thereafter for use of a controlled substance.  The

defendant shall pay a special assessment of $100 per count of

conviction, for a total of $300.  The Court finds that the

defendant does not have the ability to pay a fine, so I will

waive the imposition of a fine in this case.

Mr. Lloyd, you're advised of your right to appeal the

sentence I just imposed, along with the underlying conviction.

1  If you desire to appeal, a notice of appeal must be filed with
2  the clerk of the court within ten days after the entry of
3  judgment or your right to appeal will be lost.

4      If you are unable to afford an appeal -- strike
5  that -- if you are unable to afford an attorney for purposes of
6  an appeal, the court will appoint one to represent you at the
7  court's expense.  If so you request, the clerk of the court
8  will immediately file a notice of appeal on your behalf.

9      We're going to take about a ten-minute break and we'll
10 go back with the sentencing hearing of Max Cooper.

11     MR. SCHLIE:  Thank you, Your Honor.

12   (Recess at 3:25 p.m.)

13                   REPORTER'S CERTIFICATE

14     I certify that the foregoing is a correct transcript
15 from the record of proceedings in the above-entitled matter.
16 Dated at Denver, Colorado, this 9th day of April, 2004.

18                    _Kara Spitler_____
19                         Kara Spitler