IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 07-cv-00367-WYD
Criminal Action No. 01-cr-00214-WYD

UNITED STATES OF AMERICA,

v.

4.      ALVIN GREEN, a/k/a "MEL DOG,"

        Movant.

---

ORDER DENYING 28 U.S.C. § 2255 MOTION

---

Movant, Alvin Green, is a prisoner in the custody of the United States Bureau of

Prisons (BOP) who was incarcerated at the United States Penitentiary - Victorville in

Adelanto, California, when he initiated this action.  According to the inmate locator on

the BOP's website, www.bop.gov, he currently is incarcerated at the United States

Penitentiary - Lee in Jonesville, Virginia.

On February 21, 2007, Mr. Green filed, through counsel, a motion pursuant to 28

U.S.C. § 2255 to vacate, set aside, or correct sentence and a supporting brief.  On

March 22, 2007, I directed the government to file an answer to the § 2255 motion.  On

April 12, 2007, the government filed its answer.  On April 30, 2007, Mr. Green filed a

reply.  On May 27, 2009, I ordered to government to clarify and supplement certain

transcript and exhibit references in the answer.  On June 8, 2009, the government filed

its response to the order to clarify.  After reviewing the entire file, I find that an

evidentiary hearing is not necessary.  For the reasons stated below, the § 2255 motion

will be denied.

I.  <u>Factual and Procedural Background</u>

Mr. Green was convicted by a jury of conspiracy to distribute and possess with intent to distribute fifty grams or more of crack cocaine, as well as other offenses charging use of a communications facility to further a drug trafficking crime and money laundering.  I sentenced Mr. Green to a mandatory term of life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A).  The sentence was driven by the quantity of crack cocaine charged in count one (fifty grams or more) and the fact that Mr. Green had two prior felony drug convictions.

On September 15, 2005, the judgment of conviction was affirmed on direct appeal.  *See United States v. Small*, 423 F.3d 1164 (10th Cir. 2005).  On February 21, 2006, the United States Supreme Court denied certiorari review.  The government concedes that Mr. Green's 28 U.S.C. § 2255 motion, filed on February 21, 2007, is timely.  *See United States v. Burch*, 202 F.3d 1274, 1276 (10th Cir. 2000) (judgment of conviction becomes final under § 2255 on the later of the expiration of the ninety-day time for filing certiorari petition or Supreme Court's final disposition of petition).  This is Mr. Green's first § 2255 motion.

II.  <u>Claims</u>

<u>Ineffective Assistance of Counsel</u>

Mr. Green asserts two claims of ineffective assistance of counsel.  He contends that his trial counsel provided ineffective assistance by failing to cross-examine a government witness regarding prior inconsistent statements (claim one).  He also claims that his appellate counsel was ineffective in failing to raise meritorious issues on appeal (claim two).

The Supreme Court has established a two-prong test to review ineffective-assistance-of-counsel claims. *See Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Green must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance was prejudicial. *See id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. There is a "strong presumption" that counsel's performance falls within the range of "reasonable professional assistance." *Id.* It is the defendant's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances. *See id.*

In order to demonstrate prejudice, Mr. Green must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland* at 694.

If Mr. Green fails to satisfy either prong of the two-part *Strickland* test, the ineffective-assistance-of-counsel claims must be dismissed. *See id.* at 697. Finally, ineffective-assistance-of-counsel claims are mixed questions of law and fact. *See id.* at 698.

<u>Claim One</u>

As his first claim, Mr. Green argues that his trial counsel provided ineffective assistance by failing to cross-examine a government witness concerning inconsistent statements he allegedly made concerning Mr. Green's role in the drug distribution scheme. In support of this claim, he asserts that during interviews with the FBI, Dachaun Davis, an associate of Mr. Green's co-defendant Willie Small, informed investigators that Mr. Green never was seen with drugs nor was he involved in the

conspiracy.  He also asserts that after receiving a deal from the government, Mr. Davis testified that Mr. Green was seen with drugs and was a member of the conspiracy.

Mr. Green contends that the government relied heavily on the testimony of Mr. Davis, Keyonna Davis, and Bridget Johnson to prove his involvement in the conspiracy. He argues that had counsel conducted a proper investigation of the discovery materials, counsel would have found the inconsistencies in Mr. Davis's statements and cross-examined him regarding those issues.  Mr. Green maintains that such an examination would have provided the jury with a reasonable doubt regarding his guilt.

Mr. Green does not identify specific statements he alleges were inconsistent with the trial testimony nor does he provide any citations to the record.  Mr. Green's conclusory allegations are insufficient to establish ineffective assistance of counsel. *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994).  Moreover, he fails to state how cross-examination might have assisted his defense.  Merely making a conclusory allegation, i.e., if counsel had conducted a proper investigation of the discovery materials, counsel would have found the inconsistencies in Mr. Davis's statements, cross-examined him regarding those issues, and the cross-examination would have provided the jury with a reasonable doubt regarding his guilt, is insufficient to establish ineffective assistance of counsel.

Nonetheless, the government, both in its answer and in the response to the order to clarify, has responded to Mr. Green's allegations.  I will address them as well.  In responding to these allegations, the government located and cited to Mr. Davis's trial testimony, in which he admitted on direct examination that in February 2003 he went to the United States Attorney's Office and gave a statement to investigators.  In that

February 2003 statement, Mr. Davis did not tell the government about Mr. Green's

involvement because he alleged he felt sympathy for Mr. Green.  Mr. Davis later

changed his mind, and when he returned a second time, he told investigators he had

seen Mr. Green with large amounts of money, guns, and drugs:

> Q      You know, you've talked about Alvin Green. Does he have any relationship to the Davis family?
>
> A.     No.
>
> Q      Did he have any relationships with anyone in the Davis family?
>
> A      Yes.  With Keyonna.
>
> Q      What was that relationship?
>
> A      They were friends back before, I guess. Dated, whatever.
>
> Q      You remember coming into the office of the U.S. attorney and giving some statements about your role and involvement in the case?
>
> A      Yes.
>
> Q      Did you come in more than once?
>
> A      Yes.
>
> Q      On the first time that you came in, in February of 2003, did you give the complete picture?
>
> A      No.
>
> Q      Why not?
>
> A      Because I felt some sympathy, I guess, for a few of the guys on the case.

Q       Who did you not tell about the first time
        around?

A       Mel.  Mel Dog.

Q       Alvin Green?

A       Yeah, Alvin Green.

Q       Did you – did you change your mind about that
        later?

A       Yes.

Q       And what did you – what did you say when you
        came back in the second time?

A       That it was a – I seen him with large amounts
        of money, guns, and drugs.

Q       And was that truthful?

A       Yes.

Q       And why hadn't you told us that the first time?

A       Like I said, I felt some sympathy towards him.
        I had been knowing him since I was young.  So
        I, you know, I felt like I didn't want to tell.

Answer at attachment 3; R. at vol. XXXIX (Trial to Jury, Day 6), 1254-55, Sept. 29,

2003).

        Although Mr. Green argues that the jury would have had a reasonable doubt as

to his guilt if his counsel pursued cross-examination of Mr. Davis and challenged his

credibility, there was sufficient other evidence that Mr. Green was involved with Mr.

Small in distributing drugs.  In affirming Mr. Green's conviction on appeal, the United

States Court of Appeals for the Tenth Circuit (Tenth Circuit) found that "[t]he trial

evidence showed that Green was a major source of supply for Small's drug operation,

that he traveled to California for the purpose of obtaining large quantities of drugs for Small, and that Small was dependent on Green to supply the operation." *Small*, 423 F.3d at 1183.

The Tenth Circuit's conclusion was based on more than Mr. Davis's testimony. His testimony was corroborated by the testimony of witnesses such as Keyonna Davis, Ms. Johnson, and Sandra Davis, as follows:

- Keyonna Davis testified that Mr. Small told her that he was "waiting" on Mr. Green for cocaine. R. at vol. XLII (Trial to Jury, Day 9), 1788-89, Oct. 2, 2003. She observed that Mr. Green would leave town and when he returned, she would have more crack at her house. *Id.* at 1791-92. She said Mr. Small gave money to Mr. Green for crack. *Id.* at 1804-05. Mr. Small told her he had to sell Mr. Green's drugs so he could get Mr. Green his money. *Id.* at 1805. Mr. Small also told her he got "a better deal" on the drugs from Mr. Green than from his other suppliers. *Id.* She saw Mr. Green with large amounts of money, and the wads of bills were so large they were "hard to hold." *Id.* at 1807.

- Ms. Johnson testified that she was present when Mr. Small and Mr. Green discussed "dope" that "Mel" (Mr. Green) got from California. R. at vol. LIV (Trial to Jury, Day 18), 3306, Oct. 24, 2003. Ms. Johnson knew that Mr. Small gave money to Mel, *id.* at 3307; that Mel went to California to pick up cocaine, *id.* at 3332; and that Mr. Small gave Mel "a grand" for drugs. *Id.* at 3334.

- Sandra Davis testified that she knew Mr. Green as "Mel"[1] and that he would ask her to make airline reservations for him to Los Angeles. R. at vol. XLVIII (Trial to Jury, Day 12), 2400, 2403, Oct. 9, 2003. Mr. Small told her that Mr. Green went to Los Angeles to find drugs. *Id.* at 2406. Sandra Davis used to clean house for both Messrs. Small and Green, and she testified that Mr. Small kept crack cocaine in a false-bottomed can of cleanser. *Id.* at 2376-77, 2395-96, 2407. She knew that Mr. Small took the can to Mr. Green's house. *Id.* at 2410.

- Brian Harris testified that on at least one occasion (he was not sure which), Mr. Green was with Mr. Small during a drug transaction that he

---

[1]This corroborates Mr. Davis's testimony that Mr. Green's nickname was "Mel" or "Mel Dog." *See* R. at vol. XXXIX (Trial to Jury, Day 6), 1248-49, Sept. 29, 2003.

(Mr. Harris), had with Mr. Small.  R. at vol. XLV (Trial to Jury, Day 10),
2023, Oct. 3, 2003.

The testimony of these witnesses, plus Mr. Davis's testimony, about Mr. Green's

drug-dealing activities was corroborated by telephone conversations between Messrs.

Green and Small that were intercepted on the government's wiretaps.  The wiretap

interceptions show the connection between Mr. Green's supply side of the drug

business and Mr. Small's distribution side.  The wiretap evidence admitted at trial

showed:

- Mr. Green took monthly trips to California to purchase cocaine.  R. at vol. XL (Trial to Jury, Day 7), 1406-07 (testimony of Mr. Davis), Sept. 30, 2003; ex. 921, ex. 154R at 5, ex. 180 at 2 (Mr. Green in California).

- When Mr. Green was out of cocaine, Mr. Small would deal with other, less reliable sources, such as cooperating witness Dwayne Van Dyke.  *See, e.g.*, ex. 398, where Mr. Small had to put off Sammy Woods, who wanted to buy drugs, stating that he was waiting for the drugs to arrive.  Mr. Small expressed his annoyance at Mr. Green's supply interruptions to Mr. Green himself, saying "I really don't wanna try to [expletive deleted] with Ian." Ex. 380 at 4.

- Mr. Small told Mr. Van Dyke not to bother with looking for alternate supplies of drugs when he knew Mr. Green was returning from California, where Mr. Green obtained kilogram quantities of cocaine.  In ex. 498 at 2, Mr. Small says, "I'm straight. . . . Mel got back . . . last night."

- Mr. Small told "Bobbie" to "tell him [Soul] I sent like 20, 20 large up to California . . . the same day that [expletive deleted] happened to him.  And I ain't retrieved my package yet, so my ends' tighter than a [expletive deleted]."  Ex. 590 at 3.  Trial testimony showed that a kilogram of cocaine, commonly referred to as a "chicken" or "bird," cost approximately $20,000.  R. at vol. LI (Trial to Jury, Day 15), 2868-69  (testimony of Steven Stanton), Oct. 21, 2003.  Mr. Small stated, "I got one and a half and another one on the way, referring to a kilogram as a 'bird.'" Ex. 194R at 11, 6.

- Mr. Small needed Mr. Green to supply drugs because some of his former suppliers, such as "Bear" and "YC," ran into legal problems and stopped coming to Colorado.  R. at vol. LIV (Trial to Jury, Day 18), 3306-08

(testimony of Ms. Johnson), Oct. 24, 2003.  *See also* R. at vol. XLIX (Trial to Jury, Day 13), 2547-49, Oct. 10, 2003, where Mr. Van Dyke testifies that Bear was a source of supply.  Mr. Van Dyke, also a supplier to Mr. Small, testified that he dealt with Mr. Green after Troy Anderson, another California source, "got indicted."  *See id.* at 2549-50.

- Mr. Small needed Mr. Green to return from California so he could continue the distribution side of the business:  "I want you to get back so bad cause . . . that thing gonna come up where it ain't nothing . . . we want to be able to take care of our business until it get back on."  Ex. 514 at 3.

- A statement Mr. Small made to Sandra Davis showed the close financial interdependence of Messrs. Green and Small:  "[M]an, I ain't got no money, [expletive deleted] I gave Mel all that money, and that [expletive deleted] me . . . because I . . . wanna make sure he's able to take care of his, if he can't take care of his end. . . . I sure can't take care of mine. . . so I try to get the money to him as fast as possible . . . [s]o that's why . . . I give him all that money at one time so that way he can get back and I'll still have some while he gone."  Ex. 530R at 4-5.

- Mr. Small told Zebedee Hall:  "I . . . went in with the home boy on this thing . . . he goes to California . . . I trust him . . . 'cause . . . [h]e always come back with the thing."  Ex. 536 at 3-4.

- Mr. Small told Mr. Davis:  "[W]e need to get somethin' goin', man. . . . Mel's still got work that we need to try to get to, . . . if he ain't downed it already."  Ex. 272 at 3.

- When Mr. Hall wanted two additional ounces, Mr. Small called Mr. Green to get some of his supply to sell to Mr. Hall.  Ex. 350 at 2.

- Mr. Small told Sandra Davis:  "Normally I do all that [unintelligible] . . . for his . . . . I can't even get away with what I got."  Ex. 248 at 3.

- Mr. Small told Shirley Davis:  "I got the little bit of [expletive deleted] that Mel gave me, but [expletive deleted] that [expletive deleted] gonna be gone and I don't think he got no more."  Ex. 342 at 11.

- Mr. Small told Sandra Davis that Mr. Green was taking longer than anticipated in California, stating: "he said he . . . wasn't complete with the job he went to do.  [Expletive deleted] wasn't there. . . . He gonna be there for a while I believe. . . . I told him how slow it was on my end and he said well it ain't gonna be slow long. . . . He said [expletive deleted] pop up but it be gone before ya know it."  Mr. Small explained:  "I think he [Mr. Green] get his kind a like half and half, half up front and half, you know cash.  So

whoever got the full cash is, most likely gonna be the one that get the package."  Ex. 182R at 7-8.

- Mr. Small wired money to Mr. Green (to a name different from his own) so Mr. Green could get cocaine.  Ex. 940 at 2-5.  Mr. Small tells Ms. Johnson he had to send money to Mr. Green for expenses, stating:  "[Y]ou know, I had to give Mel . . . a grand . . . but he need that to take care of our business up there and then come back."  Ex. 440 at 5.

- Mr. Green directed Mr. Small to send the expense money to a name different from his own in California.  Ex. 432 at 3, 6 (a May 26, 2001, wiretap call between Messrs. Small and Green, in which Mr. Green gives Mr. Small the name Dejon Durden to use in wiring money to him in Los Angeles through Western Union).  *See also* exs. 426 at 3, 436 at 2, 446 at 2, 448 at 2 (Mr. Green to Mr. Small: "Who did you sent it to?  To Dejon, right?"), 450 at 2, 452 at 2.  *See* R. at vol. LIII (Trial to Jury, Day 17), 3217 (testimony of Steven Stanton, Jr., in which he misstates the date of the wiretap call between Messrs. Green and Small as May 6, 2002, instead of May 26, 2001), Oct. 23, 2003.  Officer Stanton testified that, in May 2001, he had never heard of Dejon Durden, *id*.; the money probably was for transportation, not drugs, *id.* at 3218; and exhibit 472 at 2, dated May 29, 2001, a telephone conversation in which Mr. Small tells someone that "I'm still waiting on this fool to get back from California" and "he really don't even bring it back.  Somebody else bring it back." meant that the money probably would pay transportation expenses.

- Discussing Mr. Green's trips to California, Mr. Small said:  "[W]hen my dude gets back, I have work."  Ex. 472 at 5.  Mr. Small also discussed the risks and suspicions of the business – he doesn't know exactly when Mr. Green will return and does not seem to want to know "so if anything ever do happen, [expletive deleted] can't say, 'Well, Willie was the only one who knew.'"  *Id.* at 3.

Given the evidence of Mr. Green's drug-dealing activity, any error on the part of his counsel in failing to cross-examine Mr. Davis concerning inconsistent statements he allegedly made about Mr. Green's role in the drug distribution scheme would not have affected the outcome of the proceedings.  Mr. Green's claim of ineffective assistance of trial counsel fails to satisfy the prejudice prong of the *Strickland* test, and must be dismissed.  *See Rompilla v. Beard*, 545 U.S. 374, 405 (2005) (Kennedy, J., dissenting)

(noting that the defendant bears the burden of proving prejudice); *see also Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Claim Two

As his second claim, Mr. Green argues that his appellate counsel was ineffective in failing to raise meritorious issues on appeal.  He specifically alleges that his appellate counsel was ineffective for failing to argue the issue of severance, which was raised at trial, and for failing to argue the ineffective assistance of counsel at trial because of trial counsel's failure to request a special jury instruction as to drug quantities attributable to Mr. Green.

A.  Severance

Mr. Green contends that his appellate counsel was ineffective in failing to appeal the district court's denial of his "severance motion."  *See* supporting brief at 15.  However, he fails to identify the severance motion he filed, does not explain how I erred in denying the motion, and does not cite to an order he maintains his counsel should have appealed.  Instead, he cites to *Zafiro v. United States*, 506 U.S. 534, 539 (1993), for the proposition that a joint trial presented "the possibility that evidence of wrongdoing of a codefendant might be used by the jury to determine the guilt of the defendant," *see* supporting brief at 16, but fails to cite to specific evidence at trial that might have prejudiced him.  Once again, Mr. Green's conclusory allegations are insufficient to establish ineffective assistance of counsel.  *See Fisher*, 38 F.3d at 1147.  Nonetheless, because the government has responded to Mr. Green's allegations, I will too.

11

The Supreme Court has held that severance should be granted "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  However, "in a conspiracy trial it is preferred that persons charged together be tried together." *United States v. Scott*, 37 F.3d 1564, 1579 (10th Cir. 2004).  To overcome the presumption in favor of joint trials, a defendant must make "a strong showing of prejudice." *United States v. Evans*, 970 F.2d 663, 675 (10th Cir. 1992).  "Prejudice occurs when there is a serious risk that a joint trial [will] compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Edwards*, 69 F.3d 419, 434 (10th Cir. 1995) (internal quotation marks and citations omitted).  The potential for prejudice inherent in joint trials ordinarily can be addressed through limiting instructions. *Zafiro*, 506 U.S. at 539-40.

"Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance." *United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1986) (citations omitted); *see also United States v. Cardall*, 885 F.2d 656, 667-68 (10th Cir. 1989); *United States v. Colonna*, 360 F.3d 1169, 1178 (10th Cir. 2004).

Mr. Green fails to identify any specific evidence of a codefendant's "wrongdoing," *see* supporting brief at 16 (citing *Zafiro*, 506 U.S. at 539), that was admitted against him. Moreover, at trial, I gave instructions cautioning the jury to weigh the evidence against

12

each defendant separately.  Mr. Green has not provided any evidence suggesting that the jury was unable to follow these instructions:

- Instruction number 9 advised the jurors that "[i]n certain instances evidence was admitted only concerning a particular party or only for a particular purpose" and cautioned them against using the evidence "for any other purpose or against any party not specifically mentioned."  *See* R. at vol. LVIII (Trial to Jury, Day 22), 4123, Oct. 30, 2003.

- Instruction number 27 cautioned the jury:  "It is your duty to give separate and personal consideration to the case of each defendant."  The instruction required the jury to analyze the evidence with regard to each defendant, "leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants."  *Id.* at 4131.

- Instruction number 28 further cautioned the jury to consider separately the evidence and charges against each defendant and not to allow a verdict on one charge to "control your verdict as to any other offense charged against the defendant or against any other defendant."  *Id.* at 4132.

Mr. Green maintains that at the sentencing hearing, the government's attribution to him of over 50 grams of crack cocaine was based upon "tenuous links" made through "the testimony of persons in their own criminal trouble."  *See* supporting brief at 17.  Mr. Green's argument is misguided.  Count one of the second superceding indictment charged Mr. Green with conspiring to distribute and possess with intent to distribute crack cocaine "weighing more than fifty grams."  R. at vol. III, 1595 at 4.  The weight of the drugs was an element of the offense.  In order to render a guilty verdict, the jury was instructed it must find each element of the offense "as to each defendant."  R. at vol. LVIII (Trial to Jury, Day 22), 4134, Oct. 30, 2003.  Those elements were:

> 1.  That two of more persons agreed to distribute or to possess with intent to distribute crack cocaine;

> 2.  That the conspiracy involved 50 grams or more of crack cocaine;

13

> 3. That the defendant knew the essential objectives
> of the conspiracy;
>
> 4. That the defendant knowingly and voluntarily
> agreed to become involved in the conspiracy; and
>
> 5. That the alleged conspirators were interdependent.

*Id.*

As indicated above, element number 2 required the jury to find: "That the conspiracy involved 50 grams or more of crack cocaine." *Id.* Element numbers 3 and 4 required the jury to find that each defendant knew the essential objectives of the conspiracy and knowingly and voluntarily agreed to become involved in the conspiracy. *Id.* By rendering a guilty verdict, the jury found that the government proved that Mr. Green conspired to distribute and possess with intent to distribute 50 grams or more of crack cocaine. *See Small*, 423 F.3d at 1187 ( "The quantity of drugs was alleged in the indictment and found by the jury beyond a reasonable doubt."). The joint trial did not change the government's burden of proof. Mr. Green has failed to show either error or prejudice in my denial of a severance motion. Therefore, his appellate counsel did not act unreasonably by not raising the issue on appeal. *See Strickland*, 466 at 687.

### B. Trial Counsel's Failure to Request a Special Jury Instruction

Mr. Green also maintains that his appellate counsel was ineffective because he failed to argue on appeal that trial counsel was ineffective in failing to request a special jury instruction to determine the quantity of drugs attributable to him. *See* supporting brief at 15, 17-18. However, claims of ineffective assistance of counsel ordinarily should not be brought on direct appeal. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) ("Ineffective assistance of counsel claims should be brought in

collateral proceedings, not on direct appeal.  Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed.").

Even construed as a claim of ineffective assistance of trial counsel, the claim is without merit.  As previously discussed, the jury was required to find the quantity of drugs attributable to Mr. Green.  His trial counsel, therefore, could not have been ineffective in failing to seek a special jury instruction.  *See Strickland*, 466 at 687.

### III.  Conclusion

For the reasons stated above, the motion to vacate pursuant to 28 U.S.C. § 2255 will be denied.  Accordingly, it is

ORDERED that the motion to vacate pursuant to 28 U.S.C. § 2255 is **DENIED** and the action is **DISMISSED WITH PREJUDICE**.  It is

FURTHER ORDERED that each party shall bear his or its own costs and attorney's fees.

Dated:  September 3, 2009

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge